**UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

FRANCIS GATES, ET AL.,

Plaintiffs,                                           CIVIL ACTION FILE

                                                      NO.  CA 06-1500

v.

SYRIAN ARAB REPUBLIC ET AL.,

Defendants.

<u>**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**</u>

I.    <u>**INTRODUCTION**</u>

        This action seeks damages for acts of state-sponsored terrorism that resulted in the

kidnapping, torture, and murder of two Americans: Olin Eugene "Jack" Armstrong

(hereinafter "Jack Armstrong") and Jack L. Hensley ("Jack Hensley").  The gruesome

murders of these men were carried out by terrorists operating in Iraq with material aid

and support from the Defendants: the Syrian Arab Republic (hereinafter "Syria"); the

Syrian president, Bashir al-Assad; the Al-Mukhabarat Al-Askariya or Syrian Military

Intelligence; and Syria's Director of Military Intelligence, General Asif Shawkat.  Acting

through its principals, including the named individual Defendants, Syria provided

material support and resources, aided and abetted and conspired with the al-Tawhid wal-Jihad and its leader, Abu Mus'ab al-Zarqawi ("Zarqawi"). Syria intended such support for Zarqawi and his terrorist network to promote torture, hostage taking, and extrajudicial killings of American citizens and Iraqi civilians. As a totalitarian, Ba'athist state, Syria's goal in supporting acts of sensational barbarity was to prevent the establishment of a neighboring democratic state in post-Saddam's Iraq. Syria believed the establishment of a neighboring democratic state would be antithetical to the interests of its totalitarian, Ba'athist regime.

## II.    **STATEMENT OF THE CASE**

Plaintiffs bring this action pursuant to the provisions of the Foreign Sovereign Immunities Act, ("FSIA"), codified at 28 U.S.C. § 1602, *et seq.* Defendants were served with process on October 27, 2006.[1] Though served, none of the Defendants have answered. The Court proceeded to a default setting as provided by 28 U.S.C. § 1608(e):

> A court shall not enter a default judgment against a foreign state "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 232, 2003 WL 21495185 (D.C. Cir. 2003). This "satisfactory to the court" standard is identical to the standard for entry of default judgments against the United States in Federal Rule of Civil Procedure 55(e). *Hill v. Republic of Iraq*, 328 F.3d 680, 684 (D.C. Cir. 2003). In evaluating the plaintiffs' proof, the court may "accept as true the plaintiffs' uncontroverted evidence." *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 100 (D.D.C. 2000). In FSIA default judgment proceedings, the plaintiffs may establish proof by affidavit. *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002).

---

[1] Service upon each of the Defendants was perfected under 28 U.S.C. § 1608(a)(3) through delivery of the required documents (translated to Arabic) to an employee and agent of Defendants via international courier service, evidenced by a signed return-receipt dated October 27, 2006. Gates v. Syrian Arab Republic, CA 06-1500, docket #17 (RMC) (D.D.C. filed December 28, 2007).

<u>Campuzano v. Islamic Republic of Iran</u>, 281 F. Supp. 2d 258, 268 (D.D.C. 2003). In a default setting, therefore, the Plaintiffs' burden of proof is "evidence satisfactory to the court." <u>Id.</u> All uncontroverted evidence is acceptable as proof. <u>Id.</u>

A three-day hearing on liability and damages was held beginning January 7, 2008. At trial, this Court accepted evidence in the form of live testimony, videotaped testimony, affidavit, and original documentary and videographic evidence. The Court applied the Federal Rules of Evidence. The Court also accepted credible expert testimony from four well-qualified experts on various specialties related to the issues in this matter.[2] Plaintiffs established their claim to relief by "evidence that is satisfactory to the Court" as required by 28 U.S.C. § 1608(e). This Court finds the following facts were established by Plaintiffs.

## III.    <u>FINDINGS OF FACT</u>

As a country, Syria has a long history of providing material aid and support to terrorist organizations, including the terrorist network led by Zarqawi that claimed

---

[2] Evan Kohlmann gave expert testimony on the history, infrastructure, and the use of the internet as a medium for the distribution and dissemination of propaganda by Zarqawi and his terrorist network. (Kohlmann, T-1-14). He has given prior expert testimony regarding these issues in numerous federal trials and in Europe. (Kohlmann, T-1-23). His expert opinion was based upon original evidence collected and archived by Kohlmann—principally from 2003 through 2006—from particular internet websites which are original and distinct sources of information from Abu Musab al-Zarqawi and his terrorist network in Iraq. (Kohlmann, T-1-25).        Dr. Matthew Levitt formerly worked in counter-terrorism at posts with the Federal Bureau of Investigation and the U.S. Treasury and is now a director of Counter Terrorism Intelligence Studies and Senior Fellow at the Washington Institute of Near East Policy. He has given expert testimony in federal trials regarding the financing of terrorist groups and to both Houses of Congress 2-3 times regarding Syrian sponsorship of terrorism. (Levitt, T-1-114-116). Among many scholarly works in his field, he has written a book that discussed Syrian state sponsorship of terrorism and articles regarding Zarqawi's terrorist network and its connections to Syria. (Levitt, T-1-114, 115).

Dr. Marius Deeb is a professor at the Johns Hopkins School of Advanced International Studies and has, for more than thirty years, studied, written and taught about Islamic politics, the Syrian regime, and Syria's state support for terrorism as an instrument of its foreign and domestic agenda. (Deeb, T-1-62-64).

David Schenker formerly served as the senior policy advisor to the Secretary of Defense on matters related to Syria, Jordan, Lebanon and Palestinian affairs from 2002-2006. (Schenker, T-1-79). He is now the director of Arab politics at the Washington Institute, (Schenker, T-1-81), and a member of the Council on Foreign Relations. (Schenker, T-1-84).

responsibility for the kidnapping, torture and murder of Jack Armstrong and Jack Hensley. In 2004, Syria regarded Zarqawi's terrorist network as indispensable for Syrian interests in the Middle East.

The government of Syria conspired with Zarqawi and his terrorist network to kill and injure U.S. citizens and Iraqi civilians through acts of barbaric terrorism and aided and abetted Zarqawi's efforts to do so. The terrorist attacks were a means to an end: Syria believed that dramatized acts of sensational barbarity would prevent the establishment of a democratic state in neighboring post-Saddam Iraq. By fully supporting Zarqawi's terrorist operations, Syria calculated to gain prestige and stature among radical elements in the Arab and Islamic worlds. Terrorists like Zarqawi[3] were a means to this end.

## A.    SYRIAN SUPPORT FOR ZARQAWI AND HIS TERRORIST ORGANIZATION

Syrian support for Zarqawi's terrorist network was critical in 2002-2005 because Syria was the critical geographic entry point for Zarqawi's fighters into Iraq. (Levitt, T-1-127).[4] Syria served as a "logistical hub" for Zarqawi's terrorist network, in the words of European investigators. (Levitt, T-1-119, 127). There are several ways in which Defendants gave material aid and support so as to be legally and civilly responsible for damages suffered by the Plaintiffs. The types of support Zarqawi and his organization received from Defendants fall into several categories: (1) facilitation of transportation of

---

[3] Syria's support for, and use of, terrorism for its political objectives predates 2002 and Iraq, specifically. Syria is regarded as a long-time foe of the peace process in the Middle East and has promoted terrorism as an extension of its domestic and diplomatic agenda. (Deeb, T-1-65, 66).

[4] The format for citations to the trial transcript is as follows: (Levitt, T-1-120) is a reference to Dr. Levitt's testimony from the trial transcript on day 1, or meaning from volume 1 of the trial transcripts, found at page 127. Ex. 44 refers to the exhibit 44, entered into evidence during the three day hearing.

terrorists into Iraq; (2) harboring and providing sanctuary to terrorists and their

operational and logistical supply network; (3) facilitating recruitment and training of

Zarqawi's followers; and (4) financing Zarqawi and his terrorist network in Iraq.  Finally,

the individual Defendants authorized the provision of this support and resources within

the scope of their official duties.

1.    FACILITATION OF TRANSPORTATION OF TERRORISTS INTO IRAQ

1.  The Syrian government and the Syrian intelligence service provided active assistance

   to Zarqawi and his network in Iraq including the assisting in transporting operatives,

   including high-ranking operatives, across the border into their first military training

   camp.  (Kohlmann, T-1-53).  In late 2003 a Syrian intelligence officer named Abu

   Moaz transported senior Al-Qaeda leaders across the border into a training camp near

   Rawha in Iraq.  (Kohlmann, T-1-54).  This camp was significant because it is the

   training camp where almost all of Zarqawi's senior officers who led his network in

   2003-2004 were trained.  (Kohlmann, T-1-54).

2.  The Syrian government provided assistance to facilitate the movement of terrorists

   through Syria for Zarqawi's terrorist network.  (Abu Massoquoi Depo. Transcript, 20-

   23).[5]

3.  Syria allowed insurgents to arrive without restriction into the Damascus airport and in

   significant numbers (Schenker, T-1-98), before continuing their journey across the

   border and into Iraq. (Schenker, T-1-94, 99).  "This wasn't an underground railroad;

---

[5] Sheikh Abu Massoquoi is an officer in a security company that operates in Iraq and is under contract with the American military.  (Abu Massoquoi Depo. Transcript, 13-15).  As part of its operations, the company maintains an intelligence-gathering network.  (Abu Massoquoi Depo. Transcript, 15).  In his capacity as the second highest rank within the security company, Sheikh Massoquoi acquired knowledge and information regarding the relationship between the Syrian government and Al Qaida in Iraq.  (Abu Massoquoi Depo. Transcript 16).

this was being done with a full recognition and support of the government of Syria."
(Schenker, T-1-95, 96).

4.  Travel inside Syria is closely regulated by the government when it so chooses.

5.  Syria provided Zarqawi, a Jordanian national, with a Syrian passport, which it gives
    to leading terrorists that are part and parcel of its network of terrorism.  (Deeb, T-1-
    75).

6.  Zarqawi fled Afghanistan to Iran in 2002 but was arrested by the Iranians.  (Deeb, T-
    1-75).  Iran however is an ally of Syria and so Iran released Zarqawi because he had a
    Syrian passport.  (Deeb, T-1-75).

7.  A major transit point that supplied foreign fighters to fight in Iraq was located across
    the street from the US embassy in Damascus.  (Schenker, T-1-87).  Foreign fighters
    would line the street to sign up at this office to get on a bus and go to Baghdad.
    (Schenker, T-1-88).  The street the U.S. embassy is located on is heavily guarded and
    regulated by the Syrian military.  (Schenker, T-1-88).  The terrorist recruitment office
    was therefore necessarily under the command and control of the Syrian government.

8.  Ted Kattouf, the U.S. Ambassador to Syria, complained to the Syrian government so
    much that they closed the office and relocated it to the Damascus fairgrounds, which
    are owned and operated by the Syrian government.  (Schenker, T-1-88).  This move
    further demonstrated the command and control of the Syrian government over the
    terrorist recruitment office.

9.  In testimony to Congress, Deputy Secretary Wolfowitz read from three passports of
    insurgents killed in Iraq, which were stamped by Syrian officials with a stamp that

read these people are allowed into Iraq to support the insurgency and to "aid our

brothers in Iraq." (Schenker, T-1-90).

10. Congress passed the Syria Accountability Act in 2003,[6] which sanctioned the Syrian

government for, among other things, seeking to destabilize Iraq. (Schenker, T-1-91).

Among Congress's findings in the Act were that "[o]n April 13, 2003, Secretary of

Defense Donald Rumsfeld charged that 'busloads' of Syrian fighters entered Iraq

with 'hundreds of thousands of dollars' and leaflets offering rewards for dead

American soldiers." 117 Stat. at 2485. The Act states that it is the "[s]ense of

Congress that":

> (2) the Government of Syria should--
> (A) <u>immediately and unconditionally stop
> facilitating transit from Syria to Iraq of individuals,
> military equipment, and all lethal items</u>, except as
> authorized by the Coalition Provisional Authority or a
> representative, internationally recognized Iraqi
> government;
> (B) <u>cease its support for "volunteers" and
> terrorists who are traveling from and through Syria into
> Iraq to launch attacks</u>; and
> (C) undertake concrete, verifiable steps to deter
> such behavior and control the use of territory under
> Syrian control;

117 Stat. at 2486 (emphasis added).

11. Senior officials of the U.S. government made official demarches to the Syrian

government to cease its support of the insurgency from 2003-2005. (Schenker, T-1-

92).

12. The Syrian government had been able to exercise tight control over its border with

Iraq when Saddam Hussein was in power. The border was very well-secured at that

time. (Schenker, T-1-93). In 2003 and 2004 the Syrians minimized the presence of

---

[6] P.L. 108-175, 117 Stat. 2486 (2003).

their troops on the border to allow unrestricted flow of terrorists through Syria into Iraq. (T-1-94). When individuals seeking to pursue jihad would cross the Syrian border, Syrian border guards would deliberately look the other way because they perceived it to be to Syria's advantage to allow the crossings. (Kohlmann, T-1-53).

13. Large numbers of insurgents were arriving in Syria via the airport in Damascus. Though Damascus airport is one of the most tightly-controlled locations in Syria, (Schenker, T-1-94), Syria did <u>not</u> require a visa for Arab males or females until 2006 or 2007. (Schenker, T-1-94). The U.S. government requested Syria to require a visa for Arab male and females transiting through Syria but Syria refused until recently. (Schenker, T-1-95).

14. The Damascus airport was the chokepoint for the insurgency in Iraq because large numbers of foreign fighters entered Syria through the airport from other Arab countries. (Schenker, T-1-99). It was critical for the insurgency that foreign fighters were able to pass through the airport without constraint. (Schenker, T-1-99).

15. The Syrian government places many controls over the internal movement of persons inside Syria. (Schenker, T-1-98). At one time, one could not travel by bus inside Syria without first showing an ID and having the destination noted. (Schenker, T-1-99). The government requires special permission to travel to areas it designates as sensitive. (Schenker, T-1-99). For example, today, the government requires special permission for anyone to travel to Kamishli, an area of the border near Iraq, or Kunetra, which is an area of the border near Israel. (Schenker, T-1-99). The government maintains roadblocks and periodic stops to keep track of where its people are traveling. (Schenker, T-1-99).

16. An open border was important to the insurgency because the majority of foreign fighters were transiting into Iraq through Syria, with the full recognition and support of the government of Syria. (Schenker, T-1-95).

17. The movement of large numbers of military age men through the country would have been known by the military intelligence, General Shawkat and President Assad. (Deeb, T-1-74). The regime, which seeks to maintain a monopoly on violence in order to control the country, would monitor flows of military age men very carefully in case they may present a threat. (Schenker, T-1-100).

18. The movement of the large number of foreign fighters requires a large number of vehicles traveling back and forth to the border, which was directly facilitated by the Syrian government. (Schenker, T-1-97).

   2.   HARBORING AND PROVIDING SANCTUARY TO TERRORISTS AND THEIR OPERATIONAL AND LOGISTICAL SUPPLY NETWORK

19. Zarqawi's terrorist network benefited from safe haven on Syrian territory. (Levitt, T-1-119). Zarqawi maintained a logistical support network on Syrian soil, which provided among other things a steady flow of fighters, and created relationships with other Syrian supported terrorist organizations including Hezbollah. (Levitt, T-1-119, 122).

20. The logistical support network included operatives in Syria who facilitated the movement of foreign fighters through Syria into Iraq, including the financing of this movement. (Levitt, T-1-120). European investigators called Syria a "transportation hub" for Zarqawi's network. (Levitt, T-1-123).

21. Relationships between Zarqawi's group and Hezbollah and other groups would not have been possible without Syrian authorization. (Levitt, T-1-125). Such

relationships enable both groups to leverage each other's various knowledge, expertise and capabilities. (Levitt, T-1-125).

22. The Zarqawi network conducted terrorist attacks from inside Syria. (Levitt, T-1-119).

23. Zarqawi was physically located in Syria when U.S. AID official Lawrence Foley was assassinated in Jordan in 2002. (Deeb, T-1-75). Zarqawi organized the plot to assassinate Mr. Foley. (Deeb, T-1-75), (Levitt, T-1-120-121). Zarqawi operatives received training and weapons in Syria for use in the attack. (Levitt, T-1-121).

24. The "money-man" for the operation was a Zarqawi supporter named Shakr Absi, who was located in Syria when he funded the attack. (Schenker, T-1-100, 102). The Jordanian government tried Absi and sentenced him to death in abstensia. (Schenker, T-1-101). In 2002 Absi fled to Damascus and the Jordanian government requested his extradition, which was refused. (Schenker, T-1-101). The Syrian government protected him, claiming he was under detention while he was actually running a training camp in Syria for terrorists headed to Iraq. (Schenker, T-1-101).

25. In 2004, another Zarqawi plot was headed by an operative named Jayousi and was intended to destroy the Jordanian intelligence headquarters with a chemical bomb that could have killed 100-160,000 people in Jordan. (Schenker, T-1-102), (Levitt, T-1-121). The Jayousi cell was organized and found logistical support in Syria. (Schenker, T-1-102). Members of the Jayousi cell were detained by Syrian border guards but then released to allow them to continue into Jordan, where they were captured. (Schenker, T-1-102).

26. Sulieman Khalid Darwish was one of the highest ranking members of the Zarqawi network and was resident in Syria. (Levitt, T-1-121, 122). He oversaw

communications between the Jayousi cell and the members of Zarqawi's network inside Syria in 2004.

27. Darwish was a member of Zarqawi's shura, or advisory counsel, and was thought to be his designated successor. (Levitt, T-1-123). After the U.S. government designated Darwish as a terrorist in January 2005,[7] Syria did nothing to interfere with him prior to his death six months later. (Levitt, T-1-123). Darwish could not have operated inside Syria without the support and acquiescence of the Syrian government. (Levitt, T-1-125).

28. In 2003 Deputy Secretary of Defense Paul Wolfowitz testified to Congress regarding Syria's decision to grant safe haven to 12 top Iraqi insurgent leaders. (Schenker, T-1-90). The list was shared with Syria but it refused to take action. (Schenker, T-1-90).

        3.    FACILITATING RECRUITMENT AND TRAINING OF ZARQAWI'S FOLLOWERS

29. Recruits for the Zarqawi network came to Syria where they were trained, provided with weapons and money and then funneled into Iraq. (Deeb, T-1-67, 74, 75). Mosques in Syria provided militants with the ideological fire needed for recruitment. (Deeb, T-1-75).

30. In 2003, a militant preacher on the Syrian government payroll named Abu Qaqa was known to actively recruit terrorists for the Zarqawi network. (Schenker, T-1-103).

31. Al Qaida members who were captured by Abu Massoquoi's security company confessed to receiving training at Al Qaida camps located within Syria. (Abu Massoquoi Depo. Transcript, 24).

---

[7] The Department of Treasury designation stated: "[t]he U.S. Department of the Treasury took action against an individual named Sulayman Khalid Darwish, who is located in Syria. Darwish was designated under Executive Order 13224 for providing financial and material support to the al-Zarqawi Network and al Qaida." http://treas.gov/offices/enforcement/archive.shtml

32. According to Abu Massoquoi, Zarqawi and Al Qaida would not be effective operationally in Iraq without Syria's assistance. (Abu Massoquoi Depo. Transcript, 20).

33. Because Syria has been a centrally-controlled police state, the Syrian government has knowingly acquiesced and approved the aid and support to Al Qaida. (Abu Massoquoi Depo. Transcript, 27-28).

>  4.  FINANCING AND SUPPORTING ZARQAWI AND HIS TERRORIST NETWORK IN IRAQ

34. Fawzi Al-Rawi was appointed to be the head of the Iraqi wing of the Syrian Ba'th party by President Assad. (Levitt, T-1-125). Under Al-Rawi's direction, this group provided funds to Zarqawi's network. (Levitt, T-1-125-126).

35. Al-Rawi met with Zarqawi's lieutenants to discuss operations against the Americans, recruited suicide bombers, and provided funding and weapons to Zarqawi's organization. (Levitt, T-1-126).

36. Al-Rawi could not have operated in this manner without authorization from Assad and Shawkat. Al-Rawi actually received a salary from the Syrian government and had close ties with the Syrian military intelligence. (Levitt, T-1-126).

>  5.  DEFENDANTS' AID AND SUPPORT FOR ZARQAWI WAS WITHIN THE SCOPE OF THEIR OFFICIAL DUTIES

37. Support for terrorist groups has been part and parcel of Syrian foreign policy since the 1970s. (Deeb, T-1-65). Syria has often supported terrorist groups in order to destabilize the Middle East peace process, beginning in 1974 onward, as it served the interests of the regime. (Deeb, T-1-65, 66). To that end, Syria has supported terrorist organizations such as Hamas, Palestinian Islamic Jihad and Al-Qaeda.

38.  Syria supported Zarqawi and his terrorist organization because Syria wanted to destabilize Iraq and prevent the U.S. from succeeding there.  (Deeb, T-1-65) (Schenker, T-1-86).

39. Syria wanted to prevent the replacement of a fellow Ba'athist regime in Iraq with a democratic, pro-western government supported by American troops.  (Schenker, T-1-86, 87).  Thus, Syria wanted the U.S. to fail in Iraq to extend Syria's influence over whatever diplomacy or bargaining would occur in such an event.  (Deeb, T-1-66).

40. In 2003 the foreign minster of Syria stated publically that it was in Syria's interest to see the American invasion of Iraq fail.  (Schenker, T-1-87).

41. Support for Zarqawi and his network from Syrian territory or Syrian government actors could not have been accomplished without the authorization of the Syrian government.  (Deeb, T-1-67).  Syria is a "world-class" police state with a dozen intelligence networks spying on its own people, as well as each other.  (Deeb, T-1-67-68) (Schenker, T-1-96). The effectiveness of Syria's intelligence networks resembles the Stasi spy system that operated in East Germany.  (Deeb, T-1-67).  Nothing that happens within the country of any political significance is unknown to the government.  (Deeb, T-1-68).

42. The government of Syria is a paranoid regime.  The regime's highest priority is staying in power.  (Schenker, T-1-100).  The government, founded in 1970 by the father of current President Bashir Assad, is controlled by a minority religious sect called the Alawi, which is 11% of the country's population.  (Deeb, T-1-68)  Because such a small percentage of people control the country, they fear the democratic process and instead base their supremacy upon their control of the army and

intelligence services.  (Deeb, T-1-68).  The dominant clan therefore controls all the means of violence and intelligence information in society despite lacking popular support.  (Deeb, T-1-69).

43. The Alawi clan, which is the dominant clan in the country, suffered persecution in the Middle Ages as a minority, which contributes to a clannish outlook among its members.  (Deeb, T-1-69).  This clannishness is utilized to centralize control over the means of violence in Syria, by assigning control of the military and intelligence to the kin of President Assad.  (Deeb, T-1-69).

44. The Syrian government closed down the facebook.com website in Syria because it feared lack of control over a website where young persons congregate online on the internet to socialize.  (Schenker, T-1-97).

45. The Syrian Military Intelligence, al-Mukhabarat al-`Askariya, has the portfolio for control over terrorist groups such as Hamas, Al Qaeda or Zarqawi.  (Deeb, T-1-70). It is the most important intelligence organ in Syria, but coordinates with the other agencies.  (Deeb, T-1-72).

46. The most powerful individuals in Syria are President Assad and his brother-in-law Asif Shawkat, who absolutely controls the military intelligence.  (Deeb, T-1-70).

47. President Assad is very close to Shawkat, who is married to Assad's sister, who is a power in her own right.  (Deeb, T-1-71).  As head of military intelligence, Shawkat is privy to all intelligence of any importance.  (Deeb, T-1-71).  The relationships between figures such as Shawkat and Assad, who are at the top of the Syrian political hierarchy, are very important to the survival of the regime, which rests its legitimacy

over its control over intelligence and the military, and depends on these relationships among clansmen to maintain that control.  (Deeb, T-1-71).

48.  Shawkat shares all important intelligence information with Assad.  (Deeb, T-1-72).  Decisions of any political or security importance that may affect the regime's survival can not be made without the explicit authorization of Assad and Shawkat.  (Deeb, T-1-72, 73).

49. That Syria's support of Zarqawi was continuous and consistent for an extended period of time preceding September of 2004 shows the extent of Defendants' approval and support of Zarqawi's methods.  Without the protection and logistical support his organization and followers received from Defendants, Zarqawi would not have been able to execute operations within Iraq such as one that would involve kidnapping, hostage-taking, and murder of Americans like Armstrong and Hensley.

## B.    THE MURDER OF JACK ARMSTRONG AND JACK HENLSEY BY ZARQAWI AND HIS TERRORIST NETWORK

50. In September of 2004, Jack Armstrong and Jack Hensley were non-combatants, employed by a private sub-contractor as civilian project managers in Baghdad, Iraq.  Their employer was part of an American consortium providing support and logistical services pursuant to contracts with the Defense Department and/or United States Air Force.  These men were not hired to act as armed security forces or bodyguards.  Jack Armstrong's and Jack Hensley's responsibilities included providing technical and operational assistance and resources for the military in non-combat environments in Iraq.  At the time of their kidnapping, they lived in Iraqi residential housing.  The

house was two levels with a gated wall surrounding it.  In mid-September of 2004, terrorists led by Zarqawi seized the men.

51. Zarqawi's terrorist organization in Iraq published propaganda on the Internet that glorified its acts of terrorism, mayhem and murder.  (Kohlmann, T-1-26, 30).

52. Zarqawi's terrorist organization began issuing claims of responsibility for grotesque acts of terrorist violence in Iraq beginning with the videotaped beheading of American businessman, Nicholas Berg, in spring of 2004.  (Kohlmann, T-1-26, 47).

53. In communiqués that were consistently formatted in the same way and presented through the same, known Zarqawi propaganda mouthpieces in online web forums that were well-known repositories of Zarqawi messages and propaganda, (Kohlmann, T-1-36), strikingly similar videos were released, promoted and then redistributed across the internet by sympathizers of Zarqawi for the purpose of celebrating in graphic depiction the brutal treatment of Jack Armstrong and Jack Hensley.  (Kohlmann, T-1-60).  These videos remain online for viewing today by anyone with internet access, including the family members of those tortured and murdered by Zarqawi.

54. U.S. government contractors Ken Bigley, Jack Armstrong and Jack Hensley were all kidnapped in Iraq in September, 2004.  Shortly afterward, on September 18, 2004 a video was released online that showed the three hostages blindfolded and held captive by armed terrorists. (Kohlmann, T-1-35, 36).  The video was disseminated in an online web forum that was a well-known repository of authentic messages from the Zarqawi terrorist organization.  (Kohlmann, T-1-36).

55. The videos prominently displayed the logo for Zarqawi's terrorist organization, a logo not used by any other terrorist group.  (Kohlmann, T-1-38).

56. On September 20, 2004, a message was released in the same online web forum where Zarqawi messages and videos had been posted previously, which announced the murder of one of the hostages.  (Kohlmann, T-1-38, 39).

57. A video, which was remarkably similar in format and production to the previous Zarqawi terrorist organization videos, was released later the same day in the same online web forum where Zarqawi messages and videos had been posted previously.  (Kohlmann, T-1-40).  The video depicted the gruesome murder of Olin Eugene "Jack" Armstrong by beheading.  (Kohlmann, T-1-40).

58. On September 21, 2004, a message was released in the same online web forum where Zarqawi messages and videos had been posted previously, which announced the murder of a second hostage.  (Kohlmann, T-1-43).

59. A video, which was remarkably similar in format and production to the previous Zarqawi terrorist organization videos, was released later the same day in the same online web forum where Zarqawi messages and videos had been posted previously.  (Kohlmann, T-1-45).  The video depicted the gruesome murder of Jack Hensley by beheading.  (Kohlmann, T-1-45).

60. There has never been any dispute as to who killed Jack Armstrong or Jack Hensley or a competing claim of responsibility by another terrorist group.

61. After the murders, a number of critics in the Muslim world argued that it was cowardly to behead civilian hostages.  (Kohlmann, T-1-47).  A response issued from Zarqawi's terrorist organization defending the practice from the same online forum user that had posted the previous messages announcing the beheadings and the beheading videos themselves in the same online web forum.  (Kohlmann, T-1-47).

62. The testimony of Mr. Kohlmann established that a series of video postings containing visual images of the victims and their beheadings were authenticated as coming from Muntada al-Ansar, a notorious website forum trafficked by supporters of Zarqawi and members of his terrorist organization in Iraq.  See Video Exhibits 47 (live hostages); Ex. 40 (Murder of Armstrong); Ex. 44 (Murder of Hensley).  Also authenticated by Kohlmann were a series of communications promoting, and claiming responsibility for, the beheadings of Armstrong and Hensley, as well as a British national, Kenneth Bigley.  (Exs. 34, 35, 36, 38, 39, 41, 42).  Each of these communiqués was identified as consistently originating with someone identified as Abu Maysarah al-Iraqi, who is regarded as both a credible associate of Zarqawi and as an official spokesperson for Zarqawi's organization in Iraq.  (Kohlmann, T-1-29, 31).

63. Mr. Kohlmann's testimony also established that Zarqawi's terrorist network in Iraq began issuing serial claims of responsibility for grotesque acts of terrorism in Iraq beginning with the videotaped beheading of American businessman, Nicholas Berg, in spring of 2004,. (Kohlmann, T-1-26, 47).  In communiqués that were consistently formatted and presented, (Kohlmann, T-1-36), similar videos were promoted, released, then redistributed by sympathizers of Zarqawi for the purpose of celebrating and graphically depicting the brutal treatment of these men, including Mr. Armstrong and Mr. Hensley. (Kohlmann, T-1-60).

64. In the State Department's official description of the murder of Jack Armstrong and Jack Hensley, Country Reports on Terrorism 2004, p. 111, U.S. Dept. of State, (Ex. 27), it is stated that Zarqawi's terrorist organization claimed responsibility for the murders.  (Levitt, T-1-118).

65. The events of September of 2004 were not the first time Zarqawi staged barbaric killings of Americans in Iraq. Nor were the deaths of Mr. Armstrong and Mr. Hensley the first time that Zarqawi sensationalized grotesque and inhuman murders as a propaganda tool. Several months before, in April of 2004, Zarqawi kidnapped Nicholas Berg, an American businessman in Iraq. As he would do with Mr. Armstrong and Mr. Hensley, Zarqawi beheaded Berg and published a videotape of the infamous act.

66. Even after the publicized beheading of Mr. Berg in May of 2004, Defendants' support of Zarqawi did not abate rather, it increased. (Levitt, T-1-127)

67. The execution videos of Mr. Armstrong and Mr. Hensley follow roughly the same pattern. The videos depict the American men blindfolded and sitting on the ground. Their hands appear bound behind their backs. The terrorists stand immediately behind the sitting Americans, their faces concealed by black hoods. Several brandish assault rifles. The leader, presumably Zarqawi himself, reads a polemic statement in Arabic. As their captors read, Armstrong and Hensley are visibly in fear of their lives. One can discern the anxiety and fear experienced by the victims from the videotape both audibly (soft wimpering) and visibly (rocking back and forth nervously). When the reading is finished, the leader produces a knife.

68. Grabbing the men from behind in both videos, the leader begins sawing at the necks of the Americans. The victims cry out in agony. They are forced to the floor. The video footage records awful sounds: painful screams, labored breathing, even the frenzied action of the knife. The men's muffled screams become hoarser, presumably as their necks and throats sustain damage. Though the elapsed time on the video lasts

for less than a minute, the medical testimony suggests such a clumsy decapitation would have taken several minutes at a minimum, (T-2-69), raising the question of whether the video may have been edited.  Copious blood and gore is shown.  At the conclusion of the both of the execution videos, the decapitated heads of Armstrong and Hensley are displayed.[8]

69. The horrific sights and sounds of the videos have but one clear purpose--terrorism. The purpose was to glorify acts of terrorism, mayhem and murder.  Posted to the internet, the awful videos were used to rally others to the cause of the terrorists and, of course, to terrorize their enemies.  Zarqawi's group Al-Tawhid wal-Jihad claimed responsibility for the beheadings of Jack Armstrong and Jack Hensley.[9]  Using the internet, the terrorists published video footage of the murders for propaganda purposes. (Kohlmann, T-1-25).  Zarqawi and al-Tawhid wal-Jihad murdered these men and exploited their horrifying deaths in order to terrorize and further embarrass the United States.

## IV.     CONCLUSIONS OF LAW

### A.  THE COURT MAY ASSERT SUBJECT MATTER JURISDICTION OVER THIS CASE

The Defense Authorization Act for Fiscal Year 2008, ("Defense Authorization Act"), Section 1083, Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338-344 (2008) revised the framework under which state-sponsored terrorism cases are brought by substituting

---

[8] Both men's remains were recovered after finding them dumped in various locations in Baghdad.

[9] Since 2005, it has been the official position of the United States government regarding Zarqawi that his group, also known as Al-Qaida in Iraq, "claimed responsibility for the videotaped execution by beheading of Americans Nicholas Berg (May 8, 2004), Jack Armstrong (September 20, 2004), and Jack Hensley (September 21, 2004)."  Country Reports on Terrorism 2004, U.S. Department of State, Office of the Coordinator for Counterterrorism, 111 (April 2005) (Ex. 27).

28 U.S.C § 1605A in place of 28 U.S.C. § 1605(a)(7), among other revisions.  The Court

ruled on February 27, 2008 that Plaintiffs may proceed under 28 U.S.C § 1605A.  <u>Gates</u>

<u>v. Syrian Arab Republic</u>, docket #27 (RMC) (February 27, 2008).  The requirements for

the Court to assert its subject matter jurisdiction[10] over this case have not changed.[11]  <u>See</u>

28 U.S.C § 1605A(a)(1), (a)(2).  The subject matter jurisdiction provision of the new

terrorism provision differs from the old subject matter jurisdiction provision of the state-

sponsored terrorism subsection principally in the scope of victims who may bring suit

under the exception to foreign sovereign immunity, which is not an issue in this case.

The requirements for subject matter jurisdiction under 28 U.S.C. § 1605A allow

Plaintiffs to seek money damages for personal injury or death if the damages were caused

by:

---

[10] The substitution of 28 U.S.C § 1605A for 28 U.S.C. § 1605(a)(7) does not change the Court's test for subject matter jurisdiction, which is clear upon a comparison of the two statutory provisions.  Subsection (a)(1) states that "a foreign state shall not be immune from suits in which money damages are sought against the foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee or agent of such foreign state while acting within the scope of his or her office, employment or agency."  Aside from the expansion of the class of potential claimants, this language matches the language from 28 U.S.C. § 1605(a)(7), the former section that established the Court's subject matter jurisdiction in this case.

[11]    28 U.S.C. § 1605(a)(7) (deleted as of January 28, 2008) (stating "not otherwise covered by paragraph (2), in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources (as defined in section 2339A of title 18) for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency, except that the court shall decline to hear a claim under this paragraph--

(A) if the foreign state was not designated as a state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)) or section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371) at the time the act occurred, unless later so designated as a result of such act or the act is related to Case Number 1:00CV03110(EGS) in the United States District Court for the District of Columbia; and

(B) even if the foreign state is or was so designated, if--

(i) the act occurred in the foreign state against which the claim has been brought and the claimant has not afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with accepted international rules of arbitration; or

(ii) neither the claimant nor the victim was a national of the United States (as that term is defined in section 101(a)(22) of the Immigration and Nationality Act [8 USCS § 1101(a)(22)]) when the act upon which the claim is based occurred.").

1.  the provision of "material support or resources"[12] for hostage taking, torture, and an extrajudicial killing;

2.  if the provision of material support was engaged in by an official while acting within the scope of his office;

3.  the defendant was a "state-sponsor of terrorism" at the time the act complained of occurred; and

4.  the claimant or the victim was a "US national" at the time of the act of terrorism

28 U.S.C. § 1605A(a)(1), (a)(2).  As set forth below, the Court may assert subject matter jurisdiction over the Defendants under this statute.

Proof of the first two elements is inextricably intertwined with the requirements of proof for Plaintiffs' causes of action.  Plaintiffs proved at the hearing beyond their burden under 28 U.S.C. § 1608(e) that Syria provided material support and resources, as defined by 18 U.S.C. § 2339A(b), to Zarqawi and his network of terrorists in Syria and Iraq for hostage taking, torture, and extrajudicial killings on a scale such that the imposition of vicarious liability is required under 28 U.S.C. § 1605A(c) and the applicable state common law.  (See Section IV.B.1., 2., supra).  Proof of aiding and abetting or conspiracy necessarily proves that Syria provided material support or resources to Zarqawi and his terrorist network.

For the purposes of satisfying the requirements of 28 U.S.C. § 1605A(a)(1), Syria provided safe haven for Zarqawi himself at times, key Zarqawi lieutenants such as

---

[12] 28 U.S.C. § 1605A(h)(3) defines "material support or resources" as "the meaning given that term in section 2339A of title 18."   18 U.S.C. § 2339A(b) defines "material support or resources" as "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel."

Sulieman Khalid Darwish, Shakr Absi and the Jayousi cell, and the Zarqawi network's

organizational and logistical hub from 2002 to 2005 at least.  When a foreign sovereign

allows a terrorist organization to operate from its territory, this meets the statutory

definition of "safehouse" under 18 U.S.C. § 2339A(b):

> Insofar as the government of the Republic of Sudan affirmatively allowed
> and/or encouraged al Qaeda and Hizbollah to operate their terrorist
> enterprises within its borders, and thus provided a base of operations for
> the planning and execution of terrorist attacks -- as the complaint
> unambiguously alleges -- Sudan provided a "safehouse" within the
> meaning of 18 U.S.C. § 2339A, as incorporated in 28 U.S.C. § 1605(a)(7).

Owens v. Republic of Sudan, 412 F. Supp. 2d 99, 108 (D.D.C. 2006).  Plaintiffs' further

evidence of Defendants' cooperation and support of Zarqawi and terrorist network is

discussed below in the context of Defendants' joint liability for the beheadings of Jack

Armstrong and Jack Hensley.

Plaintiffs furthermore presented uncontroverted evidence that the Syrian

Defendants supported Zarqawi and his terrorist network's efforts to launch terrorist

attacks to kill and injure Americans citizens and Iraqi civilians.  (See Section IV.B.1., 2.,

supra).  Thus the first and second elements to allow the Court to assert subject matter

jurisdiction are satisfied.

The third element is whether the defendant foreign sovereign was a "state-sponsor

of terrorism" at the time the act complained of occurred.  28 U.S.C. §

1605A(a)(2)(A)(i)(I).  The term "state-sponsor of terrorism" is defined by the statute at

28 U.S.C. § 1605A(h)(6):

> the term 'state sponsor of terrorism' means a country the government of
> which the Secretary of State has determined, for purposes of section 6(j)
> of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)),
> section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371),
> section 40 of the Arms Export Control Act (22 U.S.C. 2780), or any other

> provision of law, is a government that has repeatedly provided support for
> acts of international terrorism . . . .

Syria has been designated as a state-sponsor of terrorism continuously since December 29, 1979[13] and Syria's continued designation as a state-sponsor of terrorism was noted on May 18, 2004, 69 Fed. Reg. 28,098, 28,100 (2004), and in 2005, among other times.  31 C.F.R. 596.201 (2005).

The fourth element required is that the victim or claimant be a U.S. national at the time of the act of terrorism.  28 U.S.C. § 1605A(a)(2)(A)(ii).  28 U.S.C. § 1605A(h)(5) defines a U.S. national as it is defined in 8 U.S.C. § 1101(a)(22) as "a citizen of the United States."  In this case, all victims and claimants are citizens of the United States.

The Court may therefore assert subject matter jurisdiction over the Defendants under 28 U.S.C. § 1605A(c).  Once the immunity of a foreign state has been lifted and the Court asserts subject matter jurisdiction, 28 U.S.C. § 1606 defines the sources of law that may be applied against a foreign sovereign.

> Once a foreign state's immunity has been lifted under Section 1605 and
> jurisdiction is found to be proper, Section 1606 provides that "the foreign
> state shall be liable in the same manner and to the same extent as a private
> individual under like circumstances." 28 U.S.C. § 1606. Section 1606 acts
> as a "pass-through" to substantive causes of action against private
> individuals that may exist in federal, state or international law.

Heiser v. Islamic Republic of Iran, 466 F. Supp. 2d 229, 265-266 (D.D.C. 2006) (quoting Dammarell v. Islamic Republic of Iran, 2005 U.S. Dist. LEXIS 5343, at *27-32 (D.D.C. Mar. 29, 2005)).  In this case, a federal cause of action exists, along with state law causes of action where they would not lead to an impermissable duplicative recovery.

The Court looks to common law as illustrated by the Restatement (Second) Torts when seeking to define the federal causes of action under 28 U.S.C. § 1605A(c) to fulfill

---

[13] http://www.state.gov/s/ct/c14151.htm.

the requirement of 28 U.S.C. § 1606 that non-immune foreign sovereigns shall be liable as would a private individual.  See Bettis v. Islamic Republic of Iran, 315 F.3d 325, 333 (D.C. Cir. 2003).  The past practice of courts in this Circuit serves as a guide for this Court's choice of law analysis.  Courts in this circuit defined causes of action under a federal private right of action known as the Flatow Amendment by utilizing common law as illustrated by the Restatement (Second) Torts.  E.g., Sutherland v. Islamic Republic of Iran, 151 F. Supp. 2d 27, 48 (D.D.C. 2001) (applying the Second Restatement of Torts to plaintiff's intentional infliction of emotional distress claim under the federal common law).[14]  The Court therefore looks to the Restatement (Second) of Torts to define the federal causes of action under 28 U.S.C. § 1605A(c).

### B.  SYRIA IS VICARIOUSLY LIABLE FOR THE MURDER OF JACK ARMSTRONG AND JACK HENSLEY UNDER 28 U.S.C. § 1605A(c)

Recent amendments to the FSIA expand the legal mechanisms for combating state-sponsors of terrorism.  These amendments create a new private right of action under federal law that operates against any foreign state that is or was a state sponsor of terrorism as described in subsection 28 U.S.C. § 1605A(a)(2)(A)(i) and any official, employee or agent of that foreign state while acting within the scope of his or her office,

---

[14] The practice of borrowing from common law to define causes of action under the Flatow Amendment ended with the D.C. Circuit's decision in Cicippio-Puleo v. Islamic Republic of Iran, 353 F.3d 1024, 1033 (D.C. Cir. 2004), which barred further use of the Flatow Amendment against foreign states or their agencies and instrumentalities.  This decision overturned numerous district court decisions that had held the Flatow Amendment provided a cause of action against the foreign state itself.  E.g., Cronin v. Islamic Republic of Iran, 238 F. Supp. 2d 222, 231 (D.D.C. 2002).  The holding of Cicippio-Puleo does not apply to 28 U.S.C. § 1605A(c), which renews the availability of a federal private right of action for certain victims of state-sponsored terrorism, which was Congress's original intention behind the Flatow Amendment.  Id. at 232 ("[T]he legislative history of 28 U.S.C. § 1605(a)(7) and the Flatow Amendment support the conclusion that victims of state-sponsored acts of terrorism have a cause of action against the foreign state itself.")

employment or agency.  28 U.S.C. § 1605A(c).[15]   The wording of this provision[16]

matches the wording of the Flatow Amendment[17], except 28 U.S.C. § 1605A(c) explicitly

provides a cause of action directly against the foreign state itself.

28 U.S.C. § 1605A(c) allows claims to be brought against the state-sponsor of

terrorism if the claimant or the victim was, at the time of the terrorist act, a national of the

United States, as were all the victims and claimants here.  Claims may be brought under

28 U.S.C. § 1605A(c) for "personal injury or death caused by" the acts of terrorism as

described in 28 U.S.C. § 1605A(a)(1), such as when the "official, employee or agent of

that foreign state" engages in the "provision of material resources or support" for

"extrajudicial killing" or "hostage taking".  For these acts by a foreign state's officials,

---

[15] 28 U.S.C. § 1605A(c) is the effective recodification of the prior understanding of the Flatow Amendment that existed prior to the Cicippio-Puleo decision. Thus, the language of the new federal private right of action nearly matches the language of the Flatow Amendment.

[16] P.L. 110-181: Private Right of Action.--A foreign state that is or was a state sponsor of terrorism as described in subsection (a)(2)(A)(i), and any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, shall be liable to--
   "(1) a national of the United States,
   "(2) a member of the armed forces,
   "(3) an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment, or
   "(4) the legal representative of a person described in paragraph (1), (2), or (3), for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages. In any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages. In any such action, a foreign state shall be vicariously liable for the acts of its officials, employees, or agents.

[17]  P.L. number 104-208:  Liability of agents of state sponsors of terrorism to U.S. nationals. Act Sept. 30, 1996, P.L. 104-208, Div A, Title I, § 101(c) [Title V, § 589], 110 Stat. 3009-172, provides:
   "(a) An official, employee, or agent of a foreign state designated as a state sponsor of terrorism designated under section 6(j) of the Export Administration Act of 1979 [50 USCS Appx § 2405(j)] while acting within the scope of his or her office, employment, or agency shall be liable to a United States national or the national's legal representative for personal injury or death caused by acts of that official, employee, or agent for which the courts of the United States may maintain jurisdiction under section 1605(a)(7) of title 28, United States Code, for money damages which may include economic damages, solatium, pain, and suffering, and punitive damages if the acts were among those described in section 1605(a)(7).
   "(b) Provisions related to statute of limitations and limitations on discovery that would apply to an action brought under 28 U.S.C. § 1605(f) and (g) shall also apply to actions brought under this section. No action shall be maintained under this action if an official, employee, or agent of the United States, while acting within the scope of his or her office, employment, or agency would not be liable for such acts if carried out within the United States.".

employees or agents the "foreign state shall be vicariously liable for the acts of its

officials, employees or agents . . . ."  In this case, Plaintiffs proved that Syria both aided

and abetted and conspired with the Zarqawi and his terrorist network, which resulted in

the murders of Jack Armstrong and Jack Hensley.  The Court also finds that the Syrian

provision of material support and resources to Zarqawi was conducted by Syrian

government officials, employees and agents withint he scope of their official duties.  See

Section IV.B.3, supra.

The common law approach to civil aiding and abetting liability was set forth in

the leading case of Halberstam v Welch, 705 F. 2d 472 (D.C. Cir. 1983).[17]  Courts in the

D.C. Circuit have adopted the Halberstam analysis in order to analyze whether a foreign

sovereign aided and abetted terrorism or conspired with terrorists.  Bodoff v. Islamic

Republic of Iran, 424 F. Supp. 2d 74, 85 (D.D.C. 2006); Haim v. Islamic Republic of

Iran, 425 F. Supp. 2d 56, 69 (D.D.C. 2006); Ungar v. Islamic Republic of Iran, 211 F.

Supp. 2d 91, 99 (D.D.C. 2002).  This Court similarly adopts the Halberstam test to

analyze the Defendants' vicarious liability resulting from their support of Zarqawi and his

network.

### 1.  SYRIA AIDED AND ABETTED THE MURDERS OF JACK ARMSTRONG AND JACK HENSLEY

The undisputed facts establish Defendants' vicarious liability for their aiding and

abetting of the terrorists who murdered Jack Henlsey and Jack Armstrong.  In

---

[17] Halberstam is widely regarded as the seminal case for civil aiding and abetting law even though it was
based on diversity jurisdiction, because there was no existing state law to apply, and the Court of Appeals
therefore synthesized the general American Tort Law on civil aiding and abetting including the standards
set out by the RESTATEMENT (SECOND) TORTS § 876 (1979).  Halberstam, 705 F. 2d at 477.
(analyzing and adopting these standards).  "The Supreme Court has described Halberstam v. Welch, 227
U.S. App. D.C. 167, 705 F.2d 472 (D.C. Cir. 1983), as 'a comprehensive opinion on the subject [of aiding
and abetting].'"  Khulumani v. Barclay Nat'l Bank Ltd., 504 F.3d 254, 287-288 (2d Cir. 2007) (quoting
Cent. Bank, N.A. v. First Interstate Bank, N.A., 511 U.S. 164, 181 (1994)).

Halberstam, the defendant (Hamilton) was held civilly liable under an aiding/abetting theory for the death of Halberstam after he was killed during a burglary by the burglar (Welch), who lived with Hamilton.  705 F. 2d at 475-76.  Hamilton disclaimed knowledgeable participation while she lived with the burglar for five years and essentially processed the proceeds of numerous burglaries, she had not participated in Halberstam's murder or in any of Welch's many burglaries.  Id. at 486-87.  Hamilton claimed that she never asked and was never told the purpose of Welch's nighttime forays, conducted from 5pm until 10pm, over the course of 5 years.  Id. at 475.  Hamilton further claimed that she never opened the numerous loot boxes stored in the basement of the house that she shared with the burglar.

The D.C. Circuit nonetheless found that "although Hamilton and Welch did not commit burglaries together", their activities were "symbiotic" because Hamilton knew about Welch's illegal activity and assisted him in various ways (e.g., filing tax returns that hid burglary profits, typing transmittal letters for ingots made of gold and silver melted from stolen loot, handling payments and accounts and maintaining all financial transactions in her name).  Id. at 486-487.  The court's decision in Halberstam was predicated upon general civil aiding and abetting law, including Section 876 of the Restatement (Second) Torts, to find that civil aiding/abetting liability depends upon:

1.    a showing that the party whom the defendant aids must perform a wrongful act that causes an injury;

2.    the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides assistance; and

3.    the defendant must knowingly and substantially assist the principal violation but need not actually agree to join the wrongful conduct.

Id. at 477-478 (emphasis added).  The D.C. Circuit additionally made clear in Halberstam that a defendant does not have to participate in, or even know about, the specific bad act that harms the victim.  Id. at 484.

Under Halberstam, Defendants are liable for aiding and abetting the beheadings and all of the associated intentional torts that were reasonably foreseeable as a result of their provision of material support or resources to Zarqawi and his network, which caused all of Plaintiffs' injuries.  Id.  The kidnapping and murder of Plaintiffs were a reasonably foreseeable result of Syria's decision to aid and abet Zarqawi and his terrorist network, which sought to attack and murder American citizens and Iraqi civilians in its quest to destabilize the government of Iraq.

Defendants are liable for the deaths and injuries caused by Zarqawi and his terrorist organization under an aiding and abetting theory of liability.  The first two elements of the Halberstam test are clearly met:  (a) the Zarqawi network, "the party whom the defendant aids", beheaded Jack Armstrong and Jack Hensley, or performed a wrongful act that caused an injury and (b) Syria was "generally aware of" its "role as part of an overall illegal or tortious activity at the time that" it provided assistance to Zarqawi.

Syria could not possibly claim that it was unaware of the aims or notorious practices of the Zarqawi network, which included torture, murder and terrorism of Americans and Iraqis across the Middle East on a horrific scale.  "Additionally, the length of time two parties work closely together may also strengthen the likelihood that they are engaged in a common pursuit. Mutually supportive activity by parties in contact with one another over a long period suggests a common plan."  Id. at 481 (court's emphasis retained).  Zarqawi's terrorism began at the latest in 2002 with the assassination

of Lawrence Foley, a plot conducted from inside Syria by Zarqawi himself. Zarqawi also had associated himself with Al Qaeda, well-known at that time for its worldwide jihad and the indiscriminate slaughter of civilians, which included the attacks on America in 2001.

The third element of the Halberstam test is whether the Syrian government knowingly and substantially assisted the beheadings. While Defendants may not have had prior knowledge of the particular kidnappings or Zarqawi's decision to behead the men, Syria provided its support to Zarqawi knowing and intending that such activities were likely. Defendants provided critical material support or resources to Zarqawi and his network by providing:

- safe haven for Zarqawi's logistical supply network inside Syria;

- safe haven for key Zarqawi operatives who raised money and recruited terrorists to fight for Zarqawi;

- safe haven for Zarqawi operatives who carried out terrorist attacks on targets in Jordan from inside Syria;

- intelligence officers to facilitate the transport of key terrorists from Syria to a training camp in Iraq;

- government agents to recruit and support Zarqawi's terrorist network;

- alliances with powerful networks of terrorists firmly allied with the Syrian regime;

- mosques in Syria provided militants with the ideological fire needed for recruitment of terrorists for the fight; and

- organization and transport for terrorists to travel through Syria into Iraq; and

- free passage over travel routes through Syria into Iraq.

Syria could never argue that any of these activities occurred without the authorization, agreement and support of its government. The key to the analysis of Syria's support for Zarqawi and his network is to understand the paranoid, clannish nature of the Syrian government and its complete monopoly on violence and information. The support and conspiracy with Zarqawi and his terrorist network was a decision with major implications for the regime, a decision that expert testimony concludes could not have been made without authorization and knowledge from President Assad and General Shawkat and the active participation of the Al-Mukhabarat Al-Askariya or military intelligence. C.f. Eisenfeld v. Islamic Republic of Iran, 172 F. Supp. 2d 1, 6 (D.D.C. 2000) (finding high officials of the defendant "whose approval would be necessary to carry out the economic commitment of Iran to Hamas and the training of terrorists in Iran" liable based upon expert witness testimony).

The Syrian government is a paranoid dictatorship of a minority that is structured to maintain control over the country by maintaining control over the government's monopoly over violence and information. The absence of popular support among the people of Syria only heightens the paranoia of the regime and increases the dependency of the ruling caste upon each other. The mechanism of maintaining control has been successful; the regime has been in power for nearly 38 years since the President Basher Assad's father founded the dictatorship without serious signs of instability, despite the crisis created by the U.S. invasion of Iraq in 2003.

A prime example of how the upper echelons of the government are structured in order to maintain this control is the positioning of Asif Shawkat as the head of Al-

Mukhabarat Al-Askariya or military intelligence, the most powerful intelligence agency in Syria. Asif Shawkat is the brother-in-law of President Assad by marriage to Assad's sister, who is a powerful figure in that family in her own right.

Credible expert witness testimony documented the manifestations of the government's successful efforts to maintain control: Syria is a highly efficient police state with pervasive domestic spying similar to the degree practiced by the Stasi in East Germany. Informers working for the state are located throughout the country and over a dozen Syrian intelligence agencies spy on the domestic population, as well as each other.

Thus, important decisions that would implicate the survival of the regime must be reviewed or authorized by President Assad or General Shawkat. Authority over groups and figures such as Zarqawi and his network is housed in the Al-Mukhabarat Al-Askariya, which is headed by General Shawkat. Important decisions made by that agency are authorized by President Assad. Dr. Deeb concluded that Syrian government support for Zarqawi and his terrorist network was not possible without the knowledge of President Assad and General Shawkat. (Deeb, T-1-74). Without this knowing support, the Zarqawi network could not have successfully carried out terrorist operations in Iraq.

Whether the quantity of assistance provided meets the requirements of the Halberstam test depends on the Court's analysis of five factors: "[t]he Restatement suggests five factors in making this determination: 'the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other [tortfeasor] and his state of mind.'" Halberstam v. Welch, 705 F.2d 472, 478 (D.C. Cir. 1983). A court need not find that all five factors are present to make a finding of substantial assistance. The Halberstam court noted the defendant

was not present during the principal violation, as described below, but nonetheless found the defendant civilly liable.

The Halberstam court first looked at the nature of the act assisted when it analyzed the five-factor test to determine the substantiality of the assistance provided by the defendant to the burglar, which was "a long-running burglary enterprise, heavily dependent on aid in transforming large quantities of stolen goods into 'legitimate' wealth." Id. at 488. This factor is defined as: "the *nature of the act* involved dictates what aid might matter, i.e. be substantial." Id. at 484. As an example, in Rael v. Cadena, 93 N.M. 684, 604 P.2d 822 (1979) (liability for verbal encouragement at the scene of a battery) the nature of the act, a beating, informed the decision as to the substantiality of the aid, the aider and abettor yelling "kill him, kill him." 705 F.2d at 481, 484. In this case, the Zarqawi network subsisted on a steady diet of terrorists and suicide bombers, which came directly through the Damascus airport and over the Syrian border. Facilitating free passage was crucial to the nature of the act involved: the construction of a terrorist network in Iraq to launch terrorist attacks to kill and injure innocent civilians.

The Halberstam court next looked at the amount of assistance the burglar's wife rendered to the general criminal enterprise. "[A]lthough the amount of assistance Hamilton gave Welch may not have been overwhelming as to any given burglary in the five-year life of this criminal operation, it added up over time to an essential part of the pattern." Id. Halberstam discussed Cobb v. Indian Springs, Inc., 258 Ark. 9, 522 S.W.2d 383 (1975), where mere verbal encouragement sufficed where a security guard encouraged a younger new car owner to engage in a high speed test drive, during which a pedestrian was struck. 705 F.2d at 482. The Court finds the amount of assistance that

Syria funneled to Zarqawi and his terrorist network far exceeds the threshold required by the <u>Halberstam</u>.

The <u>Halberstam</u> court then analyzed and discounted the third factor, presence at the scene of the principal violation.

> Third, Hamilton was admittedly not <u>present at the time</u> of the murder or even at the time of any burglary. But as we noted above, the success of the tortious enterprise clearly required expeditious and unsuspicious disposal of the goods, and Hamilton's role in that side of the business was substantial.

<u>Id.</u>  The same analysis results in this case.  The presence of Syrian agents is not a prerequisite for aiding and abetting liability.

The <u>Halberstam</u> court also discounted the fourth factor, relation to the tortfeasors, because of its desire to avoid finding a spousal relationship as a reason for liability.  <u>Id.</u> In this case, however, the relation to the tortfeasor significantly contributed to the terrorist war that Zarqawi launched on Iraq.  Syria occupied a key geographical position and only its willingness to participate in the conspiracy with Zarqawi's network to destabilize Iraq allowed Zarqawi to succeed as he did and murder Jack Armstrong and Hensley.

The <u>Halberstam</u> court examined the fifth factor, the defendant's state of mind and found that the wife's long term and knowing participation in the enterprise "reflected her intent and desire to make the venture succeed; it was no passing fancy or impetuous act." <u>Id.</u>  In this case, for over three decades the Syrian government has aided, abetted and conspired with terrorist organizations.  The Syrian government is uniquely experienced in the cost-benefit calculus of working with terrorist organizations, as well as the inevitable consequences for the targeted pool of victims, such as U.S. citizens working to stabilize

the Iraqi government. Syria's aid to Zarqawi and his terrorist network was not an

impetuous act performed without an appreciation of the foreseeable consequences.

The Halberstam court also found the length and circumstances of the wife's

assistance to add to the inference that she knew that her husband was involved in a

criminal enterprise. "She performed these services in an unusual way under unusual

circumstances for a long period of time and thereby helped launder the loot and divert

attention from Welch." Id. at 487. In this case, Syria can never claim that it

misunderstood the aims and practices of the Zarqawi network of terrorists. Syria knew

that Zarqawi and his terrorist network would kill and injure American citizens and Iraqi

civilians to achieve its goals. Knowing this, and because of this, the Syrian government

continued to give substantial assistance to Zarqawi from at least 2002 to 2005. The

stealthy circumstances of Syrian assistance to Zarqawi are similar to the circumstances of

Hamilton's aid to Welch, which prompted the Halberstam court to note that Hamilton

provided the "services in an unusual way under unusual circumstances for a long period

of time" thereby creating a further justification for a finding of aiding and abetting

liability.

Finally, a key question for the Halberstam court was whether the murder was a

natural and foreseeable consequence of the activity that the wife assisted the husband in.

> Similarly, under an aiding-abetting theory, it was a natural and foreseeable
> consequence of the activity Hamilton helped Welch to undertake. It was
> not necessary that Hamilton knew specifically that Welch was committing
> burglaries. Rather, when she assisted him, it was enough that she knew he
> was involved in some type of personal property crime at night--whether as
> a fence, burglar, or armed robber made no difference--because violence
> and killing is a foreseeable risk in any of these enterprises.

Id. at 488 (D.C. Cir. 1983) (emphasis added).  Even if Syria did not know that Mr.

Armstrong and Mr. Hensley would be kidnapped and then beheaded, the beheadings of

Mr. Armstrong and Mr. Hensley were natural and foreseeable outcomes of Syria's aid to

Zarqawi.

###    2.    SYRIA CONSPIRED WITH ZARQAWI TO KILL AND INJURE U.S. CITIZENS AND IRAQI CIVILIANS BY ACTS OF TERRORISM IN IRAQ

Halberstam v. Welch also discussed the tort of civil conspiracy, as set forth by the

Restatement, which has also been relied upon by numerous decisions in this Circuit

finding that foreign states conspired with terrorist groups such as Hezbollah.  E.g., Valore

v. Islamic Republic of Iran, 478 F. Supp. 2d 101, 109 (D.D.C. 2007) (citing Estate of

Heiser v. Islamic Republic of Iran, 466 F. Supp. 2d 229, 266 (D.D.C. 2006)).  Civil

conspiracy includes four elements.  "A list of the separate elements of civil conspiracy

includes: (1) an agreement between two or more persons; (2) to participate in an unlawful

act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act

performed by one of the parties to the agreement; (4) which overt act was done pursuant

to and in furtherance of the common scheme."  Halberstam v. Welch, 705 F.2d 472, 477

(D.C. Cir. 1983) (citing Ryan v. Eli Lilly & Co., 514 F. Supp. 1004, 1012 (D.S.C. 1981)).

Under this analysis, the government of Syria is also vicariously liable for the murders of

Jack Armstrong and Hensley as a result of its conspiracy with Zarqawi's terrorist network

to destabilize Iraq through terrorist attacks.

The first and key element to a conspiracy case is whether the Syrian government

agreed to join Zarqawi and his network in wrongful conduct.  "The prime distinction

between civil conspiracies and aiding-abetting is that a conspiracy involves an agreement

to participate in a wrongful activity. Aiding-abetting focuses on whether a defendant knowingly gave 'substantial assistance' to someone who performed wrongful conduct, not on whether the defendant agreed to join the wrongful conduct." Halberstam, at 478. Whether the Syrian government agreed to the actual beheadings is irrelevant:

> As to the extent of liability, once the conspiracy has been formed, all its members are liable for injuries caused by acts pursuant to or in furtherance of the conspiracy. A conspirator need not participate actively in or benefit from the wrongful action . . . . [a]s noted above, a conspirator can be liable even if he neither planned nor knew about the particular overt act that caused injury, so long as the purpose of the act was to advance the overall object of the conspiracy.

Id. at 481, 487 (emphasis added).  Civil conspiracy only requires proof of an agreement to participate in wrongful conduct.  Id. at 477.  The Syrian government and Zarqawi and his terrorist network conspired to kill and injure U.S. citizens and Iraqi civilians through barbaric acts of terrorism.  The beheadings were organized and committed as an overt act pursuant to the conspiracy and in furtherance of the goals of the conspiracy.  Civil conspiracy does not require an agreement to engage in the particular wrongful act that produced the injuries.  See id.

    The question then logically becomes what evidence is sufficient to establish the existence of an unlawful conspiracy:

> in most cases the court will have to infer a conspiracy from indirect evidence, it must initially look to see if the alleged joint tortfeasors are pursuing the same goal -- although performing different functions -- and are in contact with one another. The circumstances of each case dictate what other specific evidence may be useful in inferring agreement.

Id. at 481 (emphasis added).  Here, Syria and Zarqawi pursued the same goal:  the prevention of a democratic government supported by the United States in post-Saddam Iraq.  In 2003 the foreign minster of Syria stated publically that it was in Syria's interest

to see the American invasion of Iraq fail.  Plaintiffs also produced evidence of contacts between the Syria and Zarqawi:

- Syrian Ba'athist party official Al-Rawi, appointed by President Assad and salaried by the Syrian government, met with Zarqawi's lieutenants to discuss operations against the Americans, recruited suicide bombers, and provided funding and weapons to Zarqawi's organization.

The circumstances of this case dictate that evidence of explicit agreements or an open alliance will be almost impossible to produce.  Not only does the presence of the U.S. military next door to Syria provide a good reason for Syria to exert best efforts to obscure any ties between it and Zarqawi or other terrorist groups, but the nature of Islamic politics also make it more likely that both Syria, a secular regime, and Zarqawi, a committed and fanatical jihadist, would strenuously avoid any public association.  (Kohlmann, T-1-55).

Evidence of an explicit agreement is unnecessary for a finding of civil conspiracy.  In Halberstam v. Welch, the court inferred an agreement between Hamilton, the live-in girlfriend of the burglar and the de-facto accountant of his criminal enterprise, and Welch, the burglar, despite the lack of a confession by Hamilton or any other direct evidence of an agreement between them to conspire to steal goods and launder the proceeds.  Id. at 486-87.

> [C]ourts have to infer an agreement from indirect evidence in most civil conspiracy cases. The circumstances of the wrongdoing generally dictate what evidence is relevant or available in deciding whether an agreement exists. Factors like the relationship between the parties' acts, the time and place of their execution, and the duration of the joint activity influence the determination. In this case, Hamilton and Welch did not commit burglaries together but their activities were symbiotic.

Id. (emphasis added).  In this case, the Court may infer an agreement to engage in a campaign of terrorism designed to topple the post-Saddam Iraqi democratic government from the symbiotic nature of their activities, which all supported the terrorist attacks against innocent civilians:

- The Syrian government assisted in transporting operatives, including high-ranking operatives, across the border into their first military training camp.

- In late 2003 a Syrian intelligence officer named Abu Moaz transported senior Al-Qaeda leaders across the border into a training camp near Rawha in Iraq.

- Relationships between Zarqawi's group and Hezbollah and other groups would not have been possible without Syrian authorization.

- After the Lawrence Foley assassination Zarqawi operative Shakr Absi fled to Damascus where the Syrian government protected him from the Jordanian government,[18] claiming he was under detention while he was actually running a training camp in Syria for terrorists headed to Iraq.

- The Jayousi cell that planned a bombing of the Jordanian intelligence headquarters with a chemical bomb was organized and found logistical support in Syria.  Members of the Jayousi cell were detained by Syrian border guards but then released to allow them to continue into Jordan, where they were captured.

- Fawzi Al-Rawi was appointed to be the head of the Iraqi wing of the Syrian Ba'th party by President Assad.  Under Al-Rawi's direction, this group provided funds directly to Zarqawi's network.

---

[18] Attacks upon Jordan were planned and conducted for the same purpose as Jordan is one of the few countries friendly to the U.S. in the region and one of the few that was willing to attack Zarqawi and his network.

- In 2003, a militant preacher named Abu Qaqa on the Syrian government payroll worked to recruit people for the Zarqawi network.

As Hamilton in <u>Halberstam</u> acted as a logistical support hub for Welch—as his accountant and money launderer—Syria acted as a logistical support hub for Zarqawi by providing safe haven for training and the operations of numerous important Zarqawi operatives and facilitating safe passage through absolutely critical transit points for the flow of jihadists. The duration of joint activity, from at least 2002 to 2005, lends further support to the Court's findings of an agreement to engage in terrorist attacks to kill and injure American citizens and Iraqi civilians.

### 3. THE INDIVIDUAL DEFENDANTS ARE LIABLE UNDER 28 U.S.C. § 1605A(c)

The aiding and abetting of, and conspiring with, Zarqawi and his terrorist network were acts conducted by officials, employees, and agents of the Syrian government, including individual Defendants President Assad and General Shawkat. Such conduct exposes responsible members of a government of state-sponsors of terrorism to joint and several civil liability under the FSIA. <u>See</u> <u>Campuzano v. Islamic Republic of Iran</u>, 281 F. Supp. 2d 258, 261, 277 (D.D.C. 2003); <u>Stern v. Islamic Republic of Iran</u>, 271 F. Supp. 2d 286, 302 (D.D.C. 2003) (finding $300,000,000 in punitive damages with joint and several liability against Ayatollah Ali Hoseini Khamenei, Ali Akbar Hashemi-Rafsanjani and Ali Fallahian-Khuzestani). <u>Eisenfeld v. Islamic Republic of Iran</u>, 172 F. Supp. 2d 1, 6 (D.D.C. 2000) (awarding damages against individuals who were high officials of Iran "whose approval would be necessary to carry out the economic commitment of Iran to Hamas and the training of terrorists in Iran.").

In this case, Plaintiffs produced credible expert testimony on the structure of the Syrian government, which because of its paranoia could not allow a decision of such great political significance to escape the attention of President Assad or General Shawkat. The decision to aid and abet and conspire with Zarqawi and his terrorist network to kill and injure Americans and Iraqis through acts of terrorism could not have occurred without the authorization of President Assad and General Shawkat, the head of Al-Mukhabarat Al-Askariya or the military intelligence, the most powerful intelligence agency in a country covered end-to-end with intelligence agencies.

### C.    PLAINTIFFS' DAMAGES

#### 1.    DAMAGES UNDER 28 U.S.C. § 1605A(c)

Plaintiffs have proven Defendants' liability under 28 U.S.C. § 1605A(c), which makes the following damages available under the statute:  economic damages, solatium, pain and suffering and punitive damages.  Plaintiffs' evidence supports their claim for these damages is provided below in Plaintiffs' description of their state law causes of action.  Recovery under both the federal private right of action and state common and statutory law is permitted where there is not an impermissible double recovery.

#### 2.    WRONGFUL DEATH

28 U.S.C. § 1606 provides that "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances . . . ." This allows a plaintiff to assert any applicable cause of action against a non-immune foreign state.  As discussed in Section IV.B.1-2, supra, 28 U.S.C. § 1605A(c) provides a federal cause of action and for vicarious liability against a foreign state.  After their

immunity has been stripped under 28 U.S.C. § 1605A, foreign states are also liable under

state law, where the recovery is not duplicative.  "In the wake of the D.C. Circuit's

opinion in Cicippio-Puleo, district courts in this jurisdiction have uniformly held that

state law may be used to hold foreign states liable for acts of terrorism."  Pugh v.

Socialist People's Libyan Arab Jamahiriya, 2006 U.S. Dist. LEXIS 58033 (D.D.C. 2006)

(citing Holland, 2005 U.S. Dist. LEXIS 40254, at *63-65; Price v. Socialist People's

Libyan Arab Jamahiriya, 384 F. Supp. 2d 120, 132 (D.D.C. 2005); Dammarell, 2005 U.S.

Dist. LEXIS 5343, at *55-56)).

　　　　28 U.S.C. § 1605A therefore paves the way for state law causes of action for

wrongful death[19] and intentional infliction of emotional distress. A wrongful death action

is designed to compensate a decedent's heirs-at-law for economic losses which result

from the decedent's premature death.  In the case of Georgia, the state wrongful death

statute provides for the "full value of the life" of the decedent, which includes the

decedent's emotional damages resulting from his death.  See Section IV.C.2.ii, infra.  To

the extent that the claims for wrongful death and damages available are informed by state

law, the Court examines the state law of Michigan and Georgia, the domiciles of Jack

Armstrong and Jack Hensley, respectively.

　　　　　　　　　i.  Michigan Law of Wrongful Death

　　　　Under Michigan law, which governs the claim for the wrongful death of Jack

Armstrong, this claim is properly brought by Fran Gates, the personal representative of

---

[19] The estates of Jack Armstrong and Jack Hensley could conceivably assert a state common law cause of action against the Defendants for false imprisonment, battery and assault but any recovery under these torts would be duplicative of their recovery for pain and suffering under 28 U.S.C. § 1605A(c) and would certainly be duplicative of the decedents' pain and suffering recovery under their state law wrongful death cause of action.  In Peterson v. Islamic Republic of Iran, injured marines who had survived the 1983 Beirut Marine Barracks bombing by Iranian agents were precluded from recovering under the surviving marines' IIED claims because the court had already awarded them compensation for their mental and emotional damages under a battery cause of action.  515 F. Supp. 2d 25, 40 (D.D.C. 2007).

the decedent's estate.  M.C.L.A. 600.2922(2).  The damages available to the Estate for

wrongful death are viewed from the perspective of the decedent's loved ones and include

a full range of damages:

> In every action under this section, the court or jury may award damages as
> the court or jury shall consider fair and equitable, under all the
> circumstances including reasonable medical, hospital, funeral, and burial
> expenses for which the estate is liable; reasonable compensation for the
> pain and suffering, while conscious, undergone by the deceased during the
> period intervening between the time of the injury and death; and damages
> for the loss of financial support and the loss of the society and
> companionship of the deceased.

M.C.L.A. 600.2922(6).  Thus, as to Jack Armstrong's claim for wrongful death, the

award of damages for loss of the decedent's society and companionship might, arguably,

be redundant with an award of solatium under FSIA.

ii.   Georgia Law of Wrongful Death

Under Georgia law, which governs Jack Hensley's claims as the state of domicile

at the time of his death, the measure of damages in an action for wrongful death is "the

full value of the life . . . without deducting for any of the necessary or personal expenses

of the decedent had he lived."  O.C.G.A. § 51-4-1; see generally, Eric James Hertz &

Mark D. Link, Georgia Law of Damages with Forms § 31-1 (2002).  This statute is

considerably different from the wrongful death statute of Michigan and includes damages

not otherwise provided for by 28 U.S.C. § 1605A(c).

Georgia law takes a unique view in the sense that the damages valuation for

wrongful death is viewed from the perspective of the decedent.  The "full value of the

life" therefore means the value of the decedent's life to him.  Thus, a wrongful death

action under Georgia state law does not consider damages such as solatium or the mental

suffering and grief experienced by the survivor(s).  E.g., Young Men's Christian Ass'n v.

Bailey, 112 Ga. App. 684, 146 S.E.2d 324 (1965); Hudson v. Cole, 102 Ga. App. 300, 115 S.E.2d 825 (1960). The wrongful death damages therefore available for the death of Jack Hensley are not duplicative of FSIA's allowance of solatium damages to survivors, which award the survivors for their emotional damages occasioned by their loss of a loved one.

The "full value of the life of the decedent" is divided into two elements: the economic value of the decedent's normal life expectancy and the intangible element incapable of exact proof. Miller v. Jenkins, 412 S.E.2d 555 (Ga. App. 1991). The former is the subject of normal modes of actuarial proof, reduced to present cash value. The latter element—the intangible value of the decedent's life—is not economic in nature and, thus, is not discounted to present cash value. The intangible component of the "full value of the life" incorporates the loss to the decedent of the ability to enjoy the society, advice, counsel, and companionship of his family, friends, and loved ones throughout the course of his expected lifespan. Childs v. U.S., 923 F. Supp. 1570 (S.D. Ga. 1996). Since reciprocity is presumed in human relationships, what the deceased lost may be inferred from what the plaintiff and others can testify about the loss caused by the destruction of this relationship. The intangible element, being incapable of exact proof, is addressed to the "enlightened conscience" of the factfinder.

### iii.  Economic Losses

As to economic losses resulting from the deaths of Mssrs. Armstrong and Hensley, evidence of the decedents' lost earning capacity was presented by Pia Di Girolamo, Ph.D., an economist who was accepted by the Court as an expert in the field of economic statistics. For Jack Armstrong, two estimates were used for statistical worklife.

Mr. Armstrong had a history of working in foreign lands as a civilian construction engineer under dangerous conditions, including Bosnia and Angola. At the time of his death, his annual salary was $90,000, including a $20,000 bonus. An acceptable discount rate of 5.0% was applied to calculate the economic loss to Armstrong's estate of Armstrong's lost earnings. Those lost earnings were calculated to be $1,129,186, (assuming a worklife to age 62.7) and $1,347,919 (assuming a worklife to age 65). (T-2-80). Because he did not have a legal spouse, no calculation was done to reflect loss to his Estate of the value of Mr. Armstrong's household services. (T-2-82).

For Jack Hensley, lost earnings were calculated to be $1,635,154, assuming a worklife to age 65. (T-2-78). Because Mr. Hensley was married, an additional loss computation was made of $77,884, representing the loss to Mr. Hensley's estate of the value of his household services after age 65 but before age 70. (T-2-78-79). The total estimated economic loss (lost earnings and lost household services) equaled $1,713,038. (T-2-80). The testimony of Dr. Di Girolamo reviewed the methodology of calculation of economic loss, which the Court finds satisfactory.

The Court finds that the total amount of economic loss damages sustained by Fran Gates, as administratrix of the Estate of Olin Eugene "Jack" Armstrong, is $_____.

The Court finds that the total amount of economic loss damages sustained by Pati Hensley, as the person entitled to bring a wrongful death claim on Mr. Hensley's behalf, is $_____ .

The Court further finds that an additional amount for intangible damages for wrongful death are awardable for the death of Jack Hensley as part of the "full value of

the life," and awards _____ , based upon the evidence and findings contained in Section IV.C.3., <u>infra</u>.

      3.  S<span style="font-variant:small-caps">OLATIUM</span>

      i.  <u>Introduction</u>

This lawsuit is brought by immediate family members of Jack Armstrong and Jack Hensley.  Under 28 U.S.C. § 1605A(c), United States nationals or their legal representatives have standing to bring a cause of action for damages including solatium where personal injury or death results from state-sponsored terrorism.  The law of solatium, in the context of state-sponsored terrorism cases, finds no better explication than Judge Lamberth's opinion in <u>Flatow v. Islamic Republic of Iran</u>, 999 F. Supp. 1 (D.D.C. 1998).  Judge Lamberth's opinion came into disuse subsequent to the Circuit's decision in <u>Cicippio-Puleo</u> that the Flatow Amendment and its damages, such as solatium, were not available to claimants against the foreign state itself.  <u>Cicippio-Puleo v. Islamic Republic of Iran</u>, 353 F.3d 1024, 1033 (D.C. Cir. 2004).  Now that a federal cause of action with solatium damages against the foreign state itself has been codified into law under 28 U.S.C. § 1605A(c), opinions such as <u>Flatow</u> that issued prior to <u>Cicippio-Puleo</u> provide valuable insight into the nature of the damages available under 28 U.S.C. § 1605A(c), which includes the same damages as were available under the Flatow Amendment.

Solatium damages compensate Plaintiffs for their emotional injuries suffered as a result of the horrific murders of their loved ones and their subsequent absence.  "Solatium is traditionally a compensatory damage which belongs to the individual heir personally for injury to the feelings and loss of decedent's comfort and society."  <u>Flatow</u>, 999 F.

Supp. at 29.   There are identifiable factors that enter into a judgment for solatium.  "Thus

mental anguish, bereavement and grief resulting from the fact of decedent's death

constitutes the preponderant element of a claim for solatium."  Id. at 30 (stating "the

claimant must prove a close emotional relationship with the decedent.") (citing to Miles

v. Apex Marine Corp., 498 U.S. 19 (1990)).  As damages for mental anguish are

extremely fact-dependent, the claims require careful analysis on a case-by-case basis.

        The cruel, calculated and public manner with which the kidnapping and

subsequent murders were broadcast added to Plaintiffs' solatium damages.  "How the

claimant learned of decedent's death, and whether there was an opportunity to say good-

bye or view the body can be a significant factor contributing to the claimant's anguish."

Id.  The malice and political objectives that motivated the murders also increased

Plaintiffs' solatium damages.

> The malice associated with terrorist attacks transcends even that of
> premeditated murder. The intended audience of a terrorist attack is not
> limited to the families of those killed and wounded or even just Israelis,
> but in this case, the American public, for the purpose of affecting United
> States government support for Israel and the peace process. The terrorist's
> intent is to strike fear not only for one's own safety, but also for that of
> friends and family, and to manipulate that fear in order to achieve political
> objectives. Thus the character of the wrongful act itself increases the
> magnitude of the injury. It thus demands a corresponding increase in
> compensation for increased injury.

Id.

        The terrorists slaughtered Jack Armstrong and Jack Hensley as a propaganda act

of terrorism.  The brutality quotient was maximized in order to achieve the maximum

amount of terror, which was especially felt by Plaintiffs.  This factor affects Plaintiffs'

solatium damages.

> Spouses and relatives in direct lineal relationships are presumed to suffer damages for mental anguish. The testimony of sisters or brothers is ordinarily sufficient to sustain their claims for solatium. See Reiser, 786 F. Supp. 1334. Proof relies predominantly on the testimony of claimants, their close friends, and treating medical professionals, as appropriate. See Alejandre at 20-22; 61 ALR4th 413 at § 13

Id. at 30-31.  The following further types of proof and evidence of mental anguish have been considered factors to be accounted for when conducting a solatium damages analysis:

- obvious distress during testimony, or the claimant's inability to testify;

- testimony of a general feeling of permanent loss or change caused by the decedent's absence; and

- medical treatment for depression and related affective disorders.  Id. at 31.

These factors are relevant in this case, as described below.

The closeness of Plaintiffs' relationships with the decedents is another factor that supports their claims for solatium damages.   "Courts have also recognized that in the long term, the sudden death of a loved one may manifest itself as "a deep inner feeling of pain and anguish often borne in silence."  Id. (citing Connell v. Steel Haulers, Inc., 455 F.2d 688 (8th Cir. 1972)). The nature and intensity of the relationship between the decedent and his loved ones is a critical factor in the solatium analysis:

> The nature of the relationship between the claimant and the decedent is a critical factor in the solatium analysis.  If the relationship is strong and close, the likelihood that the claimant will suffer mental anguish and loss of society is substantially increased, particularly for intangibles such as companionship, love, affection, protection, and guidance.  Numerous factors enter into this analysis, including: strong emotional ties between the claimant and the decedent; decedent's position in the family birth order relative to the claimant; the relative maturity or immaturity of the claimants; whether decedent habitually provided advice and solace to claimants; whether the claimant shared interests and pursuits with

> decedent; as well as decedent's achievements and plans for the future
> which would have affected claimants.

Id. at 31-32.  Finally, Judge Lamberth recognized the difficulty of the task assigned to a

Court in deciding what compensation to assign for solatium damages:

> This is the paradox of solatium; although no amount of money can
> alleviate the emotional impact of a child's or sibling's death, dollars are
> the only means available to do so.  It is with this understanding as to the
> purpose of solatium, alternately described as the "intangible loss," that the
> Court analyzes the facts of this case.

Id.  Plaintiffs' evidence in support of their claims for solatium damages follow.[20]


### ii.  Olin Eugene "Jack" Armstrong

Present at trial were Jack Armstrong's mother, Fran Gates, and sister, Jan Smith.

Both testified.  An "Army brat," Jack's childhood spanned many different places.  While

they were a close-knit family, they all traveled extensively.

Jack Armstrong took a construction engineer job in Croatia in early 1994.  This

was the first of several jobs where work as a construction engineer would lead him to

faraway, and sometimes dangerous, places.  His work involved reconstruction and

rebuilding.  (T-2-88).  His employer was a subcontractor to the United Nations.  Shortly

thereafter, Jack Armstrong was joined in Croatia by his sister, Jan Smith, who went to

work in Zagreb with the U.N. Peace Forces and was able to visit her brother.  In 1995,

Sarajevo and Croatia were experiencing a wretched internal conflict, violent fighting and

ethnic cleansing.  (T-2-89).  Jan Smith described the reconstruction work done by her

brother—building and supplying camps for refuges—as making a difference.  (T-2-89).

When the United Nations forces lost control, the situation in Croatia became too

dangerous and Jack Armstrong was forced to leave.  (T-2-90).

---

[20] Solatium should not be discounted to a present value.  Flatow, at 32.

Armstrong's work with international humanitarian efforts continued, however. He worked in Angola, the site of another United Nations humanitarian effort in the wake of a crisis in neighboring Rwanda. (T-2-92). Once again, Jack Armstrong worked as a construction engineer. His work centered on accommodating U.N. Peacekeepers as well as Rwandan refugees who streamed into Angola. (T-2-93). After finishing his contract, Mr. Armstrong went to Thailand.

He had been in Thailand intermittently between construction jobs and he had a committed relationship with a female companion. Together, they hoped to begin a cooperative farm. (T-2-95-96). Before doing so, however, Jack Armstrong took another job in Iraq to earn enough "seed money" to start their farm. (T-2-117-118). Jack Armstrong signed a year-long contract. (Ex. 2).

Unfortunately, the security situation in Iraq deteriorated. Apparently, the company that employed Mr. Armstrong was unprepared, incapable or unwilling to take the steps necessary to protect its employees from those who intended to do him harm.

Asked why Jack Armstrong took jobs in such dangerous places, his mother testified: "Jack was a builder. Not a destroyer." (T-2-111). His sister explained that, aside from the fact that the construction work paid well and was tax-exempt income, the work fit Jack Armstrong's sense of adventure and allowed him to make a difference in the world. (T-2-96).

The testimony before the Court described a close-knit family that, despite long distances, remained connected emotionally. The testimony was that Jack Armstrong was unique, down-to-earth, and honest. He was described as a caring person. Judging from his work in various humanitarian efforts in dangerous parts of the world, this Court finds

that his compassion was complimented by personal courage.  Based upon all of the

testimony, the Court finds that awards in the following amounts are appropriate in

compensation, as solatium, for the loss suffered by each individual family member of

Jack Armstrong:

Fran Gates (Mother of Jack Armstrong):      $_____

Jan Smith (Sister of Jack Armstrong):        $_____

### iii. Jack Hensley

Jack Hensley graduated college in the 1970s with a degree in mathematics and

computer science.  (T-3-16).  He loved machinery and gadgets.  (T-3-16).  Jack Hensley

met his wife, Pati, through their work.  Both were working for an international

construction and engineering firm that demanded long durations of international travel.

Jack had previously worked in Saudi Arabia whereas Pati worked in Maryland. (T-3-15).

Later, Jack and Pati were transferred to a coal export project in Columbia.  (T-3-17).

Though she initially turned him down, Jack's persistent requests for a date eventually led

to a courtship, romance, and eventual marriage on Christmas Eve of 1985. (T-3-17-20; T-

3-8-9).

Settling in Marietta, Georgia, Jack Hensley went to work with Wang Laboratories

as their computer operations manager for the Southeast region. (T-3-21).  He would stay

at Wang for 11 years.  In 1991, Pati gave birth to Sara Alicia Hensley. (T-3-22).

Jack Hensley was a loving father to Sara.  "He just lit up about it [Sara]."  (T-3-7;

T-3-27).  Jack became Sara's coach.  (T-3-9).  He volunteered at her school.  (T-3-9).  He

taught her math and science, tennis, and horseback riding.  (T-3-27).

Jack Hensley accepted employment in Iraq as a civilian contractor because of financial difficulties largely resulting from a failed entrepreneurial venture into the restaurant business.  In the mid-1990s, the Hensleys opened a neighborhood restaurant called Networks.  (T-3-23).  The business did not do well.  Nevertheless, the Hensleys persevered for several years.  Unable to turn the business around, the restaurant drained their savings.  (T-3-23).  Jack's mother was diagnosed with Alzheimers.  In 1998, the Hensleys took over her care and moved her into their home.  (T-3-23; T-3-29).

To support his family, Jack Hensley took four part-time jobs but could not fully reverse their financial difficulties.  (T-3-24).  Jack and Pati discussed working overseas again because it had been so lucrative before.  (T-3-24).  A recruiter offered Jack a job in Iraq.  Having worked in Saudi Arabia earlier in his career, Jack Hensley had an understanding of Muslim culture.  (T-3-25).  Believing the company would provide adequate security, Jack and Pati decided he would sign a year-long contract.  (Ex. 1).  The pay from Jack's salary helped the Hensley family avoid bankruptcy.  Their financial situation stabilized.  (T-3-28).

In Iraq, Hensley made the best of difficult circumstances.  Sam Rossman, a Marine, was stationed at a remote base with Mr. Hensley.  As one of the few other Americans on a remote outpost, Jack Hensley developed a "special bond" of brotherhood and trust with Rossman and the other Marines.  They confided in each other.  In the eyes of his comrades, Jack Hensley was a "true American patriot" who loved his family dearly yet went to Iraq to cure some financial missteps and make a contribution to the War on Terrorism.  Had he lived, Rossman believes Jack wanted to be a family man and to be financially secure so his daughter could have everything she needed to be successful.

Jack Hensley was a family man.  He was a husband of 19 years to Pati Hensley.
To Sara Hensley, who was thirteen (13) years old in September of 2004, Jack was a
loving father and best friend.  He had a close relationship to his younger brother, Ty.  He
was noted for his unflappable humor.  (T-3-26).  He forged strong relationships among
family and friends.

Jack Hensley's premature death leaves especially large holes in the lives of Pati,
his wife, and Sara, his teenage daughter.  Based upon all of the testimony, the Court finds
that awards in the following amounts are appropriate in compensation, as solatium, for
the losses suffered by the family of Jack Hensley:

> Pati Hensley (Wife of Jack Hensley): $_____
>
> Sara Hensley (Daughter of Jack Hensley): $_____

### 4.    PAIN AND SUFFERING

Claims for the conscious pain and suffering of Jack Armstrong and Jack Hensley
are actionable through the men's respective estates.  M.C.L.A. 600.2922(6); Manley v.
Ingram, 755 F.2d 1463, 1466 n. 7 (11th Cir. 1985) (under Georgia law, claims for
decedent's pain and suffering recoverable by Estate).  Such actions are separate and
distinct from any claim of wrongful death by decedent's heirs-at-law.  Upon evidence of
conscious pain and suffering, determination of the compensation has largely been
relegated to the discretion of the trier of fact based upon factors including the duration
and nature of the suffering endured.  The trier of fact has broad discretion in calculating
damages for pain and suffering.  Taylor v. Washington Terminal Co., 409 F.2d 145 (D.C.
Cir. 1969) (cert. denied, 396 U.S. 835 (1969)).

Independent of the federal law applicable to this case, compensatory damages for conscious pain and suffering, mental and physical, of the decedent are available under the state law of both Michigan and Georgia.  Howard v. Calhoun County, 148 F. Supp. 2d 883 (W.D. Mich. 2001) (damages for conscious pain and suffering, including emotional distress, experienced by decedent prior to death are recoverable as an element of compensatory damages under Michigan's Wrongful Death Act); Childs v. U.S., 923 F. Supp. 1570 (S.D. Ga. 1996) (under Georgia law, pain and suffering is generic name for several types of damages under that heading, including mental and physical pain and suffering; measure of damages is enlightened conscience of impartial factfinder).

The Court heard extensive testimony on the pain and suffering resulting from the acts above described.  The Court received the videos as evidence depicting the beheadings of both Mr. Armstrong and Mr. Hensley, as well as medico-legal reports from examinations of the remains.

According to a medico-legal examination conducted by Dr. Alex Welch, Mr. Hensley was physically restrained around the time of his death.  There were abrasions underneath these bindings, signifying that the bindings of his ankles and wrists were present before death and would have limited Mr. Hensley's ability to defend himself.  (T-2-22-23).  During the decapitation, Mr. Hensley endured unimaginable fear, pain and suffering.  The medical and physical evidence of Dr. Welch corroborates the video evidence that Mr. Hensley was alive when his captors began decapitating him.  (T-2-25).

There was no evidence that Mr. Hensley's senses were impaired or that there was anesthetization prior to his murder.  (T-2-35-36).  He would have felt the pain of a sharp

tool being applied to soft tissue in repeated sawing movements up until the time that his spinal cord was severed.  (T-2-28).

The decapitation of Mr. Hensley did not occur in a quick, single motion.  (T-2-29).  Describing the decapitation process as particularly "gruesome," (T-2-31), Dr. Welch opined that Jack Hensley was a victim of torture.  (T-2-32-33).

An autopsy and medico-legal examination was performed upon Jack Armstrong by a medical doctor and forensic pathologist, Dr. Carmen Williams.  (T-2-41).  The medical evidence corroborates the video of Jack Armstrong's beheading as to the fact that Mr. Armstrong was alive when his captors began to saw upon his neck with a sharp-bladed tool.  (T-2-48).  Armstrong was physically restrained during the ordeal.  (T-2-49).  There were handcuffs around his wrists, positioned behind his back.  (T-2-49).  A rope bound him at the ankles.  (T-2-49).

During the decapitation, Mr. Armstrong suffered unimaginable mental and physical agony.  There was no evidence that Mr. Armstrong's senses were impaired or of any effort to anesthetize Mr. Armstrong prior to his murder.  (T-2-51).

The ability to sense pain depends upon the brain receiving input from the spinal cord.  It is not easy to fully sever the spinal cord using the methods and tools used by the murderers of these two men, evidenced by the markings on the men's spinal vertebrae, which were recovered with their remains.  Encased in, and protected by, bone in the vertebrae, the spinal cord would be one of the last anatomic structures to be severed.  (T-2-53).  As long as there was adequate blood flow to the brain, the long and difficult process of decapitation using these crude methods would be fully felt and sensed by the victims as various layers of skin, soft tissue, and muscle were cut.  (T-2-53).  It would

take a great deal of effort and time to cut through the bone structures of the cervical vertebrae and, finally, sever the spinal cord. (T-2-56).

Armstrong was held in captivity before being physically restrained for decapitation by a method that required considerable force, multiple and time-consuming movements, and brutal damage to Armstrong's neck. (T-2-58). "It's a very cruel and inhumane method of causing death." (T-2-63). Mr. Armstrong would have been aware and felt the cutting of his neck for a considerable time as his death was occurring. (T-2-58). In the opinion of Dr. Williams, Jack Armstrong was a victim of torture. (T-2-58).

In the words of a forensic anthropologist, Dr. Blair Cole, who consulted on the medico-legal examinations of both Armstrong and Hensley, the decapitations were a "very heinous, non-humane way of killing an individual." (Cole Depo. Transcript, at 36). The decapitations were so awful because, anatomically, it is almost impossible to decapitate someone quickly with the tools and technique used by Zarqawi's terrorist organization. Id. The technique and instrument used to decapitate Armstrong and Hensley involved the "greatest amount of pain and trauma to that individual because you have multiple actions that are actually tearing at the tissues as the head is being wrenched around and trying to separate." Id. Dr. Williams estimated that the men's suffering probably lasted minutes longer than the videotape evidence, which are subject to editing,[21] would otherwise suggest:

> I think conservatively if you're adding cutting through the soft tissue, it would be at very bare minimum in just several minutes before there would be a loss of consciousness. I would think that there would have to be at least a 30 to 60 seconds before there's loss of consciousness at

---

[21] The video of Mr. Armstrong's murder appears to have been significantly edited, with missing material from between the initiation of the beheading and the final severing of the head from the body. (Ex. 40). It is fair to assume that the decapitation took longer than Zarqawi's terrorists wished to depict and those lost moments of unbelievable brutality add to Mr. Armstrong's compensable pain and suffering.

the fastest, at the most extreme.  I think [in] my medical opinion it
would be <u>several minutes</u> before loss of consciousness, then death
would follow.

(T-2-69) (emphasis added).

It is not hyperbole to say that this Court can scarcely imagine a situation where
conscious pain and suffering would be more severe than that described by the medical
testimony and depicted by the video evidence.  Experienced forensic pathologists
testified both Armstrong and Hensley were subjected to torture.  This Court agrees.

To make an award that reflects the conscious pain and suffering experienced by
Mssrs. Hensley and Armstrong prior to their death, this Court considers the sort of injury,
its tendency to produce pain, the intensity of the pain, and its probable duration.  Here,
the injuries were grievous and unparalleled in this Court's experience.  In fact, the crude
technique and apparatus chosen by the terrorists appears calculated to inflict physical
pain of great intensity and significant duration.

The mental anguish and psychological terror experienced by the men during their
executions can not be understated and is a significant component in the Court's pain and
suffering award.  There is no established metric to which this Court can turn in
quantifying endurance of the stress, panic, suffering and pain experienced by Mr.
Armstrong and Mr. Hensley.  Instead, the Court, as factfinder, must exercise the wisdom
of an "enlightened conscience."  To be sure, no reasonable person could disagree that the
facts of this case justify an extraordinary amount to compensate for the cruel torture
suffered by Mr. Armstrong and Mr. Hensley.  The mental and physical pain and suffering
proven by the evidence demand an extraordinary award.  These men consciously suffered
the very worst of deaths and the Court finds that they had sufficient time and appreciation

to experience the unimaginable terror that must precede knowing you will die in an inhumane manner.

The Court finds that the evidence warrants compensatory damages for Jack Armstrong's conscious pain and suffering in the amount of $_____, awarded to the administratrix of his Estate, Fran Gates.

This Court finds that the evidence warrants compensatory damages for Jack Hensley's conscious pain and suffering in the amount of $_____ , awarded to his legal heir, Pati Hensley.

5.    INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

The claims for intentional infliction of emotional distress ("IIED") proceed under state law of Michigan and Georgia.[22]  Both states have adopted section 46(1) of the Restatement (Second) of Torts.  The tort of intentional infliction of emotional distress under the Restatement (Second) requires proof of the following:  "(1) the defendant engaged in extreme and outrageous conduct with the intent to cause, or with reckless disregard of the probability of causing, emotional distress; (2) the plaintiff suffered severe or extreme emotional distress; and (3) the defendant's conduct is the actual and proximate cause of the plaintiff's emotional distress".  Peterson v. Islamic Republic of Iran, 515 F. Supp. 2d 25, 42 (D.D.C. 2007) (relying upon the RESTATEMENT (SECOND) OF TORTS § 46 (1965)); McCahill v. Commercial Ins. Co., 179 446 N.W.2d 579 (Mich. App. 1989); Gordon v. Frost, 388 S.E.2d 362 (Ga. App. 1989).

---

[22] At the time of the incident, Jan Smith was domiciled in Ontario Canada.  Canadian tort law recognizes the tort of intentional infliction of nervous shock.  Wilkinson v. Downton, 2 Q.B. 57 (1897).  There must be "outrageous or extreme conduct coupled with an actual or constructive intent to cause a severe impact on the plaintiffs' psychological well-being."  Phillip H. Osborne, The Essentials of Canadian Law: The Law of Torts, p. 251 (3d ed. September 2007).  This tort is comparable to a claim for IIED.

Defendants acted in a manner, by supporting terrorism, that was extreme and outrageous with the intent to cause or reckless disregard to cause severe emotional distress among the immediate family members of any U.S. citizen unlucky to be caught in the hurricane of violence unleashed by Zarqawi. Haim v. Islamic Republic of Iran, 425 F. Supp. 2d 56, 70 (D.D.C. 2006); Stethem v. Islamic Republic of Iran, 201 F. Supp. 2d 78, 89 (D.D.C. 2002) ("Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror."). Defendants provided material aid and support to a terrorist such as Zarqawi over an extended period of time, both prior to and after the heinous murders at issue in this case. Mr. Armstrong and Mr. Hensley are clearly entitled to recover for IIED claims, where not duplicative of recovery under other causes of action for emotional injury. The standing of Plaintiffs to recover for their emotional injuries under IIED claims is determined by the "presence" requirement under the Restatement.

> There still remains the issue of whether each plaintiff has standing to recover under state law for the defendant's attack on the plaintiffs' respective family members. Section 46(2) of the Restatement (Second) of Torts governs the ability of plaintiffs to recover for intentional infliction of emotional distress where the defendant's conduct is directed at a third party. Restatement (Second) of Torts § 46(2). Section 46(2) of the Restatement specifically states that only present third parties may recover for an IIED claim.

Peterson v. Islamic Republic of Iran, 515 F. Supp. 2d 25, 42 (D.D.C. 2007). Courts have uniformly held that a terrorist attack—by its nature—is directed not only at the victims but also at the victims' families. Peterson v. Islamic Republic of Iran, 515 F. Supp. 2d 25, 44 (D.D.C. 2007) (quoting Estate of Heiser v. Islamic Republic of Iran, 466 F. Supp. 2d 229, 328 (D.D.C. 2006)); Salazar v. Islamic Republic of Iran, 370 F. Supp. 2d 105, 115 (D.D.C. 2005); Burnett v. al Baraka Inv. and Dev. Corp., 274 F. Supp. 2d 86 (D.D.C.

2003) ("A terrorist attack on civilians is of course intended to cause emotional distress to the victims' families."); <u>Jenco v. Islamic Republic of Iran</u>, 154 F. Supp. 2d 27, 35 (D.D.C. 2001) ("If the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person which is not present, no essential reason of logic or policy prevents liability.").  The raison d'etre of an act of terrorism is to terrorize innocent civilians with acts of horrifying and mind-numbing brutality.  Without the audience of family members at home, an act of terrorism loses its claim to infamy.  E.g., <u>Sutherland v. Islamic Republic of Iran</u>, 151 F. Supp. 2d 27, 50 (D.D.C. 2001).  One can scarcely imagine a case more illustrative of this truth—that terrorism targets families as well as victims—than in this case where the entire hostage crisis unfolded on television and included television appeals for the men's safe return by Mrs. Hensley.

The Armstrong and Hensley families were clearly a target of the Defendants' terrorism.  Neither Michigan state common law nor Georgia state common law requires the family members to be literally present during the conduct of the act that causes emotional distress to allow the family member to assert a valid IIED claim for an act of state-sponsored terrorism.  <u>Peterson</u>, at 44.  Here, the evidence demonstrates the Defendants' support for a campaign of attacks against Westerners in the Middle East and, especially, in Iraq, was intended not only to harm the victims, but to instill terror in their loved ones and others in the United States.

In September of 2004, Jack Armstrong, Jack Hensley, and Kenneth Bigley were kidnapped from their Baghdad villa by Zarqawi.  They were held captive as hostages for several days.  They were blindfolded and paraded before a video camera.  They were forced to identify themselves, knowing the horror this would cause their families.  (Ex.

47).  This video and the subsequent videos that followed were quickly and foreseeably distributed far and wide across the internet.

In the days that followed, each man would be placed on their knees.  Their hands and feet were bound.  Behind them, their captors read in Arabic for several minutes. Suddenly, the men were grabbed from behind and forced to the ground, and decapitated. While the beheadings take less than a minute on the video, the medical testimonies collectively suggest the beheadings actually required more time to complete.  Given the medical testimony, it is a reasonable inference that the video footage was edited before being posted and distributed.  If so, the actual duration of Armstrong and Hensley's suffering may have been too repulsive to be fully depicted, even given the terrorists' gruesome propaganda purposes.

The Court finds that the facts prove an entitlement to an award of damages for IIED.  The record of emotional distress suffered by the Plaintiffs is replete with evidence of extraordinary emotional suffering.  Though the emotional harm of family members under these circumstances could reasonably be presumed, the Court also relies upon the following as evidence that supports an award for emotional distress caused by Defendants' intentional support for terrorists that Defendants knew would perpetrate acts that were so barbarous as to shock the conscience.  The Court finds the Defendants acted with such intentionality because Defendants' provision of support to Zarqawi and his terrorist network commenced prior to Nicholas Berg's beheading, a propagandized event, and continued subsequent to Mr. Armstrong's and Mr. Hensley's beheadings.  The Court will examine the circumstances of the two victim's families separately.

i.

Olin Eugene "Jack" Armstrong

Jack Armstrong's sister, Jan Smith, learned her brother was captured after she was alerted by a friend.  (T-2-99).  When she turned on the television to CNN, she saw three men, blindfolded, kneeling before their captors.  One of them was her brother.  (T-2-99).  The next day, Jan flew to Germany to be with her and Jack's mother, Fran.  Jan's memory of the frantic days between initially learning of her brother's capture and his death is not precise.  (T-2-101).  But she remembers a phone call from the American Embassy in Baghdad telling her mother that Jack Armstrong's body was recovered.  (T-2-101).

After her brother's murder, Jan Smith sank into depression and anger.  (T-2-102).  Jan's mother, Fran Gates, feared she might lose not only her son but her daughter as well.  (T-2-124).  Jan suffered a nervous break down.  Overcome by feelings of anger and helplessness, she became a person she did not like, lashing out at friends and family.  (T-2-102).  Jan entered therapy.  She has been prescribed antidepressants continuously since Jack's death.  (T-2-103). She lives in constant fear of slipping back into the nightmare she calls "the dark place."  (T-2-103-104).

Jack Armstrong's mother, Fran Gates, was at her home in Germany when some friends came to her home to tell her Jack had been taken hostage. (T-2-121).  She saw the video on the television news channels showing her son as a blindfolded hostage. (T-2-123).  Joined in Germany by her daughter the next day, the family began calling Jack Armstrong's company, the FBI and the American Embassy in Baghdad in a frantic search for information.  Three days later, on September 20, 2004, they received the news that one of the hostages had been killed but there was no immediate confirmation as to which

hostage. There was a body but no head. FBI agents came to Fran's home to obtain information that could be used to identify whether the decapitated body was that of Jack Armstrong. (T-2-124). Subsequently, the body was identified as Jack Armstrong's. Later, Jack's head was recovered.

The horror of a mother witnessing her son held hostage, then brutally executed is beyond comprehension. Fran Gates viewed parts of the video showing her son's murder. (T-2-125). She has never felt free to cry for her son because she fears that if she started, she would not be able to stop. (T-2-125). The devastation caused by the videotape footage of the beheadings will last a lifetime:

> You never, once you see some of these pictures, you never clear them out of your mind. . . . When I close my eyes the picture of my son kneeling in front of those men is on the inside of my eyelids. Every time I close my eyes I see it. I suppose I'll see it the rest of my life.

(T-2-126).

### ii.    Jack Hensley

Pati Hensley first learned her husband was abducted on the morning of September 16, 2004, when she went to read the news on the internet. (T-3-29). She saw a report that two Americans and a British national had been kidnapped in Baghdad. (T-3-30). She immediately feared for her husband. The daughter of a military family, Pati Hensley had grown up stoic and composed. For the first time in her life, she felt overwhelmed by panic. (T-3-31). She had to tell her daughter and her mother-in-law, who suffered from Alzheimers disease. FBI agents arrived at her home, followed immediately by satellite trucks from the media and press. (T-3-33). Pati e-mailed Jack's brother, Ty Hensley. Ty was appointed the family's spokesperson to the media. The family tried to avoid the media.

When the first hostage's body was found, the Hensleys went through the agonizing wait for his identification. When they learned it was Jack Armstrong and not Jack Hensley, the waiting began again. (T-3-12). Ty Hensley flew to New York. Believing Zarqawi would probably kill his brother, and under tremendous pressure, Ty made a televised plea that his brother's life be spared. Pati taped a similar public request on CBS. (T-3-35). Their pleas for mercy were not heeded. Jack Hensley was tortured and murdered a day before his 49th birthday.

At first, the Hensley family knew only that a second body was found, triggering a process of confirmation through fingerprints and dental records. Then, they learned the awful truth. When he learned that his brother had been found murdered, Ty Hensley felt relief that Jack was no longer suffering. (T-3-14). Pati and Sara knew there was a videotape of the beheading. Pati viewed it on the internet. (T-3-38).

The impact of the loss to Pati and Sara Hensley has been devastating. Pati wishes she could simply return to the way things were before. (T-3-40). Had he lived, Pati Hensley believes Jack would have been able to parlay his overseas experience in Iraq into a better job in the corporate world. (T-3-41). Pati has not returned to work since Jack's death. At the time, she was preoccupied caring for Sara and Jack's mother. Even now, Pati Hensley finds it too difficult to concentrate for her return to the workforce. (T-3-42).

Sara Hensley was thirteen (13) years old when her father was abducted, held hostage, and savagely murdered. (T-3-45). Her father was her best friend. (T-3-45). Everything she did involved him. She saw how difficult it was for her mother, Pati, to cope. (T-3-46). Of course, it was also difficult for Sara, who battled severe depression and mental anguish. (T-3-46). Sara secretly found and viewed the videotape of her

father's beheading on the internet. (T-3-47). She watched it because she needed to confirm in her mind that he was gone so she could move on with her life. (T-3-47). She saw how her father's brutal death was used as propaganda for extremists. Thankfully, Sara Hensley has stepped back from the brink of hopelessness.

Now sixteen (16), Jack Hensley's daughter is moving forward with her life. She hopes to graduate early from high school and attend college. She plans to travel to places her parents have been. (T-3-48). Sara intends to honor her father by the way she lives her life: "I am missing something, I would rather have that back, but I have taken a bad situation and turned it around for the better." (T-3-48).

In recording, publishing and promoting videotape footage of the beheadings, Zarqawi's organization clearly planned and intended the effect upon the families of Armstrong and Hensley. But what should not be lost in this case is that this effect was desired not only by Zarqawi but by the Defendants—the Syrian Arab Republic and its leaders. That Zarqawi and his terrorist network had committed earlier, brutal, and public acts of terrorism against Nicholas Berg without losing the backing of their Syrian facilitators underscores the gravity of the Defendants' moral culpability.

Zarqawi and his terrorist network did not merely torture and brutalize these men. Through the internet, they transformed these acts into infamous and indelible propaganda that served these Defendants' political ends.

Because of their common motivations, these Defendants provided Zarqawi and his men with safe haven, transportation, a conduit for supplies, weapons, and bases of operations. Zarqawi fanned the flames of terror in Iraq. He did so as a de facto agent or

de jure co-conspirator of these Defendants who, for decades, have used terrorists as tools for their political objectives.

The emotional toll exacted upon these women illustrates the full spectrum of individual grief. A mother, Fran Gates, copes in silence. A sister, Jan Smith, constantly battles clinical depression with medication and therapy. Sara Hensley plans a life she hopes will honor her father's memory. Pati Hensley simply wishes she could turn back the clock to a time when her husband was coming home.

This Court recognizes that all these forms of grief, while different, are compensable. Further, all of these emotional harms resulted from actions that, in their design and execution, were particularly aimed at the families of these men.

Based upon all of the evidence, the Court finds awards in the following amounts are appropriate compensation for the intentional infliction of emotional distress to the family of Jack Armstrong:

Fran Gates (Mother of Jack Armstrong): $_____

Jan Smith (Sister of Jack Armstrong): $_____

Based upon all of the evidence, the Court finds awards in the following amounts are appropriate compensation for the intentional infliction of emotional distress to the family of Jack Hensley:

Pati Hensley (Wife of Jack Hensley): $_____

Sara Hensley (Daughter of Jack Hensley):   $_____

6.    PUNITIVE DAMAGES

Generally, the purpose of punitive damages is two-fold: to punish those who engage in outrageous conduct and to deter others from similar conduct in the future.

"Punitive damages are awarded to punish a defendant for particularly egregious conduct, and to serve as a deterrent to future conduct of the same type." Eisenfeld v. Islamic Republic of Iran, 172 F. Supp. 2d 1, 9 (D.D.C. 2000); see also Pacific Mut. Life. Ins. Co. v. Haslip, 499 U.S. 1, 15 (1991). Several factors are considered in the analysis of whether to award punitive damages and how substantial the award should be. Those factors include the character of the Defendants' acts; the nature and extent of harm to the plaintiff that the defendant caused or intended to cause; the need for deterrence; and the wealth of defendant. RESTATEMENT (SECOND) TORTS, § 908 (1)-(2), (1977). A consideration of these factors shows that this case is one that calls for the levying of substantial punitive damages.

28 U.S.C. § 1605A(c) specifically allows the award of punitive damages for personal injury or death resulting from an act of state-sponsored terrorism. In recognition of the difficulty of bringing terrorists to justice personally, Congress created jurisdiction over, and rights of action against, foreign state sponsors of terrorism. Punitive damage awards under the FSIA serve multiple purposes:

> [b]y creating these rights of action, Congress intended that the Courts impose a substantial financial cost on states which sponsor terrorist groups whose activities kill American citizens. This cost functions both as a direct deterrent, and also as a disabling mechanism: if several large punitive damage awards issue against a foreign state sponsor of terrorism, the state's financial capacity to provide funding will be curtailed.

Flatow v. Islamic Republic of Iran, 999 F. Supp. 1, 33 (D.D.C. 1998). Therefore, in addition to the traditional focus of punitive damages upon individual punishment and general deterrence, this law emphasizes specific deterrence of the transgressing state sponsors of terrorism so that future sponsorship may be prevented.

In this case, the evidence shows Defendants supported, protected, harbored and subsidized a terrorist group whose modus operandi was the targeting, brutalization and murder of American citizens and Iraqi civilians in the Middle East and Iraq. The character of these acts requires an award of punitive damages. E.g., Cronin v. Islamic Republic of Iran, 238 F. Supp. 2d 222, 235 (D.D.C. 2002) (finding the character of the defendant's act—where the defendant provided material support and resources to terrorist organizations to carry out acts such as kidnapping and torture—supported a punitive damage award of $300,000,000.00). Zarqawi established terrorist "cells" in Iraq soon after the commencement of Operation Iraqi Freedom, formalizing his group in 2004 to bring together jihadists and other insurgents in Iraq fighting against American and Coalition forces. (Country Reports on Terrorism 2004, p. 111, U.S. Dept. of State, Ex. 27). The goals of Zarqawi's organization were fully compatible with those of the Defendants: to launch terrorist attacks against U.S. citizens and Iraqi civilians.

Premeditated violence against civilian targets is not a legitimate action by any government. It does not matter whether such violence is undertaken directly or indirectly. Civilized society cannot tolerate states whose partnership with terrorist surrogates, like Zarqawi's terrorist network, is formed for the purpose of scoring political victory through kidnapping, torture and murder. Thus, in deciding that an award of punitive damages is necessary, this Court is especially cognizant of the purpose of the state-sponsor of terrorism exception to the FSIA.

In deciding the amount of punitive damages necessary, the Court undertakes the difficult task of quantifying in financial terms an act of such repugnance, premeditation and cruelty as to challenge the most faithful person's belief in the basic goodness of

mankind.  Jack Armstrong and Jack Hensley were held captive.  They were frightened, humiliated and terrorized.  Then, they were decapitated by a mechanical technique not fit for the slaughter of animals because of its clumsiness and abject viciousness.

However, nowhere is the premeditation and callousness of these acts more evident than in the recording, publication, and distribution of video footage of the men's torture and murder.  The video of these atrocities transformed innocent men—husbands, fathers, sons, and brothers—into mere props in a propaganda campaign.  The video was designed to glorify cruelty and to fan the flames of hatred.  This Court can think of nothing more offensive to human dignity than to think that as family members watched in horror, extremists were reveling in these men's screams, gasps, and cries for mercy.

The videotape makes clear that this was the result of careful planning and was carried out with what could only be described as fanatical malice.  "Killing innocent civilians for political ends constitutes unconscionable conduct in any civilized society."  E.g., Campuzano v. Islamic Republic of Iran, 281 F. Supp. 2d 258, 279 (D.D.C. 2003) (citation omitted).  For foreign states that forge partnerships with such fanatical murderers and gangsters, there must be a reasoned answer based upon the orderly application of the law of civilized nations.

In order to ensure that the Defendants will refrain from sponsoring such terrorist acts in the future, the Court finds the evidence clearly and convincingly demands an award in favor of Fran Gates, as administratrix of the Estate of Jack Armstrong, against each of the Defendants, jointly and severally, for punitive damages in the amount of $150,000,000.00.

In order to ensure that the Defendants will refrain from sponsoring such terrorist acts in the future, the Court finds the evidence clearly and convincingly demands an award in favor of Pati Hensley, as legal heir to Jack Hensley, against each of the Defendants, jointly and severally, for punitive damages in the amount of $150,000,000.00.

ORDER OF JUDGMENT

This _____ day of _____, 2008.

_____
**Rosemary M. Collyer**
**United States District Judge**

PROPOSED BY:

Dated: April 21, 2008                    Respectfully Submitted,

**/S/ JOHN SALTER_____**          **/S/ STEVEN R. PERLES**
John F. Salter                          Steven R. Perles
Ga. Bar No. 623325                      No. 326975
Roy Barnes                              Edward MacAllister
G.A. Bar  No. 39000                     No. 494558
The Barnes Law Group, LLC               THE PERLES LAW FIRM, PC
P.O. Box 489                            1146 19th Street, NW, 5th Floor
Marietta, Georgia  30061                Washington, DC 20036
Telephone:  770-419-8505                Telephone: 202-955-9055
Facsimile:  770-590-8958                Facsimile:     202-955-3806

Attorney for Plaintiffs