# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

FRANCIS GATES Individually
and as the Administrator
of the ESTATE of OLIN EUGENE
"JACK" ARMSTRONG, JR., JAN
SMITH, PATI HENSLEY and SARA
HENSLEY

CASE NUMBER:  1:06CV01500

Plaintiffs,

v.

SYRIAN ARAB REPUBLIC,
SYRIAN MILITARY
INTELLIGENCE, PRESIDENT
BASHAR AL-ASAD and GENERAL
'ASIF SHAWKAT

Defendants.

## PLAINTIFFS' TRIAL BRIEF[1]

COME NOW the Plaintiffs in this default proceeding and present this

Court with this Trial Brief regarding the upcoming default proceeding

---

[1] Contemporaneously filed with this Trial Brief is a Motion and Supporting
Memorandum addressing, at the Court's request, issues regarding how to
protect the identities of certain persons, whether the trial proceedings should
be sealed in whole or in part, and other confidentiality issues.  This Trial
Brief is not intended to be a public document.  *__Names have not been
changed to protect persons whose personal safety may be jeopardized by
disclosure of this Trial Brief.__*  Therefore, if the Court chooses to make
portions of the Trial Brief available as a public judicial record, Plaintiffs'
counsel request the opportunity to redact portions of this Trial Brief prior to
such disclosure.

scheduled for a non-jury trial on January 7-9, 2008. The primary purpose of this Trial Brief is to provide the Court with an outline of the evidence and testimony Plaintiffs expect to present at trial. Secondarily, where evidence is already capable of a proper foundation without live testimony—such as through affidavit—there are some limited areas where Plaintiffs seek to admit evidence through this Trial Brief so that the trial proceedings may be simplified. Finally, Plaintiffs attach a witness list and exhibit list immediately after this Trial Brief and prior to the exhibits attached to the brief.

## I.    INTRODUCTION

This civil action arises out of the kidnapping, torture, and murder of Olin Eugene Armstrong (hereinafter "Jack Armstrong") and Jack L. Hensley ("Jack Hensley") in Iraq on or about September 20 and 21, 2004, respectively. The murders of Jack Armstrong and Jack Hensley were carried out by groups of terrorists operating in Iraq with the material support of the Syrian Arab Republic (hereinafter "Syria"). Syria has been listed by the State Department of the United States as a state-sponsor of terrorism *continuously* since December 29, 1979. Acting through its principals, including the named individual defendants, Syria provided material support and resources to the al-Tawhid wal-Jihad and Abu Mus'ab al-Zarqawi

("Zarqawi").  Syria intended such support to facilitate the insurgency in Iraq

and the extrajudicial killings perpetrated by Zarqawi and his organization.

Plaintiffs bring this action pursuant to the provisions of the Foreign

Sovereign Immunities Act, codified at 28 U.S.C. § 1602, *et seq*.  Though

served, none of the Defendants have answered the allegations.  The Court

therefore operates in the default setting governed by 28 U.S.C. § 1608(e):

> A court shall not enter a default judgment against a foreign state
> "unless the claimant establishes his claim or right to relief by
> evidence satisfactory to the court." 28 U.S.C. § 1608(e). This
> "satisfactory to the court" standard is identical to the standard
> for entry of default judgments against the United States in
> Federal Rule of Civil Procedure 55(e). <u>In evaluating the
> plaintiffs' proof, the court may "accept as true the plaintiffs'
> uncontroverted evidence." In FSIA default judgment
> proceedings, the plaintiffs may establish proof by affidavit.</u>

*Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 268 (D.D.C.

2003) (citations omitted) (emphasis added).  The Plaintiffs' burden of proof

therefore is "evidence satisfactory to the court."

II.    **<u>THE SYRIAN DEFENDANTS ARE DIRECTLY AND/OR VICARIOUSLY
       RESPONSIBLE FOR THE ACTIONS OF THOSE THAT KIDNAPPED,
       TORTURED AND MURDERED JACK ARMSTRONG AND JACK
       HENSLEY.</u>**

A.    **Syria's Sponsorship of Terrorism and al-Zarqawi's
      Organization, Specifically**

Terrorism is an extension of Syria's domestic and foreign policy.

Syria is a primary gateway for terrorists and insurgents into Iraq.  According

to evidence elicited from captured jihadists as well as from other very reliable sources, recruits for al-Zarqawi's organization were trained in Syrian military barracks. In Syria, the recruits of al-Zarqawi's al-Tawhid wal-Jihad organization received weapons and training. Then, they crossed the border, entering Iraq with the full knowledge of the Syrian security services. Funds raised by al-Zarqawi's financial network in various Arab countries especially in Jordan (Al-Zarqawi's native country) and Saudi Arabia are funneled through Syria.

Syria has regarded al-Zarqawi's terrorist network as indispensable for Syrian interests in the region. Syria fully supports the insurgency in Iraq to inflict heavy causalities on the U.S. forces in Iraq so that the U.S. will be compelled to withdraw in a humiliating manner from Iraq. This will make it more difficult than ever for the U.S to intervene to change the regimes in Syria and Iran, Syria's close ally. By fully supporting the insurgency in Iraq and especially al-Zarqawi's network, Syria expects to gain prestige and stature in the Arab and Islamic worlds.

**B.    The Abduction, Torture and Murder of Jack Armstrong and Jack Hensley**

In September of 2004, Jack Armstrong and Jack Hensley were non-combatants, employed by a private sub-contractor as civilian project managers in Baghdad, Iraq. Their employer was part of an American

- 4 -

consortium providing support and logistical services pursuant to contracts with the Defense Department and/or United States Air Force. These men were not hired to act as armed security forces or bodyguards. Their responsibilities included providing technical and operational assistance to support forces and resources for the military in non-combat environments in Baghdad, Iraq. Prior to their kidnapping and murder, they lived in typical, Iraqi residential civilian housing. The house was two levels with a gated wall surrounding it.

Upon information and belief, the morning of the kidnapping, the Iraqi guards assigned to protect the workers' house did not appear at the compound. As was his daily ritual, early in the morning Armstrong walked out to start the generator for the compound. He was surrounded by militants and subdued. The militants stormed the house and took the remaining occupants hostage, including Jack Hensley and Ken Bigley, a British national.

For many days, Armstrong and Hensley (and Bigley) were kept in captivity, in constant fear for their lives and distraught for their families. They were humiliated. They became malnourished. Hensley was denied medical assistance for a chronic illness. After days of suffering and fearing for their lives, they were brutally murdered by decapitation. On September

20, 2004, Abu Mus`ab al-Zarqawi beheaded Jack Armstrong.  On September

21, 2004 Abu Mus`ab al-Zarqawi beheaded Jack Hensley.  The terrorists

video-recorded both of these gruesome and agonizing murders, then posted

the video footage to the internet for all the world to see, including the

families of Armstrong and Hensley.

     Abu Mus`ab al-Zarqawi's group Al-Tawhid wal-Jihad claimed it

beheaded Jack Armstrong and Jack Hensley because it was their job to work

with the "occupation forces."[2]  The terrorists documented themselves

beheading Hensley and Armstrong.  The terrorists published video footage

of their murders for propaganda purposes.  The terrorists posted the video

footage on the internet.  It is believed al-Zarqawi himself may have

performed one or more of the beheadings.  Abu Mus`ab al-Zarqawi and al-

Tawhid wal-Jihad murdered these innocent men and exploited their

horrifying deaths in order to terrorize and further embarrass the United

States.  By killing Americans in a fashion that was not only cruel but

---

[2] Since 2005, it has been the official position of the United States
government regarding Al Zarqawi that his group, also known as Al-Qaida in
Iraq, "claimed responsibility for the videotaped execution by beheading of
Americans Nicholas Berg (May 8, 2004), Jack Armstrong (September 20,
2004), and Jack Hensley (September 21, 2004)." *Country Reports on
Terrorism 2004*, U.S. Department of State, Office of the Coordinator for
Counterterrorism, 111 (April 2005) (Excerpt attached hereto as Exhibit 27).

publicly humiliating, Syria and al-Zarqawi advanced both of their political agendas.

### C.    The State Sponsor of Terrorism Exception to Foreign Sovereign Immunities Act

To allow the Court to assert subject matter jurisdiction over this case under the Foreign Sovereign Immunities Act, Plaintiffs must satisfy 28 U.S.C. § 1605(a)(7), which requires a showing that the State Department designated Syria as a state-sponsor of terrorism pursuant to section 60 of the Export Administration Act of 1979, 50 U.S.C. § 2405, section 630(A) of the Foreign Assistance Act of 1961, 22 U.S.C. § 2371, and section 40 of the Arms Export Control Act, 22 U.S.C. § 2780.

Defendant Syria is a foreign state that has been designated and remains designated as a state sponsor of terrorism since December 29, 1979. U.S. Department of State Website, Bureaus/Offices Reporting Directly to the Secretary, Office of the Coordinator for Counterterrorism, List of State Sponsors of Terrorism, http://www.state.gov/s/ct/c14151.htm (last visited December 10, 2007).

The evidence will further show—as required by 28 U.S.C. § 1605(a)(7)—that the officials and agents of the Syrian Arab Republic engaged in acts of material support and facilitation while "within the scope of his or her office, employment, or agency", the Plaintiffs or victims are US

nationals, and the murders occurred outside the territory of Syria, thereby
negating the need for international arbitration prior to the filing of the
complaint, which would otherwise be required.

After subject matter jurisdiction is assured, Plaintiffs then may assert
their federal and/or state causes of action against the foreign sovereigns as if
it were a private entity. 28 U.S.C. § 1606. A substantive discussion of the
various causes of action is found *infra* at Section IV.A.

### III.   AN OVERVIEW OF PLAINTIFFS' EVIDENCE ON LIABILITY

#### A. Expert Testimony

##### 1.   Matthew Levitt, Ph. D.

Dr. Levitt is a senior fellow and director of The Washington Institute's
Stein Program on Terrorism, Intelligence, and Policy. From 2005 to early
2007, he served as deputy assistant secretary for intelligence and analysis at
the U.S. Department of the Treasury. In that capacity, he served both as a
senior official within Treasury's terrorism and financial intelligence branch
and as deputy chief of the Office of Intelligence and Analysis, one of sixteen
U.S. intelligence agencies coordinated under the Office of the Director of
National Intelligence. During his tenure at Treasury, he played a central role
in efforts to protect the U.S. financial system from abuse and to deny

terrorists, weapons proliferators, and other rogue actors the ability to finance
threats to U.S. national security.

Previously, he provided tactical and strategic analytical support for
counterterrorism operations at the FBI, focusing on fundraising and
logistical support networks for Middle Eastern terrorist groups.   An expert
witness for the Department of Justice in several terrorism cases, Dr. Levitt
has also lectured on international terrorism on behalf of the Department of
State, consulted for various U.S. government agencies and private industry,
and testified before the Senate and House on matters relating to international
terrorism.  He is a term member of the Council on Foreign Relations, a
member of the international advisory board for both the Institute for
Counter-terrorism in Israel and the International Centre for Political
Violence & Terrorism Research in Singapore, and a CTC fellow with the
Combating Terrorism Center (CTC) at the U.S. Military Academy (West
Point).

The testimony of Dr. Levitt is expected to establish several things.
First, the Zarqawi network has benefited from Syrian safe haven and
support.  Second, the Zarqawi organization has maintained a logistical
facilitation network is Syria.  Third, the Zarqawi organization has planned,
funded and trained operatives for attacks in Jordan from inside Syria.

Fourth, the Zarqawi Network in Iraq receives financial and operational support from supporters in Syria. Zarqawi could not have done this without the support and acquiescence of the Assad government in Syria. And, finally, the Zarqawi organization has maintained relationships with other terrorist organizations resident in, and/or supported by, Syria. In summary, Dr. Levitt's testimony will show the Zarqawi network was, in large part, successful and dangerous because of the safe haven and support it received/receives from Syria.

        2.    Marius Deeb, Ph.D.

    For more than thirty years, Dr. Marius Deeb has been an authority on the Middle East. Moreover, he has studied, published and lectured on the often destructive role played by Syria in efforts for peace in the Middle East. A relevant sampling of his work includes: Marius Deeb, *Syria's Terrorist War on Lebanon and the Peace Process: 1975-2002*, (Palgrave 2003); Marius Deeb, *Lebanon since 1979: Syria, Hisballah and the War against Peace in the Middle East*, in Robert O. Freedman, *The Middle East Enters the 21st Century* (University Press of Florida 2002); Marius Deeb, *Whither Asad's Syria? Internal Dynamics and the Peace Process* (Presentation at 49th annual "Middle East Uncertainties" Conference in Washington, D.C.) (September 29-30, 1995). After receiving bachelors and masters degrees in

political theory from the American University of Beirut in Lebanon, Deeb obtained a doctorate in philosophy with a special reference to the Middle East from Oxford University in Oxford, England. Presently, Deeb is a professor of Middle Eastern Studies at the School of Advanced International Studies at Johns Hopkins University.

Dr. Deeb is expected to testify that Syria was the principal gateway for terrorists and insurgents into Iraq. In Syria, recruits of al-Zarqawi's organization, al-Tawhid wal-Jihad, received weapons, training, and a safe haven. Recruits for this organization were trained in Syrian military barracks and/or in training camps that Syria allowed to operate. Funds raised for al-Zarqawi's financial network were funneled through Syria.

Dr. Deeb will also establish the motivation for Syria's support for terrorists like al-Zarqawi. Syria regards al-Zarqawi's terrorist network as indispensable for Syrian political aspirations and interests in the Middle East. Syria fully supports the insurgency in Iraq in the hope that if the United States is forced to leave after sustaining heavy casualties, America will be less inclined, or less capable, of intervening to change regimes in Syria and Iran, Syria's close (and only) ally. By fully supporting the insurgency in Iraq and especially al-Zarqawi's terrorist network, Syria hopes to gain prestige and stature in the Arab and Islamic worlds.

3.    David Schenker

Mr. Schenker is a senior fellow in Arab politics at The Washington Institute.  Previously, he served in the Office of the Secretary of Defense as a Levant country director, the Pentagon's top policy aide on the Arab countries of the Levant.  In that capacity, he was responsible for advising the secretary and other senior Pentagon leadership on the military and political affairs of Syria, Lebanon, Jordan, and the Palestinian territories.  He was awarded the Office of the Secretary of Defense Medal for Exceptional Civilian Service in 2005.  Prior to joining the government, Mr. Schenker was a research fellow at the Washington Institute, focusing on Arab governance and political issues at a time of seminal leadership transition in the Middle East.  Mr. Schenker is fluent in Arabic.  He has visited Syria, in particular, many times.

Mr. Schenker is expected to testify to various instances where Syria and its representatives at the highest level have aided, directly and indirectly, Abu Musab al-Zarqawi and Al Quaida in Iraq.  Syria is a tightly-controlled dictatorship with pervasive surveillance and repression.  A police state, there is minimal "freelance" political activity that takes place without official government sanction or sponsorship.

- 12 -

The Government of Syria aided jihadis by facilitating their organized transportation to Iraq through Syrian territory. Syria knew that the purpose and objective of these jihadis was to kill Americans in Iraq. A majority of these jihadis were known to have been affiliated with al-Zarqawi. Until 2006, Syria did not require foreign Arabs to have VISAs in order to gain entry into the country. In the lead-up to the War in Iraq, these persons were allowed to line up across from the United States Embassy in Damascus to enter an Iraqi Government Office, where these individuals could sign-up and board a bus for travel to Iraq to attack American forces. This operation was the subject of complaints by the United States Ambassador in Damascus, Ted Kattouf.

A further example of the expected testimony by Mr. Schenker concerns a Zarqawi operative and financial supporter, Shakr Absi. Absi conducted the financing of the Zarqawi-led assassination in 2002 of Laurence Foley, an American diplomat in Jordan. In advance of the Foley assassination, Absi spent significant time in Syria. He fled to Syria after the murder. For his role in the Foley assassination, the Jordanian government sentenced Absi, *in absentia*, to death. Syria refused extradition, claiming to hold Absi in prison. However, according to open sources, Syria was actually allowing Absi to operate a training camp for would-be suicide bombers in

- 13 -

Syria. This and other testimony by Schenker will be used to show the
cooperative relationship between Syria and Al-Qaida in Iraq and al-Zarqawi,
in particular.

4.    Evan Kohlmann

Evan Kohlmann is an International Terrorism Consultant who has
spent a decade tracking Al-Qaida and other terrorist groups. In the course of
his research, he has traveled overseas to interview prominent Al-Qaida
spokesmen and has amassed one of the largest databases in the world of
terrorist communiqués and multimedia. He currently works as a senior
investigator on behalf of the Nine Eleven Finding Answers (NEFA)
Foundation and has served at various times as a private consultant in
terrorism matters for the U.S. Department of Defense, the U.S. Department
of Justice (DOJ), the Federal Bureau of Investigation (FBI), the Office of the
High Representative (OHR) in Bosnia-Herzegovina, the Australian Federal
Police (AFP), the U.K. Crown Prosecution Service (CPS), and Scotland
Yard's SO-15 Counter Terrorism Command. Mr. Kohlmann has served as
an approved expert witness in various federal terrorism trials.

The testimony of Mr. Kohlmann is expected to establish that the video
footage of Jack Armstrong and Jack Hensley which was posted to the
internet amounts to a credible "claim of responsibility" by al-Zarqawi and

Al-Qaida in Iraq for the murders of Jack Armstrong and Jack Hensley. Mr.
Kohlmann will further testify that Syrian intelligence officers were
instrumental in smuggling insurgents and militants to a key Al Qaeda
training camp in 2003.

### B. Witness Testimony

#### 1. Sam Rossman

Mr. Sam Rossman is a former ▉▉▉▉ who, between May and early
summer of 2004, was stationed with Jack Hensley at an American base
located along a highway near Iraq's border with Syria. Depending upon his
availability at the time of trial, Plaintiffs will present Rossman's testimony
either in person or via videotaped deposition. In addition to testifying to his
friendship with, and respect, for Jack Hensley, Rossman will testify to how
Syria endangered Americans in Iraq by supporting insurgents and Al-Qaida
in Iraq, including al-Zarqawi's associates.

#### 2. ▉▉▉▉▉▉▉▉

Plaintiffs wish to reserve the right to call an additional ▉▉▉▉ fact
witness. ▉▉▉▉▉▉ retired from the ▉▉▉▉▉▉▉▉▉▉▉
in Iraq proximate to the Syria-Iraq border during the relevant time period.
He will testify to the extent to which jihadis or militants were able to
infiltrate from Syria to Baghdad using the extensive highway system in Iraq.

████████     is awaiting ███████ to testify from the ██████████
███████

### 3.   Sheik Abu Massoquoi

Sheik Abu Massoquoi established a ████████████████████
████████████████████████████████████████████████████
████████████████████████████████████ Mr.
Massoquoi became of aware of the support flowing from the Syrian

government to Al Qaeda in Iraq and Zarqawi. Mr. Massoquoi testified that

Al Qaeda exists as an organization in both Syria and Iraq and that the Syrian

government's assistance allows the two organizations to cooperate. The

government of Syria facilitates the travel of Al Qaeda fighters from Syria

into Iraq. Arms shipments come through Syria and the Syrian government is

one source for these weapons.

The Syrian government also allows foreign fighters to pass into Iraq

without checking passports and by providing passports. Captured foreign

fighters also admitted they were trained in Al Qaeda camps in Syria. Injured

foreign fighters, including Zarqawi himself on at least one occasion, travel to

Syria for medical care. None of this could occur without the support and

acquiescence of the Syrian government, which operates a police state along

the liens of Saddam Hussein's former dictatorship of Iraq. Syria is a closed

country, although their border with Iraq is open to foreign fighters traveling to Iraq to fight in Al Qaeda.

Plaintiffs believe the testimony of Mr. Massoquoi is sufficiently complete and self-explanatory and intend to introduce an audio recording of a deposition. He also fears for the safety of his family and would not consent to traveling to the United States to testify further on this matter. The transcript of this deposition, and its accompanying certification, is attached hereto as Exhibit 30.

## IV.    OVERVIEW OF THE EVIDENTIARY STANDARDS FOR PLAINTIFFS' CAUSES OF ACTION AND EVIDENCE ON DAMAGES

### A. The Law Governing Available Causes of Action and Damages

Once the immunity of the foreign sovereign has been pierced and the Court asserts subject matter jurisdiction over the case pursuant to 28 U.S.C. § 1605(a)(7), the question becomes what causes of action are available and what are they based on? The statutory language of the FSIA compels the usage of the same choice-of-law provisions, once foreign sovereign immunity has been pierced, as would be used in litigation against a private party, rather than a foreign state. 28 U.S.C. § 1606. The District of Columbia, the forum state here, utilizes choice-of-law principles that analyze the "'governmental interests', under which [the court] evaluate[s] the governmental policies underlying the applicable laws and determine[s]

- 17 -

which jurisdiction's policy would be more advanced by the application of its law to the facts of the case under review." *District of Columbia v. Coleman*, 667 A.2d 811, 816 (D.C. 1995).

The law of the forum, the District of Columbia, therefore provides the operative choice-of-law analysis for this case. *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 69 (D.D.C. 2006). The District of Columbia choice-of-law rules employ "a refined government interest analysis under which courts 'evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review.'" *Id.* (citing *Hercules & Co. v. Shama Rest. Corp.*, 566 A.2d 31, 41 (D.C. 1989)). The recent decisions that have analyzed the application of the District of Columbia's choice-of-law rules to cases brought under 28 U.S.C. § 1605(a)(7) have routinely drawn upon the state common law of the plaintiff's domicile at the time of the attack. *E.g., Damarrell v. Islamic Republic of Iran*, 2005 U.S. Dist. LEXIS 5343 at *57-67 (D.D.C. March 29, 2005). Plaintiffs therefore present the Court the law from the domicile of each Plaintiff on the day of September 20 or 21, 2004, for each Plaintiff's cause of action.

- 18 -

There are two categories of plaintiffs arising from this bombing attack: 1) the estates of those murdered in the attack and 2) the emotionally injured family members. *See id.* at *66-67. The causes of action for the estates of those murdered will be provided by the domicile of their residence at the time of the beheading. *Id.* at *67-68. The causes of action for the emotionally injured family members will also be provided by the domicile of their residence at the time of the beheading. *Id.* at *70. The applicable states and the relevant causes of action are identified below.

1.    The Wrongful Death Claims Under State Law

Under Georgia law, (which governs Hensley's claims as the state of domicile at the time of his death), the measure of damages in an action for wrongful death is "the full value of the life . . . without deducting for any of the necessary or personal expenses of the decedent had he lived." O.C.G.A. § 51-4-1; *see, generally,* Eric James Hertz & Mark D. Link, *Georgia Law of Damages with Forms* § 31-1 (2002). Georgia has a unique view in the sense that the perspective of this valuation is from that of the value of the decedent's life to him. Thus, a wrongful death action under Georgia state law does not consider damages such as solatium or the mental suffering and grief experienced by the survivor.

- 19 -

The "full value of the life of the decedent" is divided into two elements: the economic value of the deceased's normal life expectancy and the intangible element incapable of exact proof. The former is the subject of normal modes of actuarial proof, reduced to present cash value. The latter element—the intangible value of the decedent's life—is not economic in nature and, thus, is not discounted to present cash value. The intangible component of the "full value of the life" incorporates the loss to the decedent of the ability to enjoy the society, advice, counsel, and companionship of his family, friends, and loved ones throughout the course of his expected lifespan. Since reciprocity is presumed in human relationships, what the deceased lost may be inferred from what the plaintiff and others can testify about the loss caused by the destruction of this relationship. The intangible element, being incapable of exact proof, is addressed to the "enlightened conscience" of the factfinder.

Under Michigan law, which governs the claim for the wrongful death of Jack Armstrong, this claim is properly brought by Fran Gates, the personal representative of the decedent's estate. M.C.L.A. 600.2922(2). In contrast to Georgia law, the damages available to the Estate for wrongful death are viewed from the perspective of the decedent's loved ones and include a full range of damages:

> In every action under this section, the court or jury may award
> damages as the court or jury shall consider fair and equitable, under
> all the circumstances including reasonable medical, hospital, funeral,
> and burial expenses for which the estate is liable; reasonable
> compensation for the pain and suffering, while conscious, undergone
> by the deceased during the period intervening between the time of the
> injury and death; and damages for the loss of financial support and the
> loss of the society and companionship of the deceased.

M.C.L.A. 600.2922(6).

2.   Pain and Suffering

Pain and suffering—both mental and physical—are proper elements

of damages where there is a physical injury.  Fear, anxiety, humiliation,

shock, emotional distress, and physical pain are all compensable aspects of

an award for such damages. *Aretz v. U.S.*, 456 F. Supp. 397, 401-2

(applying Georgia law).  Claims for the conscious pain and suffering of Jack

Armstrong and Jack Hensley are actionable through the men's respective

Estates.  M.C.L.A. 600.2922(6); *Manley v. Ingram*, 755 F.2d 1463, 1466 n.

7 (11th Cir. 1985) (under Georgia law, claims for decedent's pain and

suffering recoverable by Estate).  It is doubtful that there is a case on record

that has awarded pain and suffering damages for two men who saw a large

knife in their captor's hand, knew they were about to die a horrible death and

then suffered through the brutal beheading.  The evidence will show that the

beheadings were clumsy affairs, which exacerbated the men's suffering in

truly unimaginable ways.

- 21 -

3.    <u>Intentional Infliction of Emotional Distress</u>

The immediate family members of the two murdered men are entitled to recover damages actionable under the tort of intentional infliction of emotional distress. *See e.g., Peterson v. Islamic Republic of Iran,* 2007 U.S. Dist. LEXIS 65820 at **15-24 (D.D.C. September 7, 2007). As explained above, the law of the claimant's domicile at the time of the beheading provides the law governing the claimant's causes of action. All ▓▓▓▓ relevant domiciles—Georgia, Michigan and ▓▓▓▓▓▓▓▓▓▓—provide for recovery by family members where the tortfeasor intended to inflict serious emotional harm by his conduct, such conduct was outrageous, and such harm was caused by the outrageous conduct.

The Hensley family was domiciled in Georgia when Jack Henlsey was murdered. The relevant state common law cause of action for intentional infliction of emotional distress in this case is based upon the Restatement 2d of Torts, § 46, which requires a showing that: (1) the defendant engaged in extreme and outrageous conduct with the intent to cause, or with reckless disregard of the probability of causing, emotional distress; (2) the plaintiff suffered severe or extreme emotional distress; and (3) the defendant's conduct is the actual and proximate cause of the plaintiff's emotional distress. Georgia has adopted section 46(1) of the Restatement (Second).

- 22 -

"The Restatement 2d of Torts, § 46 (1) (1965) defines this tort as follows: One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Yarbray v. Southern Bell Tel. & Tel. Co.*, 409 S.E. 2d 835 (Ga. 1991).

Georgia law recognizes the tort of intentional infliction of emotional distress. *Thomas v. Ronald A. Edwards Constr. Co.*, 293 S.E. 2d 383 (Ga. Ct. App. 1982); *Dunn v. Western Union Tel. Co.*, 59 S.E. 189 (Ga. Ct. App. 1907). "In order to sustain a cause of action in this state for the tort of intentional infliction of emotional distress, a plaintiff must show that 'defendant's actions were so terrifying or insulting as naturally to humiliate, embarrass or frighten the plaintiff.'" *Sossenko v. Michelin Tire Corp.*, 324 S.E. 2d 593 (Ga. Ct. App. 1984); *Georgia Power Co. v. Johnson*, 274 S.E. 2d 17 (Ga. Ct. App. 1980); *Bridges v. Winn-Dixie Atlanta, Inc.*, 335 S.E. 2d 445 (Ga. Ct. App. 1985). "To recover for intentional infliction of emotional distress, the [appellants] were required to prove the following elements: (1) intentional or reckless conduct, (2) which is extreme and outrageous, (3) and caused the emotional distress, (4) which is severe." *Adams v. Carlisle*, 630 S.E. 2d 529 (Ga. Ct. App. 2006).

- 23 -

Fran Gates was domiciled in Michigan when her son was murdered. Michigan has also adopted section 46(1) of the Restatement (Second). "In order to state a claim for intentional infliction of emotional distress, a plaintiff must allege: (1) extreme or outrageous conduct; (2) which intentionally or recklessly, (3) causes, (4) extreme emotional distress. *McCahill v. Commercial Ins. Co.,* 446 N.W.2d 579 (Mich. Ct. App. 1989).

Jam Smith was domiciled in ███████████████████████ recognizes the tort of intentional infliction of nervous shock. ████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

The Plaintiffs are entitled to damages for intentional infliction of emotional harm. The fear and anxiety suffered by the Plaintiffs because of the kidnapping and hostage ordeal involving their loved ones cannot be overstated. Eventually, Jack Armstrong and Jack Hensley were murdered in brutal manner. It is the publication of this act through video footage posted on the internet however that transformed these barbaric acts into infamous and unspeakable propaganda designed to terrorize and inflict maximum emotional damage. The internet broadcast of the murder of Jack Hensley

and Jack Armstrong was intended to, and did, cause severe emotional distress to the victims' family members. "[A] terrorist attack-by its nature-is directed not only at the victims but also at the victims' families." *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 328 (D.D.C. 2006). The terrorists who kidnapped and broadcast the murders of Jack Hensley and Jack Armstrong intended to cause severe emotional distress to their family members.

## B. A Recent Legal Development Is Expected to Impact These Proceedings

Congress recently amended the Foreign Sovereign Immunities Act ("FSIA") and created a viable and uniform claim for damages under federal law by passing new legislation regarding state sponsors of terrorism. (See Exhibit 31).[3] On December 20, 2007, the Speaker of the House of Representatives sent the enrolled bill to the President of the United States for signing. The President will either sign the enrolled bill, as we understand it, or it will become law if it sits on his desk for ten days, not counting intervening Sundays.[4] The law is explicitly retroactive. (See Exhibit 31 at

---

[3] Plaintiffs attach House Report, H.R. Rep. No. 110-477, sec. 1083 (2007), as Exhibit 31.

[4] We are advised that the Senate will remain in pro forma session for unrelated reasons during the Christmas recess. Even if the President were inclined to pocket-veto this bill, and we are advised he is not, the pro forma session makes theoretical possibility of a pocket-veto moot.

p. 6-7). Under a section entitled, "Private Right of Action", this law allows a "private cause of action may be brought against a foreign state . . . . for personal injury or death caused by that foreign state, or its official, employee, or agent . . . for money damages which may include economic damages, solatium, pain and suffering and punitive damages . . . ." (See Exhibit 31 at p. 2-3).

In 1996, as part of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Congress amended the FSIA to create a judicial forum for adjudicating the claims of victims of terrorist acts committed by foreign states that the Department of State has designated as state sponsors of terrorism. Pub. L. No. 104-132, § 221, 110 Stat. 1241 (1997). AEDPA created the "state-sponsored terrorism exception" to the sovereign immunity that is ordinarily enjoyed by foreign states under the FSIA. 28 U.S.C. § 1605(a)(7). Under AEDPA, countries officially designated by the Department of State as terrorist states can be held liable for personal injuries or deaths if the foreign state commits a terrorist act, or provides material support and resources to an individual or entity that commits such an act. *Id.*

After the passage of AEDPA, Congress addressed the issue of remedies for plaintiffs in these cases. A provision called "Civil Liability for Acts of State-Sponsored Terrorism" was enacted on September 30, 1996 as

- 26 -

part of the 1997 Omnibus Consolidated Appropriations Act, Pub. L. No.
104-208, § 589, 110 Stat. 3009 (1997); commonly referred to as the "Flatow
Amendment". The Flatow Amendment established the measure of damages
available in suits under the "state-sponsored terrorism" provision of the
FSIA.

Empowered by this legislation, Americans have brought rogue states,
including Iran, Libya and Syria, to our courts in redress of damages resulting
from their sponsorship of horrific acts. This crucial congressionally
mandated authority is intended to assure that foreign states, otherwise
immune from litigation, would be treated as ordinary litigants, having the
same rights and obligations as any other party properly before a United
States Article III Court.

In the case of *Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d
1024, 1033-34 (D.C. Cir. 2004), the court terminated the right of American
victims of terrorism to sue the foreign state sponsors of terrorism under the
Flatow Amendment. The United States Circuit Court of Appeals for the
District of Columbia gutted the legislative scheme by limiting damages to
the individual, and presumably judgment proof, terrorists rather than
permitting judgment directly against the terrorist state(s). "[T]he Flatow
Amendment only provides a private right of action against officials,

employees, and agents of a foreign state, not against the foreign state itself."
*Id.*

The Flatow Amendment is a hollow right unless the state sponsor of

terrorism itself can be held liable. Allowing the parents of a murdered US

citizen to sue the driver of the truck that detonated a bomb that killed their

child does not have any effect or impact upon the calculations of the foreign

state that paid for the driver's training, the bomb that incinerated the US

citizen, and the funds that sustain the organization that planned and executed

the horrific act itself. The policy goals of anti-state sponsored terrorism

litigation, as codified by Congress, are to compensate the victims of

terrorism and to staunch the flow of money from foreign states to the

terrorist organizations that fight proxy wars on behalf of the foreign states.

This policy cannot be effectively achieved without a federal cause of action

against the state itself, and the subsequent ability to collect money

judgments against the terrorists, their organizations, their funders, and the

US State Department designated state sponsors of terrorism.

Congress has acted to remedy this problem. Under the new 28 U.S.C.

§ 1605A(d), this law would provide for an explicit federal cause of action

"against a foreign state" properly designated as a state sponsor of terrorism.

(See Exhibit 31 at p. 6-7). The law also explicitly provides for its retroactive application. (See Exhibit 31 at p. 6-7).

## C. Medical Testimony Regarding Pain and Suffering

    1. <u>Alex Welch, M.D.</u>



Dr. Welch was the ▮▮▮▮▮ Medical Examiner at the ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ Dr. Welch performed an autopsy on the body of Jack Hensley. Dr. Welch's testimony is expected to establish that Jack Hensley was decapitated through multiple cutting wounds at the neck. These wounds are consistent with movement by the victim, Hensley, during a significant duration of the decapitation process. The testimony of Dr. Welch will suggest that the decapitation process would have been difficult and that the effect would have caused extraordinary pain to Jack Hensley.

Attached as Exhibit 6 is the Final Autopsy Examination Report for Jack Hensley, prepared by Dr. Welch.[5] Presently ▮▮▮▮▮▮▮

---

[5] The Final Examination Autopsy Reports for Jack Armstrong and Jack Hensley are admissible evidence on their face because they are "public records and reports." These Reports were prepared by the ▮▮▮▮▮▮▮ for both Jack Armstrong and Jack Hensley. Under Federal Rule of Evidence 803(8)(B)-(C), these Reports qualify as exceptions to the hearsay rule. *See also United States v. Feliz*, 467 F.3d 227 (2d Cir. 2006) (findings in autopsy report qualified as public records under FRE 803(8)); *Manacchio v. Moran*, 919 F.2d 770, 775 (1st Cir. 1990) (denying habeas petition after holding that introduction of

Plaintiffs intend to present Dr. Welch's testimony at trial in the form of a videotaped deposition. Said deposition is planned to occur shortly before trial.

    2. Carmen Williams, M.D.

    As a ███████ Medical Examiner in the ████████████ ███████████ ██████████████ Dr. Williams performed an autopsy on the body of Jack Armstrong. Dr. Williams also assisted Dr. Welch with the examination of Jack Hensley. Dr. Williams' testimony is expected to show that Jack Armstrong was decapitated through multiple cutting wounds at the neck, evidenced by "dogears" on the wound site and "notching," indicating many different cutting efforts and directions of application of cutting force. In Dr. Williams 'opinion, there is evidence to suggest that Armstrong was alive for a significant part of the decapitation. Attached as Exhibit 7 is the Final Autopsy Examination Report for Jack Armstrong, prepared by Dr. Williams. By agreement, Plaintiffs intend to call Dr. Williams as a live witness at trial.

    3. Blair Cole, M.D.

---

autopsy report for purpose of proving cause of death without personal presence of medical examiner who prepared the report did not violate Confrontation Clause).

Dr. Cole performed forensic anthropological examinations upon the bodies of both Jack Armstrong and Jack Hensley.  The testimony of Dr. Cole is offered to show the multiple tool marks on the many different vertebrae of both Hensley and Armstrong by a similar tool—a thin-bladed and non-serrated knife.  Dr. Cole will opine that the manner of death was consistent between both Jack Armstrong and Jack Hensley.  Dr. Cole will testify that a number of factors made these decapitations a difficult and extraordinarily painful process, including (1) the lack of leverage; (2) the lack of momentum, or cutting force behind the blade; (3) the fact that the victims were alive and not completely immobilized; and (4) the relatively high line of severance close to the bottom of the jaw and skull base rather than in the middle of the neck.  By agreement, Plaintiffs intend to call Dr. Cole as a live witness at trial.

4.  Dana Shope, Ph.D.

Dr. Shope is a noted expert in the field of forensic toxicology.  A true and correct copy of Dr. Shope's curriculum vitae is attached to, and authenticated by, the Affidavit of Dana Shope, Ph.D., attached hereto as Exhibit 29.  As the ███████████████████████████████████ in the ███████████████████████████████████ Dr. Shope reviewed and

certified the results of toxicological examinations on the remains of both Jack Armstrong and Jack Hensley.

Tests of Jack Armstrong were negative for both screened medications and drugs of abuse.

Tests for Jack Hensley returned a positive for norpropoxyphene, a biological breakdown product of the prescription drug propoxyphene. No other drugs were detected in the specimens taken from Jack Hensley. Dr. Shope testifies that norpropoxyphene, the metabolite of the parent drug, has approximately one quarter of the potency of propoxhyphene, which Dr. Shope describes as a "weak" analgesic. (Affidavit of Shope, ¶ 15, Exhibit 29).

Shope's testimony reports that he "detected no evidence of anesthetic intervention as to either Jack Armstrong or Jack Hensley." (Affidavit of Shope, ¶ 17).

Plaintiffs believe the testimony of Dr. Shope is sufficiently complete and self-explanatory and *__do not plan to call Dr. Shope as a live witness at trial unless the Court requests otherwise__*.

### D. Economic Damages

    1. (Testimony by Affidavit and Assessments)

Dr. Staller offers expert opinions as a professional experienced in the field of forensic economics. Specifically, Staller prepared an expert opinion that quantified the economic loss sustained by the Plaintiffs as a result of what is alleged to be the wrongful deaths of both Olin Eugene "Jack" Armstrong and Jack L. Hensley. See Affidavit of Staller, attached as Exhibit 28. Dr. Staller employed a 5% discount rate to bring future earnings back to present value.

Jack Armstrong was 51.3 years of age at the time of his death. His earnings amounted to a yearly salary of $90,000, including end-of-year bonus. Dr. Staller testifies the total economic loss (lost earnings) ranges between $1,129,186 and $1,347,919, depending on whether one assumes Jack Armstrong would have retired at ages 62.7 or 65, respectively. See Assessment of Economic Loss for Jack Armstrong, Exhibit B to Affidavit of Staller, attached hereto as Exhibit 28.

Jack Hensley was 49 years of age at the time of his death. He was earning a yearly salary of $92,000, including end-of-year bonus. Dr. Staller testifies the total economic loss (lost earnings), plus lost household services,

is $1,713,038.[6]  See Assessment of Economic Loss for Jack Hensley, attached as Exhibit A to Affidavit of Staller, attached hereto as Exhibit 28.

Plaintiffs believe the Affidavit and Assessments prepared by Dr. Staller for the respective Estates of Jack Armstrong and Jack Hensley are sufficient evidence to establish the economic losses sustained by the respective Estates.  While Plaintiffs are prepared to bring Dr. Staller to the trial to be a live witness if the Court wishes, Plaintiffs ***do not plan to call Dr. Staller as a live witness at trial unless the Court requests otherwise***.

### E. Testimony of Family and Friends

1. Fran Gates

Fran Gates is the mother of Jack Armstrong and personal representative of his Estate.  It is expected that her testimony will trace the history of Jack Armstrong's life, including his prior service as a construction engineer in places like Bosnia, Angola.  As representative of his Estate, Fran Gates brings claims for Jack Armstrong's wrongful death, his conscious pain and suffering and punitive damages. M.C.L.A. 600.2922(2); M.C.L.A.

---

[6] The state law governing the calculation of economic damages for both wrongful death actions -- Hensley (Georgia) and Armstrong (Michigan) -- are substantially the same.  Neither Georgia, nor Michigan require deductions from the lost earnings for necessary personal expenses in an action for wrongful death. *Harden v. U.S.*, 688 F.2d 1025, 1029 (5th Cir. 1982)(observing that Georgia's wrongful death statute does not authorize deductions for personal expenses like taxes, but nevertheless making such deduction because of Federal Tort Claims Act).

600.2922(6).  In her personal capacity, Fran Gates has independent claims

for intentional infliction of emotional distress, her pain and suffering and

mental anguish and punitive damages.  Plaintiffs intend to call Fran Gates as

a live witness at trial.

     2.    <u>Jan Smith</u>

The sibling of Jack Armstrong, Jan Smith is expected to be call as a

live witness at trial.

     3.    <u>Ty Hensley</u>

The brother of Jack Hensley, Ty Hensley is expected to be called as a

live witness at trial.

     5.  <u>Pati Hensley</u>

Pati Hensley is the wife of Jack Hensley and personal representative

of his Estate. Pati is also mother to their 17 year-old daughter, Sara.  As

representative of his Estate, Pati Hensley brings claims for Jack Hensley's

wrongful death, his conscious pain and suffering and punitive damages.  In

her personal capacity, Pati Hensley has independent claims for wrongful

death, intentional infliction of emotional distress, her pain and suffering and

mental anguish, and punitive damages.  Plaintiffs intend to call Pati Hensley

as a live witness at trial.

6.  Sara Hensley

Sara Hensley is the daughter to Jack Hensley and a Plaintiff in this action.  She has a separate and personal claim for intentional infliction of emotional harm.  At the time of her father's death, Sara Hensley was thirteen years old.  She is now sixteen.  At this time, it is not known whether Sara Hensley will wish to testify at trial.

## V.    CONCLUSION

The families of Jack Armstrong and Jack Hensley bring this case for the purpose of holding the Syria Defendants responsible for the kidnapping, torture and murder of Jack Armstrong and Jack Hensley.  The evidence at trial will show that the Syrian Defendants provided material aid and support to al-Zarqawi and his organization because his campaign of terrorism was a principal means of achieving Syria's political goals—the destabilization of Iraq and public humiliation and terrorizing of Americans.  Congress has provided a legal mechanism that allows an award of various kinds of damages against states, like Syria, that sponsor terrorism to answer the unusual brutality of the means the Syrian Defendants have chosen to advance their political agenda.

At the conclusion of the trial, the families will ask this Court to enter a judgment in an amount sufficient to accomplish two purposes: first, to

compensate for their unimaginable loss and, second, to deter and punish the

Syrian Defendants.


Dated: December 21, 2007                    Respectfully Submitted,


John F. Salter
Ga. Bar No. 623325
The Barnes Law Group, LLC
P.O. Box 489
Marietta, Georgia 30061
Telephone:  770-419-8505
Facsimile:   770-590-8958

Attorney for Plaintiffs

Steven R. Perles (No. 326975)
Edward MacAllister (No. 494558)
THE PERLES LAW FIRM, PC
1146 19th Street, NW, 5th Floor
Washington, DC 20036
Telephone: 202-955-9055
Facsimile:    202-955-3806