### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FRANCIS GATES,** *et al.*, ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 06-1500 (RMC)** |
| ) | |
| **SYRIAN ARAB REPUBLIC,** *et al.*, ) | |
| ) | |
| **Defendants.** ) | |

### <u>MEMORANDUM OPINION</u>

It was a sunny day somewhere in Iraq and a light wind blew the long curtains into the room through the open door. A group of men clad in total black, faces covered, stood on a Persian rug facing a camera. Before them, a single man knelt. Dressed in an orange jumpsuit, hands bound behind his back, feet similarly bound, with eyes covered and mouth gagged, he rarely moved. One of the standing men began to read a proclamation in Arabic. It continued at length. Suddenly he stopped. The man in the orange jumpsuit tensed. Another of the men in black stepped forward and knocked the kneeling man over onto his side. Brandishing a knife, the man in black began to slice at the neck of the victim lying on the floor. The dying man audibly moaned and gurgled, as it took some time to cut all around his neck and through his bones before the head could be lifted in seeming triumph.

There is no doubt that al-Tawhid wal-Jihad ("al-Qaeda in Iraq") beheaded U.S. civilian contractors Jack Armstrong and Jack Hensley in the manner described, which it videotaped and played on the Internet for all the world, and ultimately this Court, to see. The question raised by this lawsuit is whether the Syrian Arab Republic can be held liable for money damages to the

families of the two men pursuant to the Foreign Sovereign Immunities Act (the "FSIA"), 28 U.S.C. § 1602 *et seq*.

## I.  PROCEDURAL POSTURE

Plaintiffs are Francis Gates and Jan Smith,[1] the mother and sister of Jack Armstrong, and Pati and Sara Hensley, the widow and minor daughter of Jack Hensley.  Plaintiffs  filed this action on August 25, 2006, against Defendants who include:   the Syrian Arab Republic ("Syria"); the president of Syria, Bashar al-Assad; the Syrian Military Intelligence, known as the al-Mukhabarat al-Askariya; and the Director of Military Intelligence, General Asif Shawkat.  Plaintiffs allege that, acting through these principals, Syria provided material support and resources to the al-Tawhid wal-Jihad ("al-Qaeda in Iraq") and its leader, Abu Mus'ab al-Zarqawi ("Zarqawi").  Plaintiffs assert a cause of action under the FSIA, 28 U.S.C. § 1605A, as well as the following causes of action under state law: battery; assault; false imprisonment; intentional infliction of emotional distress; wrongful death; action for survival damages; conspiracy; and aiding and abetting.

None of the Defendants filed an answer or otherwise appeared.  The Court proceeded to a default setting as provided by 28 U.S.C. § 1608(e), which requires a court to enter a default judgment against a non-responding foreign state only where "the claimant establishes his claim or right to relief by evidence satisfactory to the court."  *Id*.  The Court held a three-day hearing on liability and damages beginning on January 7, 2008.[2]  Plaintiffs presented evidence in the form of live testimony, videotaped testimony, affidavit, and original documentary and videographic evidence.

---

[1] This Opinion refers to Mr. Armstrong's sister by a pseudonym, Jan Smith, for her safety.

[2] The hearing transcript is set forth in three volumes, one for each day of the hearing. Citations to the transcript are identified as "name T-#-page," *i.e.*, witness name, transcript volume, and then page number.

Applying the Federal Rules of Evidence, the Court ruled that certain proposed evidence could not be admitted.  Plaintiffs presented credible expert testimony from four experts and from an Iraqi countryman concerning Syria's assistance to Zarqawi and al-Qaeda in Iraq.  From the entire record, including Plaintiffs' post-hearing filings, the Court makes the following findings of fact and conclusions of law.

## II.  FINDINGS OF FACT

### A.  The Murders of Jack Armstrong and Jack Hensley

1.  Olin Eugene "Jack" Armstrong and Jack L. Hensley were non-combatants, employed by a private sub-contractor as civilian project managers in Iraq, in September 2004.  They did not provide armed security or bodyguard services; rather, they provided technical and operational assistance and resources for the military in non-combat environments in Iraq.

2.  Mr. Armstrong had a history of working in foreign lands as a civilian construction engineer. He first took a construction engineering job in Croatia in early 1994, working for a subcontractor to the United Nations.  Smith T-2-87.  He later worked in Angola, the site of another United Nations humanitarian effort in the wake of the crisis in neighboring Rwanda. *Id*. at 92.

3.  Mr. Armstrong lived in Thailand between jobs and had a committed relationship with a Thai woman with whom he planned to begin a cooperative farm.  Smith T-2-94-95.  Mr. Armstrong signed a year-long contract to work in Iraq to earn enough money to start the farm. *Id*.

4.  Mr. Armstrong is survived by his mother, Francis Gates, and his sister, Jan Smith.  They both had a close relationship with him.  Smith T-2-85-86; Gates T-2-105, 108.

5.  Jack Hensley held a college degree in mathematics and computer science.  When he was working for an international construction and engineering firm, he met Pati, who became his wife.  Jack worked in Saudi Arabia while Pati worked in Maryland.  They both were later transferred to a coal export project in Colombia.  They married on Christmas Eve in 1985. Hensley T-3-19-21.

6.  Jack and Pati settled in Marietta, Georgia, where Jack went to work with Wang Laboratories ("Wang") as its computer operations manager for the Southeast region.  He stayed with Wang for eleven years, during which time Pati gave birth to their daughter, Sara.  Jack was a loving father to Sara, becoming her coach, school volunteer, and tutor in math and science, tennis and horseback riding.  Hensley T-3-21, 27.

7.  Wang then went out of business and Jack and Pati opened a neighborhood restaurant in Marietta named Networks.  The business did not do well and, over the years, drained their savings.  When Jack's mother was diagnosed with Alzheimer's, the Hensleys moved her into their home.  Hensley T-3-19-23.  To support his family, Jack Hensley took four part-time jobs but could not fully reverse their financial difficulties.  When a recruiter offered Mr. Hensley a job in Iraq, he saw it as an opportunity to restore financial security to his family. Having worked in Saudi Arabia earlier, Jack Hensley believed he had an understanding of Muslim culture.  His acceptance of the job also helped his family avoid bankruptcy.  Mr. Hensley signed a year-long contract to work in Iraq to stabilize the family's finances and avoid bankruptcy.  Hensley T-3-19-24-25, 28.

8.  Messrs. Armstrong and Hensley lived in Iraqi residential housing, guarded by Iraqi militia. It is reported that these guards abandoned their posts upon a small payment, which allowed

both men and Kenneth Bigley, an English national, to be kidnapped in September 2004. Shortly afterward, on September 18, 2004, a video was released on the Internet that showed the three hostages blindfolded and held captive by armed men. The video was disseminated in an online web forum that was a well-known repository of authentic messages from Zarqawi and al-Qaeda in Iraq. Kohlmann T-1-36. The videos prominently displayed the logo for Zarqawi's terrorist organization, a logo not used by any other terrorist group. *Id.* at 38.

9.    On September 20, 2004, a message was released in the same online web forum, where Zarqawi messages and videos had been previously posted, announcing the murder of one of the hostages. Kohlmann T-1-38-39. A video was released later on the same day, on the same online web forum, that depicted the gruesome murder of Jack Armstrong. *Id.* at 40.

10.   On September 21, 2004, a message was released on the same online web forum announcing the murder of a second hostage. Kohlmann T-1- 43. As before, a video was released later the same day. This video depicted the gruesome murder of Jack Hensley.[3] *Id.* at 45.

11.   There has never been any dispute as to who killed Jack Armstrong or Jack Hensley or a competing claim of responsibility by another terrorist group. The United States found that Zarqawi and Al-Qaeda in Iraq "claimed responsibility for the videotaped execution by beheading of Americans Nicholas Berg (May 8, 2004), Jack Armstrong (September 20, 2004), and Jack Hensley (September 21, 2004)." Pls.' Trial Brief, Ex. 27, Country Reports on Terrorism 2005, U.S. Dep't of State, Office of the Coordinator for Counterterrorism at 220 (April 2006).

---

[3] Kenneth Bigley suffered the same fate.

12.     Al-Qaeda in Iraq published propaganda on the Internet that glorified its acts of terrorism, mayhem and murder.   Kohlmann T-1-26, 30.   Al-Qaeda in Iraq also issued claims of responsibility for acts of violence in Iraq beginning with the videotaped beheading of American businessman Nicholas Berg in the spring of 2004.  *Id*. at 26-28.  In communiques that were consistently formatted in the same way, and presented through the same identified Zarqawi propaganda mouthpieces in online web forums, strikingly similar videos were released, promoted, and redistributed across the Internet depicting all three murders.  *Id*. at 26-28, 36.

13.     After the murders of Messrs. Armstrong and Hensley, a number of critics in the Muslim world argued that it was cowardly to behead civilian hostages.  Kohlmann T-1-47.  Al-Qaeda in Iraq defended the practice in a message from the same online forum user who had posted the previous messages announcing the murders and showing the beheadings on video.  *Id*.

14.     The execution videos of Mr. Armstrong and Mr. Hensley follow the same pattern.  The videos depict each American man blindfolded, gagged, and kneeling on the ground.  As becomes evident, their hands and feet are tied.  The terrorists stand immediately behind, faces concealed by black hoods.  Several brandish assault rifles.  One of them reads a polemic statement in Arabic.  When the reading is finished, one terrorist produces a knife.  He knocks over the American and begins sawing at his neck.  The victims attempt to move away, to no avail.  The video footage records awful sounds:  kicking and efforts to escape, muffled cries, and labored breathing by the man wielding the knife.  Copious amounts of blood are shown.

15.     It would have would have taken several minutes before the victim lost consciousness due to

the clumsy nature of the decapitation.  *See* Williams T-2-69.[4]  Thus, the videos, which are

shorter in length, had been edited.  At the conclusion of both videos, the decapitated head of

each man is displayed.

16. The horrific sights and sounds of the videos have but one clear purpose – to glorify acts of

terrorism, mayhem, and murder and to frighten the viewer.  There is no doubt that Zarqawi

and his organization, al-Qaeda in Iraq, killed Messrs. Armstrong and Hensley.  Their remains

were recovered after officials found them dumped in various locations in Baghdad.

**B.  Syria's Role in Assisting Zarqawi and Al-Qaeda in Iraq**

17. Plaintiffs presented expert witness testimony and testimony from an Iraqi countryman

concerning Syria's assistance to Zarqawi and al-Qaeda in Iraq.[5]  From this evidence, certain

---

[4] The medical examiners, members of the U.S. military, are identified by pseudonyms in this Opinion to shield them from possible reprisal.

[5] Four experts testified regarding Syria's support of Zarqawi and al-Qaeda in Iraq:

(1) Evan Kohlmann is a private consultant who gave expert testimony on the history, infrastructure, and the use of the Internet as a medium for the distribution and dissemination of propaganda by Zarqawi and his terrorist network.  Kohlmann T-1-14.  His testimony was based on evidence that he collected and archived from 2004 through 2006 from Internet sites that are direct sources of information from Zarqawi and his network.  *Id*. at 25.

(2) Dr. Matthew Levitt is a director of Counter Terrorism Intelligence Studies and a Senior Fellow at the Washington Institute of Near East Policy.  Levitt at 105.  He was previously employed in counter-terrorism positions in the Federal Bureau of Investigation and the Department of Treasury.  *Id*. at 107, 111.  He is the author of a book that includes chapters on Syria's sponsorship of terrorism.  *Id*. at 115.

(3) Dr. Marius Deeb is a professor at Johns Hopkins School of Advanced International Studies and for more than thirty years has studied, written, and taught about Islamic politics, Syria, and Syria's support for terrorism.  Deeb T-1-61-64.

(4) David Schenker is the director of Arab politics at the Washington Institute and

conclusions are clear.  Syria was the critical geographic entry point for Zarqawi's fighters into Iraq, Levitt T-1-127, and served as a "logistical hub" for Zarqawi.  *Id.* at 119, 127.  Syria supported Zarqawi and his organization by:  (1) facilitating the recruitment and training of Zarqawi's followers and their transportation into Iraq; (2) harboring and providing sanctuary to terrorists and their operational and logistical supply network; and (3) financing Zarqawi and his terrorist network in Iraq.  Once Zarqawi beheaded civilian Nicholas Berg, the depth of his inhumanity was obvious but Syria did not withdraw its support.

### 1.   Facilitating the Recruitment and Training of Zarqawi's Followers and Facilitating Their Transportation into Iraq

18.   Syria and the Syrian Military Intelligence provided active assistance to Zarqawi and his followers in Iraq by allowing and helping their operatives to move through Syria and across the border into al-Qaeda's first military training camp in Iraq, near the village of Rawha. Kohlmann T-1-52-54.

19.   A militant Islamic cleric on the payroll of the Syrian government, Abu Qaqa, actively recruited terrorists for the Zarqawi network in 2003.  Schenker T-1-103.

20.   In late 2003, a Syrian intelligence officer named Abu Moaz transported al-Qaeda operatives, including senior leaders, across the Syrian border to the Rawha training camp.  Kohlmann T-1-52-54.  The Rawha camp was where almost all of Zarqawi's senior officers who led his

---

is a member of the Council on Foreign Relations.  Schenker T-1-81-84.  Mr. Schenker previously was the senior policy advisor to the Secretary of Defense on matters relating to Syria from 2002-2006.  *Id.* at T-1-79.

In addition, an Iraqi citizen testified by deposition and shall remain anonymous in this decision.  For the purposes of this litigation, he has been given the name Sheikh Abu Massoquoi.  Because of the nature of his employment, Sheikh Abu Massoquoi became knowledgeable about the relationship between the Syrian government and al-Qaeda in Iraq.

organization in 2003-2004 were trained.  *Id*. at  54.

21.  Members of al-Qaeda in Iraq who were captured by the company operated by Sheikh Abu Massoquoi confessed to receiving training at camps within Syria.  Massoquoi Dep. at 24; *see also* Deeb T-1-67, 74-75.

22.  The Syrian government provided assistance to facilitate the movement of terrorists through Syria for Zarqawi's terrorist network.  Massoquoi Dep. at 20-23.

23.  The airport in Damascus, Syria is "one of the most tightly controlled locations in Syria" as people must pass through border guards and under the observation of intelligence officials there.  Schenker T-1-94.  Syria allowed insurgents to arrive without restriction into the Damascus airport in significant numbers,  before continuing their journey across the border and into Iraq.  *Id.* at 94, 98-99.  "This wasn't an underground railroad; this was being done with a full recognition and support of the government of Syria."  *Id.* at 95.

24.  Syria did not require a visa for non-Syrian Arabs entering Syria until 2006-07.  Schenker T-1-94.  The U.S. Government repeatedly asked Syria to require visas but it refused until recently.  *Id*. at 95.

25.  The Syrian government controls internal movement of persons within Syria.  Schenker, T-1-98.  For example, government permission is required to travel to certain sensitive border areas, and the government tracks travel through road blocks and periodic stops.  *Id*. at 99.

26.  When Saddam Hussein was in power in Iraq, Syria kept its border well secured but, in 2003-04, the Syrians minimized the presence of border troops to allow the unrestricted flow of terrorists through Syria and into Iraq.  Schenker T-1-93-94. The Syrian government facilitated the travel of "scores of vehicles" from Damascus and into Iraq.  *Id*. at 97.

27.    Syria provided Zarqawi, a Jordanian national, with a Syrian passport, which it regularly gives to leading terrorists.  Deeb T-1-75.  Zarqawi fled Afghanistan to Iran in 2002 but was arrested by the Iranians.  *Id.*  Since Iran is an ally of Syria, it released Zarqawi quickly because he had a Syrian passport.  *Id.*

28.    Syria's support for insurgents in Iraq was evident from the location of the bus transit point to take fighters to Baghdad.  The transit site was at one time located across the street from the U.S. Embassy in Damascus.  Schenker T-1-87-88.  The street is heavily guarded and regulated by the Syrian military, "one of the most closely guarded and observed spots in Syria."  *Id.*  "[F]oreign fighters were lining up and down the street . . . actually across the street from the Embassy to go to this office and sign up to get on a bus and be transported to Baghdad to take part in the insurgency."  *Id.* at 88.

29.    Theodore Kattouf, the U.S. Ambassador to Syria, repeatedly complained to the Syrian government about the bus transit point across from the U.S. Embassy.  Schenker T-1-88.  The Syrian government eventually closed that transit point and moved it to the Damascus fairgrounds.  *Id.*  The fairgrounds are owned and operated by the Syrian government, thus further revealing the Syrian government's control.  *Id.*

30.    Given Syrian government control of all domestic travel, the movement of large numbers of military-age men through Syria would have been known and approved by Syrian Military Intelligence, General Shawkat, and President Assad.  Deeb T-1-74.

### 2.  Harboring and Providing Sanctuary to Terrorists and Their Operational and Logistical Supply Network

31.    Syria offered safe haven and a logistical support network in Syria for Zarqawi and al-Qaeda

in Iraq.  Levitt T-1-119-122.  Syria not only helped foreign fighters move through its country into Iraq but also provided funding for them.  *Id.* at 121.  Zarqawi's group established useful relationships with Hezbollah and other insurgent and terrorist groups with the authorization and assistance of Syria, allowing use of greater expertise and capabilities.  *Id.* at 124-25.

32.  The Zarqawi network conducted terrorist attacks from inside Syria.  Levitt T-1-119-22

33.  For instance, Zarqawi was physically in Syria when U.S. Agency for International Development officer Lawrence Foley was assassinated in Jordan in 2002.  Deeb T-1-75-76.  Zarqawi organized the plot to assassinate Mr. Foley.  *Id.* at 76; Levitt T-1-120-21.  Zarqawi operatives received training and weapons in Syria for use in the attack on Mr. Foley.  Levitt T-1-120-21.

34.  The financing for the assassination of Mr. Foley came from Shakr Absi, a Zarqawi supporter located in Syria at the time.  Schenker T-1-100, 102.  Mr. Absi fled to Damascus in 2002, and the Jordanian government requested his extradition, which Syria refused.  *Id.* at 101.  Mr. Absi was tried by the Jordanian government in absentia and sentenced to death.  *Id.*  The Syrian government claimed that Mr. Absi was under detention in Syria but he was actually protected by Syria and running a training camp in Syria for terrorists headed to Iraq.  *Id.*  at 101.

35.  In 2004, another Zarqawi plot was headed by an operative named Jayousi and was designed to destroy the Jordanian intelligence headquarters with a chemical bomb.  Schenker T-1-102; Levitt T-1-121.  Had this plan been successful, as many as 100,000 to 160,000 people in Jordan might have been killed.  Schenker T-1-102.

36.  The Jayousi cell was organized and obtained logistical support in Syria.  *Id*. at 102.

Members of the cell were stopped by Syrian border guards but released and allowed to continue into Jordan, where they were captured. *Id.*

37.     In furtherance of the plot to bomb the Jordanian intelligence headquarters, Hatham Homar, a Syrian member of the Zarqawi network, entered Jordan through Iraq. Levitt T-1-121. He set up the safehouses in Jordan where the explosives were stockpiled and later discovered. *Id.*

38.     Sulayman Khalid Darwish, one of the highest-ranking members of the Zarqawi network, was a resident of Syria. Levitt T-1-121-22. Mr. Darwish was a member of Zarqawi's shura, or advisory counsel, and was thought to be his designated successor. *Id.* at 123. On January 25, 2005, the U.S. government designated Darwish as a terrorist[6] but there is no evidence that Syria did anything to stop or interfere with his terrorist activities prior to his death six months later. *Id.* Darwish could not have operated inside Syria without the support and acquiescence of the Syrian government. *Id.* at 125.

**3. Financing Zarqawi and His Terrorist Network in Iraq**

39.     Fawzi al-Rawi was appointed to be the head of the Iraqi wing of the Syrian Ba'th party by President Assad. Levitt T-1-125. Under al-Rawi's direction, the Syrian Ba'th party provided funds to Zarqawi's network. *Id.* at 125-26.

---

[6] That designation, issued by the Department of the Treasury, stated:

> The U.S. Department of the Treasury [ ] took action against an individual to stem cash flows to the Iraqi insurgency and al Qaida. Sulayman Khalid Darwish, who is located in Syria, was designated under Executive Order 13224 for providing financial and material support to the al-Zarqawi Network and al Qaida.

*See* http://treas.gov/offices/enforcement/archive.shtml (last visited Sept. 16, 2008).

40.    Al-Rawi met with Zarqawi's lieutenants to discuss operations against the U.S. Embassy and Green Zone compound in Baghdad, Iraq; he recruited suicide bombers; and he provided funding and weapons to Zarqawi's organization.  Levitt T-1-126.

41.    Al-Rawi received a salary from the Syrian government and had close ties to Syrian intelligence.  Levitt T-1-126.

### C. President Assad and General Shawkat Were Aware of the Activities of Zarqawi and al-Qaeda

42.    Syria is a "world-class" police state with a dozen intelligence networks spying on its own people, as well as each other.  Deeb T-1-67-68; *see also* Schenker T-1-96.  The effectiveness of Syria's intelligence networks resembles the Stasi spy system that operated in East Germany.  Deeb T-1-67.  Nothing that happens within Syria of any political significance is unknown to the government.  *Id.* at 68.

43.    The government of Syria is paranoid and its highest priority is staying in power.  Schenker T-1-100.  Founded in 1970 by the father of current President Assad, the government is controlled by a minority religious sect called the Alawi, who comprise 11% of the country's population.  Deeb T-1-68.  The Alawi remain the dominant clan in government via their control of the army and intelligence services.  *Id.* at 68-69.

44.    Syrian Military Intelligence is the most important intelligence organ in Syria.  Deeb T-1-70.  It is "in charge of" terrorist groups such as Hamas and al-Qaeda in Iraq.  *Id.*

45.    Because Syria is a centrally-controlled police state, the Syrian government has knowingly acquiesced in, and approved of, the aid and support to al-Qaeda in Iraq.   Massoquoi Dep. at 27-28.

46.  The most powerful individuals in Syria are President Assad and his brother-in-law General Shawkat, who absolutely controls Syrian Military Intelligence.  Deeb T-1-70.  The personal and familial relationships between figures such as President Assad and General Shawkat are very important to the survival of the regime.  *Id*. at 71.

47.  President Assad is very close to General Shawkat.  Deeb T-1-71.  As head of military intelligence, General Shawkat is privy to all intelligence of any importance.  *Id*.

48.  General Shawkat shares all important intelligence information with President Assad.  Deeb T-1-72.  Decisions of any political or security importance that may affect the regime's survival cannot be made without the explicit authorization of both men.  *Id*. at 72-73.

49.  Syria has often supported terrorist groups, such as Hamas, Palestinian Islamic Jihad, and al-Qaeda, in order to destabilize the Middle East peace process, beginning as early as 1974 and continuing as it served the interests of the regime.  Deeb T-1-65-66.

50.  Syria supported Zarqawi and his terrorist organization because Syria wanted to destabilize Iraq and prevent the United States from succeeding there in its military efforts.  Deeb T-1-65; Schenker, T-1-86.  A failure of the U.S. in Iraq would extend Syria's influence "because Syria would have influence [over] whoever would come to bargain . . . .  But also failure in Iraq means that the U.S. hopefully from Syria's point of view will not come back and try to change the regime[ ] in Syria . . . ."  Deeb T-1-66.

51.  In 2003, Syria's foreign minister stated publicly that it was in Syria's interest to see the American invasion of Iraq fail.  Schenker T-1-87.

52.  In this environment, it is clear that support for Zarqawi and his network from Syrian territory or Syrian government actors could not have been accomplished without the authorization of

the Syrian government and Syrian Military Intelligence through President Assad and General Shawkat.

### III.  CONCLUSIONS OF LAW

#### A.  Burden of Proof

The FSIA specifies that a court cannot enter a default judgment against a foreign state "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e); *see Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 232 (D.C. Cir. 2003) ("The court still has an obligation to satisfy itself that plaintiffs have established a right to relief.").[7] Section 1608(e) provides protection to foreign States from unfounded default judgments rendered solely upon a procedural default.  *Compania Interamericana Export-Import, S.A. v. Compania Dominicana*, 88 F.3d 948, 950-51 (11th Cir. 1996).

For a plaintiff to prevail in a FSIA default proceeding, the plaintiff must present a legally sufficient prima facie case, *i.e.*, "a legally sufficient evidentiary basis for a reasonable jury to find for plaintiff."  *Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91, 98 (D.D.C. 2002). Although a court receives evidence from only the plaintiff when a foreign sovereign defendant has defaulted, 28 U.S.C. § 1608(e) does not require a court to demand more or different evidence than it would ordinarily receive in order to render a decision.  *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994).  In evaluating the plaintiff's proofs, a court may "accept as

---

[7] This "satisfactory to the court" standard is identical to the standard for entry of default judgments against the United States set forth in Federal Rule of Civil Procedure 55(e), which uses the same language.  Fed. R. Civ. P. 55(e) ("No judgment by default shall be entered against the United States or an officer or agency thereof unless the claimant establishes a claim or right to relief by evidence satisfactory to the court."); *see Hill v. Republic of Iraq*, 328 F.3d 680, 684 (D.C. Cir. 2003) (a FSIA default winner must prove damages like any other default winner).

true the plaintiffs' uncontroverted evidence," *Estate of Botvin v. Islamic Republic of Iran*, 510 F.

Supp. 2d 101, 103 (D.D.C. 2007); *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 100 (D.D.C.

2000), and a plaintiff may establish proof by affidavit. *Weinstein v. Islamic Republic of Iran*, 184

F. Supp. 2d 13, 19 (D.D.C. 2002). While a plaintiff needs to demonstrate a prima facie case to

obtain a judgment of liability in a FSIA case, a plaintiff must show entitlement to punitive damages

by clear and convincing evidence. *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 48

(D.D.C. 2003).

Thus, to prevail on their FSIA claims, Plaintiffs must demonstrate a prima facie case

of liability. With regard to their claims for punitive damages, Plaintiffs must present clear and

convincing evidence. By its failure to appear and defend itself, Syria put itself at risk that the

Plaintiffs' uncontroverted evidence would be satisfactory to prove its points. The Court finds that

the Plaintiffs have presented satisfactory evidence to prove liability and damages, including punitive

damages.

### B. Service

Service under the FSIA is governed by 28 U.S.C. § 1608. Subsection (a) provides

for service on a foreign state and subsection (b) provides for service on an agency or instrumentality

of a foreign state. To determine whether a foreign entity should be treated as the state itself or as an

agency or instrumentality, courts apply the core functions test: if the core functions of the entity are

governmental, it is treated as the state itself; and if the core functions are commercial, it is treated

as an agency or instrumentality. *Roeder*, 333 F.3d at 234.

In this case, service upon all Defendants was perfected under 28 U.S.C. § 1608(a),

which governs service on foreign states.[8]  Obviously, Syria is a foreign state.  Further, the law treats each of the other Defendants as the foreign state.  Syrian Military Intelligence is considered to be the foreign state itself because its core functions are governmental, not commercial.  *See Roeder*, 333 F.3d at 234.  Further, President Assad and General Shawkat are categorized as the foreign state itself because "an officer of an entity that is considered the foreign state itself under the core functions test should also be treated as the state itself for purposes of service of process under § 1608."  *Nikbin v. Islamic Republic of Iran*, 471 F. Supp. 2d 53, 65-66 (D.D.C. 2007); *see also Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1034 (D.C. Cir. 2004) (an official-capacity claim against a government official is a claim against the government itself).  While the Complaint asserts claims against Syria, Syrian Military Intelligence, President Assad, and General Shawkat, service was never completed against any individual Defendant.  Because each Defendant is treated as the state itself under the FSIA and because Plaintiffs never served the individuals as such, Syria is the only Defendant in this case against whom damages can be sought.

### C.  Jurisdiction and Liability under the State-Sponsored Terrorism Exception to the FSIA

The FSIA provides "the sole basis for obtaining jurisdiction over a foreign state in the courts of this country."  *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989).  Accordingly, this Court lacks jurisdiction over Syria unless one of the FSIA's enumerated exceptions applies.  Here, the state-sponsored terrorism exception to sovereign immunity applies.  28 U.S.C. § 1605A(a).  Moreover, the FSIA was recently amended to provide a private cause of

---

[8] Service upon Defendants in this case was accomplished via 28 U.S.C. § 1608(a)(3) through delivery of the required documents (translated into Arabic) to an agent of Defendants via international courier service, evidenced by a signed return-receipt dated October 27, 2006.  *See* Pls.' Mem. Regarding Service, filed Dec. 28, 2007 [Dkt. # 17].

action by which a foreign state that sponsors terrorism can be held liable for certain enumerated

damages arising from terrorist activities:  economic damages, solatium, pain and suffering, and

punitive damages.  *Id*. § 1605A(c).

Section 1605A(a) provides that a foreign state shall not be immune from the

jurisdiction of U.S. courts in cases where plaintiffs seek money damages for personal injury or death

caused by hostage taking, torture, or extrajudicial killing, if the damages were caused by:

> (1) the provision of "material support or resources" for hostage
> taking, torture, and extrajudicial killing;
>
> (2) if the provision of material support was engaged in by an official
> while acting within the scope of his office;
>
> (3) the defendant was a "state-sponsor of terrorism" at the time the
> act complained of occurred; and
>
> (4) the claimant or the victim was a "U.S. national" at the time of the
> act of terrorism.

28 U.S.C. § 1605A(a)(1), (a)(2).  Section 1605A(c) provides a private right of action to recover

damages for state-sponsored terrorism:

> (c) Private Right of Action – A foreign state that is or was a state
> sponsor of terrorism . . . shall be liable to –  (1) a national of the
> United States . . . or (4) the legal representative of [such] a person, for
> personal injury or death caused by acts described in subsection (a)(1)
> [i.e., the provision of material support or resources for hostage taking,
> torture, or extrajudicial killing] . . . .  In any such action, damages
> may include economic damages, solatium, pain and suffering, and
> punitive damages.  In any such action, a foreign state shall be
> vicariously liable for the acts of its officials, employees, or agents.

28 U.S.C. § 1605A(c).

Plaintiffs originally brought this action under the FSIA's Flatow Amendment, P.L.

104-208, 110 Stat. 3009-172 (published as a note to 28 U.S.C. § 1605), which provided a private

right of action under the FSIA against individual officials, employees and agents of a foreign state, but did not provide a private right of action against the foreign state itself. *See Cicippio-Puleo*, 353 F.3d at 1027. On January 28, 2008, the President signed into law the Defense Authorization Act for Fiscal Year 2008 ("Defense Authorization Act"), Pub. L. No. 110-181, 122 Stat. 3, 338-344 (2008). Section 1083 of the Defense Authorization Act sets forth a new provision, 28 U.S.C. § 1605A, which waives sovereign immunity for states that sponsor terrorism and provides a private right of action against such states. The Court has permitted Plaintiffs to proceed in this suit under the new statutory provisions. *See* Order filed Feb. 27, 2008 [Dkt. # 27].

   The new provision explicitly allows a private cause of action directly against a foreign state itself, a right of action which previously had been limited to suit against that government's leaders in their personal capacities. Under prior law, the D.C. Circuit has held that "neither 28 U.S.C. § 1605(a)(7) nor the Flatow Amendment, nor the two considered in tandem, creates a private right of action against a foreign government." *Cicippio-Puleo*, 353 F.3d at 1033. The D.C. Circuit also has held that FSIA plaintiffs cannot state a claim under the "generic common law" but must "identify a particular cause of action arising out of a specific source of law." *Acree v. Republic of Iraq*, 370 F.3d 41, 59 (D.C. Cir. 2004). As a result, plaintiffs have heretofore sued leaders of foreign states under the FSIA in their personal capacities, advancing claims based on the law of the U.S. State that is or was the domicile of the injured party or decedent. *See, e.g., Dammarell v. Islamic Republic of Iran*, No. 01-2224, 2005 WL 756090, at *1 (D.D.C. Mar. 29, 2005) (holding that where Iran was subject to suit under the state-sponsored terrorism exception to the FSIA, the law of the state of domicile of each of the plaintiffs (or the law of domicile of a decedent) provided the causes of action against the foreign state).

This construct no longer applies.  Under § 1605A(c), U.S. citizens who are victims of state-sponsored terrorism can sue a responsible foreign state directly.  Significantly, state law no longer controls the nature of the liability and damages that may be sought when it is a foreign government that is sued:  Congress has provided the "specific source of law" for recovery.  *See Acree*, 370 F.3d at 59.[9]  By providing for a private right of action and by precisely enumerating the types of damages recoverable, Congress has eliminated the inconsistencies that arise in these cases when they are decided under state law.  *Compare Jackovich v. Gen. Adjustment Bureau, Inc.*, 326 N.W.2d 458, 464 (Mich. App.1982) (under Michigan law, exemplary damages are available but punitive damages are not) *with Todd v. Byrd*, 640 S.E.2d 652, 661 (Ga. App. 2006) (citing OCGA § 51-12-5.1(b), noting that punitive damages are available under Georgia law); *compare* 28 U.S.C. § 1605A(c) (providing for solatium damages under the FSIA) *and* M.C.L.A. § 600.2922(6) (wrongful death damages under Michigan law constitute damages for loss of society and companionship of the deceased) *with Young Men's Christian Ass'n v. Bailey*, 146 S.E.2d 324, 341 (Ga. App. 1965) (wrongful death action under Georgia law does not provide damages for grief of survivors) *and Runyon v. District of Columbia*, 463 F.2d 1319, 1322 (D.C. Cir. 1972) (under D.C. law, a plaintiff in a wrongful death action may not recover for grief); *see Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 29-30 (D.D.C. 1998) (noting many differences in the law of solatium among the states).

Reading the new statute as it is written, the Court concludes that State-law claims for

---

[9] Further, federal courts should look to the Restatement (Second) of Torts, and not state law, to provide content to Congress's express intentions.  *See, e.g., Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003) (accepting the Restatement (Second) of Torts as "delineat[ing] the controlling substantive law" for intentional infliction of emotional distress "as a proxy for state common law").

damages are not available against a foreign state that has engaged in state-sponsored terrorism.

Recognizing that 28 U.S.C. § 1606 provides that "the foreign state shall be liable in the same manner

and to the same extent as a private individual under like circumstances," the Court does not accept

Plaintiffs' argument that they can "assert any applicable cause of action against a non-immune

foreign state," Pls.' Mem. at 41, because this argument is inconsistent with *Cicippio-Puleo*. *See* 353

F.3d at 1033.

      Here, Plaintiffs effectively brought suit only against Syria because they served all

Defendants under 28 U.S.C. § 1608(a)(3), claiming that all Defendants in this case should be treated

as the foreign state itself.  The only cause of action permissible against Syria is a federal cause of

action under the FSIA.  Thus, Plaintiffs' claims under state law will be dismissed.

      Plaintiffs have presented evidence satisfactory to the Court in support all elements

of a claim under § 1605A.  Syria was a state-sponsor of terrorism,[10] and the Plaintiffs are and

---

[10] The term "state sponsor of terrorism" is defined in §1605A as:

> a country the government of which the Secretary of State has determined, for purposes of section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. [§] 2405(j)), section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. [§] 2371), section 40 of the Arms Export Control Act (22 U.S.C. [§] 2780), or any other provision of law, is a government that has repeatedly provided support for acts of international terrorism.

28 U.S.C. § 1605A(h)(6).  Syria has been designated by the U.S. Department of State as a state sponsor of terrorism continuously since December 29, 1979, *see* http://www.state.gov/s/ct/c14151.htm (last visited Sept. 17, 2008), and its continued designation as such was noted in 2004, 69 Fed. Reg. 28,098 - 28,100 (2004), and again in 2005, 31 C.F.R. § 596.201 (2005).  *See also* Syria Accountability Act, P.L. 108-175, 117 Stat. 2486 (2003) (Congress directed that "(2) the Government of Syria should . . . (B) cease its support for 'volunteers' and terrorists who are traveling from and through Syria into Iraq to launch attacks.")

decedents were U.S. Citizens.[11]   The critical issue in this case is whether Syria, and its officials acting within the scope of their employment, provided material support and resources to Zarqawi and to al-Qaeda in Iraq.

Syria in fact did provide material support and resources to Zarqawi and al-Qaeda in Iraq which contributed to hostage taking, torture, and extrajudicial killings.  Section 1605A(h)(3) defines "material support or resources" to have "the meaning given that term in section 2339A of title 18."  Section 2339A provides:

> 'material support or resources' means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b).  To determine whether a defendant country has provided material support to terrorism, courts consider  first, whether a particular terrorist group committed the terrorist act and second, whether the defendant foreign state generally provided material support or resources to the terrorist organization which contributed to its ability to carry out the terrorist act.  *See e.g., Ben Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 46 (D.D.C. 2008).  The types of support that have been identified as "material" have included, for example, financing and running camps that provided military and other training to terrorist operatives, *see, e.g., Sisso v. Islamic Republic of Iran*, No. 05-0394, 2007 U.S. Dist. LEXIS 48627, at *13-17 (D.D.C. July 5, 2007); *Wachsman ex rel. Wachsman v. Islamic Republic of Iran*, 537 F. Supp. 2d 85, 90 (D.D.C. 2008); allowing terrorist

---

[11] Under the FSIA, a U.S. national is defined as "a citizen of the United States."  *See* 28 U.S.C. § 1605A(h)(5) (citing 8 U.S.C. § 1101(a)(22)).

groups to use its banking institutions to launder money, *see, e.g., Rux v. Republic of Sudan*, 495 F.

Supp. 2d 541, 549-550 (E.D. Va. 2007); and allowing terrorist groups to use its territory as a meeting

place and safe haven,[12] *see, e.g., id.* Such support has been found to have contributed to the actual

terrorist act that resulted in a plaintiff's damages when experts testify that the terrorist acts could not

have occurred without such support, *see, e.g., Ben-Rafael*, 540 F. Supp. 2d at 47; or that a particular

act exhibited a level of sophistication in planning and execution that was consistent with the

advanced training that had been supplied by the defendant state, *see, e.g., Sisso*, 2007 U.S. Dist.

LEXIS 48627, at *17; or when the support facilitated the terrorist group's development of the

expertise, networks, military training, munitions, and financial resources necessary to plan and carry

out the attack, *see, e.g., Rux*, 495 F. Supp. 2d at 553 (expert testimony that the "attack might have

been possible, but would not have been as easy" without defendant's support).[13]

---

[12] *See Owens v. Republic of Sudan*, 412 F. Supp. 2d 99, 108 (D.D.C. 2006) (finding that insofar as Sudan "affirmatively allowed and/or encouraged al-Qaeda and Hezbollah to operate their terrorist enterprises within its borders," it provided a safehouse).

[13] In cases regarding the state-sponsored terrorism exception to the FSIA such as this one, courts rely extensively on expert testimony. *See, e.g., Ben Rafael*, 540 F. Supp. 2d at 44 (in a FSIA case against Iran concerning a bombing at the Israeli embassy in Argentina by the terrorist group Hezbollah, the court relied on the testimony of an expert from the Washington Institute for Near East Policy and found that "Iran exercised control over Hezbollah through its intelligence agency."); *Wachsman*, 537 F. Supp. 2d at 90 (in a suit against Iran concerning the execution of a U.S. citizen in Israel by Hamas, the court relied on the testimony of an "expert in Islamic terrorism" and found that Iran provided military and terrorist training for approximately 400 Hamas operatives through its Revolutionary Guard); *Sisso*, 2007 U.S. Dist. LEXIS 48627, at *15, 17 (in a suit against Iran concerning a Hamas suicide bombing in Israel, the court relied on testimony from two experts associated with the Washington Institute for Near East Policy in finding, "Iran has financed and run camps that provide military and other training to Hamas operatives," and "Iran further supports Hamas's terrorist activities with direct funding"); *Valore v. Islamic Republic of Iran*, 478 F. Supp. 2d 101, 105 (D.D.C. 2007) (in a case against Iran regarding a Hezbollah bombing of a U.S. military barracks in Lebanon, the court relied on testimony of "a renowned expert on Iranian affairs" and an expert working for the Project for the Research of Islamist Movements and The International Policy Institute for Counterterrorism, finding that "Hezbollah was a creature of the Iranian government,

Plaintiffs proved, by evidence satisfactory to the Court, that Syria provided substantial assistance to Zarqawi and al-Qaeda in Iraq and that this led to the deaths by beheading of Jack Armstrong and Jack Hensley.  Plaintiffs showed that Syria's provision of material support and resources was inevitably approved and overseen by President Assad and General Shawkat, acting within the scope of their official duties.  Syria served as Zarqawi's organizational and logistical hub from 2002 to 2005. During this time, Syria supported Zarqawi by providing him a passport and by providing  munitions, training,  recruiting, and transportation to him and his followers:

(1)  Syria acted as a logistical support hub for Zarqawi by providing safe haven for training and the operations of important Zarqawi operatives, as well as facilitating safe passage through the Damascus airport and overland across the border into Iraq.

(2)  In public view and on public property, Syria allowed the recruitment of volunteers to fight in Iraq.

(3)  In 2002, from inside Syria, Zarqawi plotted successfully to assassinate Lawrence Foley. After the assassination, Zarqawi operative Shakr Absi fled to Damascus where the Syrain government protected him from the Jordanian government, claiming he was under detention when he was actually running a training camp in Syria for terrorists headed to Iraq.

(4)  President Assad appointed Fawzi al-Rawi as head of the Iraqi wing of the Syrian Ba'ath party; al-Rawi, who was salaried by the Syrian government, met with Zarqawi's lieutenants to discuss operations against the Americans; recruited suicide bombers; and provided funding and weapons to the Zarqawi organization.

(5)  In 2003, a militant preacher named Abu Qaqa on the Syrian government payroll worked to recruit people for the Zarqawi network.

(6)  In late 2003, a Syrian intelligence officer named Abu Moaz transported senior al-Qaeda leaders across the border into a training camp near Rawha, Iraq.

(7)  In 2004, a Zarqawi plot headed by the Jayousi cell planned to destroy Jordanian intelligence headquarters with a chemical bomb. The Jayousi cell was organized and obtained logistical support in Syria, and Syrian border guards permitted the cell's operatives

acting almost entirely under the order of the Iranians and being financed almost entirely by the Iranians").

to travel into Jordan.  Hatham Homar, a Syrian member of the Zarqawi network, entered Jordan and set up safehouses where explosives were stockpiled.

(8)  Sulayman Khalid Darwish, a high-ranking member of Zarqawi's advisory counsel, was a resident of Syria.  Darwish could not have operated inside Syria without the support and acquiescence of the Syrian government.  Syria did nothing to interfere with his terrorist activities.

(9)  Syria was aware of the notorious practices of Zarqawi and al-Qaeda in Iraq.  In the spring of 2004, al-Qaeda in Iraq publicized, and issued claims of responsibility for, the videotaped beheading of American businessman Nicholas Berg.

(10)  Nothing that happens within Syria of any political significance occurs without the knowledge and authority President Assad and General Shawkat.  Syria is a highly efficient police state with over a dozen intelligence agencies who spy on the domestic population as well as each other.

It was the Syrian government's foreign policy to support al-Qaeda in Iraq in order to topple the nascent Iraqi democratic government.  In 2003, the foreign minister of Syria stated publicly that it was in Syria's interest to see the U.S. invasion of Iraq fail.  The very brutality of Zarqawi's acts against American civilians — broadcast on the Internet for greatest impact — was intended to weaken U.S. resolve to succeed in Iraq.  Syria's aid to Zarqawi, from at least 2002 to 2005, was no impetuous or unknowing act.  Indeed, not only was it foreseeable that Zarqawi and his terrorist organization would engage in terrorist activities in Iraq to destabilize that country (in concert with Syrian foreign policy), but also Zarqawi had beheaded civilian Nicholas Berg and could be expected to attack civilians again.  The murders of Jack Armstrong and Jack Hensley were a foreseeable consequence of Syria's aid and support to Zarqawi and al-Qaeda in Iraq.

In sum, jurisdiction over Syria is consistent with § 1605A(a), the state-sponsored terrorism exception to sovereign immunity, and Plaintiffs have provided evidence satisfactory to the Court in support of their private cause of action for damages under § 1605A(c).

### D.  Damages

Damages for a private action for proven acts of terrorism by foreign states under the FSIA § 1605A(c) may include economic damages, solatium, pain and suffering, and punitive damages.  28 U.S.C. § 1605A(c).

#### 1.  Economic Damages

Federal law allows the estates of Messrs. Armstrong and Hensley to seek economic damages arising from their deaths.  Such damages constitute the present value of each man's anticipated earnings over the remainder of his lifetime.

#### a.  Economic Damages for Jack Armstrong

Mr. Armstrong had a history of working in foreign lands as a civilian construction engineer under dangerous conditions, including Croatia and Angola.  At the time of his death, his annual salary was $70,000, with a $20,000 bonus for completing a full year in Iraq.  Plaintiffs presented the evidence of Pia Di Girolamo, Ph.D., an economist who was accepted by the Court as an expert in the field of economic statistics.  Dr. Girolamo assumed that Mr. Armstrong would continue working in dangerous conditions at this salary and bonus.  After applying a 5.0% discount rate to reduce forecasted lost earnings to present value, Dr. Girolamo calculated Mr. Armstrong's lifetime lost earnings to be either $1,129,186 (assuming a worklife to age 62.7), or $1,347,919 (assuming a worklife to age 65).  *See* Girolamo T-2-80.

While the Court accepts Dr. Girolamo's calculations as technically accurate, the evidence does not support one assumption upon which the calculation was based.  It was reasonable to forecast that Mr. Armstrong would work until he was 65, as Americans are increasingly working past that age.  It was not reasonable, however, to assume that Mr. Armstrong would continue to earn

bonus monies paid to employees working in the dangerous conditions in Iraq or other dangerous foreign environments.  Mr. Armstrong's mother and sister testified to his committed relationship with a Thai woman and Mr. Armstrong's plan to use his  earnings from Iraq to establish a cooperative farm in Thailand.  It was reasonable to project that Mr. Armstrong would have continued to work as a construction engineer to support his new lifestyle but not that he would have regularly earned an additional $20,000 bonus for working in the dangers of a war-torn part of the world.[14] Thus, his lifetime earnings should be reduced by approximately 22%, the percentage of total earnings represented by his bonus in the year of his death.[15]  Therefore, a 22% reduction of Mr. Armstrong's projected lifetime earnings through age 65, *i.e.*, $1,347,919 results in an award of economic damages to Mr. Armstrong's estate in the amount of $1,051,377.00.

### b.  Economic Damages for Jack Hensley

Jack Hensley held a college degree in mathematics and computer science.  At the time he met his wife Pati, he worked for an international construction and engineering firm in Saudi Arabia.  Later, he and Pati were transferred to a coal export project in Colombia.  Subsequently, Mr. Hensley worked for Wang  for eleven years as a computer operations manager in Marietta, Georgia.  Wang closed, however, and Mr. Hensley's next ventures were unprofitable.  When a recruiter offered

---

[14] Dr. Girolamo testified that "these gentlemen that were deceased proved themselves to be capable of signing a contract and obtaining a contract in a high tens[sion]  environment like a war zone with a base of 90,000 [dollars] and 92,000 [dollars].  So I provided you an estimate of 90,000 [dollars] and 92,000 [dollars] which is also consistent with the national average had they returned to the United States."  Girolamo T-2-76.

[15] *See* Giralomo, T-2-76 ("So what you can simply do is say okay, we're giving them 90,000 [dollars].  Let's assume instead they would make 70,000 [dollars] which is 90 minus the bonus.  Then you can reduce the earnings [to] 78 percent because 70,000 [dollars] is 78 percent of 90,000 [dollars].").

Mr. Hensley a job in Iraq, he saw it as an opportunity to restore financial security to his family, but he intended to return to them.

Dr. Girolamo calculated the economic damages suffered by the estate of Jack Hensley.  Mr. Hensley was compensated while in Iraq at a total amount of $92,000, including a $20,000 bonus for working for an entire year.  Girolamo T-2-76.  Lost earnings, calculated as they were for Mr. Armstrong, came to $1,635,154, based on a worklife to age 65.  *Id.* at 78.  Because Mr. Hensley was married, an additional loss computation was made of $77,884, representing the loss to Mr. Hensley's estate of the value of his household services after age 65 and before age 70.  *Id.* at 79.

Like the testimony concerning Mr. Armstrong, the testimony of family members made it clear that Mr. Hensley intended to return to his family in the United States after his year in Iraq.  Even so, he may be expected to have continued in the career of construction engineering.  *Id.* at 76.  The Court thus concludes that the evidence is unsatisfactory to support inclusion of a $20,000 bonus for dangerous location in each year of his worklife and will reduce the present value of Mr. Hensley's lifetime earnings accordingly by 21.7%, a reduction in the amount of $354,828.  Thus reduced, the present value calculation for Mr. Hensley's lifetime earnings amounts to $1,280,326, to which is added $77,884 for the value of his household services, leading to a full award of $1,358,210.00

### 2. Solatium

The legal term "solatium" is a Latin word for "solace" and is defined as "[c]ompensation; esp. damages for hurt feelings or grief, as distinguished from damages for physical injury."  Black's Law Dictionary 1426 (8th ed. 2004).  "Solatium is traditionally a compensatory damage which belongs to the individual heir personally for injury to the feelings and loss of

decedent's comfort and society." *Flatow*, 999 F. Supp. at 29.[16]   Damages for solatium are awarded to close family members. *Id.* at 30-31.   "[M]ental anguish, bereavement and grief resulting from the fact of decedent's death constitute the preponderant element of a claim for solatium." *Flatow*, 999 F. Supp. at 30.   In the case of Jack Armstrong, his family members claiming solatium are his mother, Fran Gates, and his sister Jan Smith, both of whom testified at the hearing.   In the case of Jack Hensley, Pati and Sara Hensley both testified to their losses.

Jack Armstrong and his sister, Jan, grew up as "Army brats" and traveled constantly during their childhoods as a result.   They maintained that pattern as adults.   Mr. Armstrong first worked as a construction engineer in Croatia in early 1994, as a subcontractor to the United Nations. Ms. Smith went to work in Zagreb, Croatia, soon thereafter with the U.N. Peace Forces and was able to visit her brother.   When the United Nations' troops lost control of the situation, all aid workers were forced to leave.

Mr. Armstrong later worked in Angola, another site of U.N. humanitarian relief in the wake of the crisis in neighboring Rwanda.   Again, Mr. Armstrong worked as a construction engineer, accommodating U.N. Peacekeepers and Rwandan refugees.   The testimony of both Mrs. Gates and Ms. Smith made it clear that the family members maintained a strong emotional connection despite these distances.   The loss of Mr. Armstrong has left his family members with great anguish for the nature of his death, bereavement for their loss of his company, and long-term grief for the especially cruel way in which he was killed.

---

[16] *Flatow* came into disuse after the D.C. Circuit's opinion in *Cicippio-Puleo*, 353 F.3d at 1033, that found no basis in the FSIA for a direct claim against a foreign state.   However, with the amendment to the FSIA enacted by the Defense Authorization Act, specifying that solatium damages are available under federal law, opinions such as *Flatow* provide insight into the nature of such damages.

The same can be said of the family of Jack Hensley.  Mr. and Mrs. Hensley were married for 19 years and had a loving family life devoted to their daughter Sara.  Sara's testimony was difficult for her to present but was clear in its force: her father was a best friend figure whom she desperately misses, especially as she grows up without his guidance and friendship.  Unlike her mother, Sara searched out the Internet video of her father's death, just to know what really happened.  She cannot and does not forget.

The cruel, calculated, and public manner in which the kidnappings and beheadings of Messrs. Armstrong and Hensley were broadcast added to the Plaintiffs' damages.  The malice and political objectives that motivated the murders also increased these damages.

> The malice associated with terrorist attacks transcends even that of premeditated murder.  The intended audience of a terrorist attack is not limited to the families of those killed and wounded . . . but . . . the American public, for the purpose of affecting [the] United States government . . . .  The terrorist's intent is to strike fear not only for one's own safety, but also for that of friends and family, and to manipulate that fear in order to achieve political objectives.  Thus, the character of the wrongful act itself increases the magnitude of the injury.  It thus demands a corresponding increase in compensation for increased injury.

*Flatow,* 999 F. Supp. at 30.  The terrorists slaughtered Jack Armstrong and Jack Hensley as a propaganda act of terrorism.  The brutality quotient was maximized to achieve the maximum amount of terror and horror, which was markedly felt by Fran Gates, Jack Armstrong's mother, who felt compelled to watch the Internet video showing her son's gruesome murder so she would know he was actually gone; the sight of it will never leave the inside of her eyelids.  Jan Smith, on the other hand, fell into a deep and lengthy depression so that, to this day, she cannot speak of her brother without copious tears and cannot bear to think of the nature of his death, which she dare not watch for fear that her struggles with mental health stability will be upset.  Pati Hensley remains afraid and

so emotionally roiled that she cannot work.  Sara Hensley grieves constantly and feels a huge hole in her life.

The extreme cruelty in the actual slaughters of Jack Armstrong and Jack Hensley adds to the Plaintiffs' solatium damages.  Al-Qaeda in Iraq killed both men in a particularly awful, consciously and obviously fearsome, way to strike terror in the hearts of onlookers.  No one could feel this terror – or the grief and pain arising from it – more than their family members.  Mr. Armstrong and Mr. Hensley went to Iraq as civilians to do good things to support their country and to establish their futures; they were killed for the simple reason of being Americans in the most terrible and public way possible.  The grief, bereavement, and pain of all family members are palpable.

The Court finds the evidence of the Plaintiffs' entitlement to solatium compensation fully satisfactory.  As a result, the Court makes the following awards:

Fran Gates:      $3,000,000.00

Jan Smith:       $1,500,000.00

Pati Hensley:   $3,000,000.00

Sara Hensley:  $3,000,000.00

### 3.  Pain and Suffering

The claims for the conscious pain and suffering of Jack Armstrong and Jack Hensley before their deaths are actionable through their estates.  The trier of fact has broad discretion in calculating damages for pain and suffering.  *Taylor v. Wash. Terminal Co.*, 409 F.2d 145, 149 (D.C. Cir. 1969).

During their decapitations, each man suffered unimaginable mental and physical

agony.   There is no evidence that their senses were impaired or that there was any effort to anesthetize either man prior to his murder.  All the evidence, in fact, points the other way — that al-Qaeda in Iraq acted to maximize the pain and suffering of both men in order to increase the impact of the terrorist activities on the intended audience.

An autopsy and medico-legal examination was performed upon the remains of Mr. Armstrong by a medical doctor and forensic pathologist, Dr. Carmen Williams, and on Mr. Hensley by a medical doctor and forensic pathologist, Dr. Alex Welch.[17]  Williams  T-2-41; Welch T-2-17. The medical evidence corroborates the video:  each man was alive when his captors began to saw upon his neck with a sharp-bladed, but relatively short tool.  Williams T-2-58; Welch T-2-25.  Both were physically restrained during the ordeal, with handcuffs holding their hands behind their backs, and ropes binding their ankles.  Williams  T-2-49-50 & 58; Welch T-2-24 & 32.  As the expert testimony made clear, the ability to sense pain depends upon the brain receiving input from the spinal cord.  It was not easy to sever fully the spinal cords of Mr. Armstrong or Mr. Hensley because of the methods and tools used by their murderers, as evidenced by the markings on their spinal vertebrae. Williams T-2-60 ("it required considerable effort and movement and length of time to cut through both the soft tissue and bone"); Welch T-2-29 ("the blade hit the spinal column in . . . 11 different places").  The cutting began on the right side of each man's neck and continued, around the back of the neck without severing the spinal cord, until it reached the left carotid artery; only then did Mr. Armstrong and Mr. Hensley bleed to death and lose sensation of pain.  *See* Williams T-2-54 ("So consciousness with just one carotid artery [ ] compromised would remain for a while.").  It was, quite

---

[17] As explained above, this Opinion refers to the medical examiners by pseudonyms, protecting their identities  for safety reasons.

obviously and scientifically, "a very cruel and inhumane method of causing death." *Id*. at 63.

These decapitations were so awful because, anatomically, it is almost impossible to decapitate someone quickly with the tool and technique used by Zarqawi's terrorists. *Id*. at 58 ("It was not a quick and sudden movement that would result in his immediate decapitation. He would have been aware and feeling much of the cutting tissue."). The technique and instrument involved the "greatest amount of pain and trauma to that individual because you have multiple actions that are actually tearing at the tissues as the head is being wrenched around and trying to separate." Cole Dep. Tr. at 36. It is estimated that the men's suffering probably lasted minutes longer than the videotape evidence, which was subject to editing.[18]

> I think conservatively if you're adding cutting through the soft tissue, it would be at a very bare minimum in just several minutes before there would be a loss of consciousness. I would think that there would have to be at least 30 to 60 seconds before there's loss of consciousness at the fastest, at the most extreme. I think [in] my medical opinion it would be *several minutes* before loss of consciousness, then death would follow.

Williams T-2-68-69 (emphasis added). Experienced forensic pathologists testified that each man was subjected to torture in the manner of his death. The Court agrees. There is no existing metric to assess pain and suffering for the unbridled and intentional cruelty of the deaths of Mr. Armstrong and Mr. Hensley, after days of captivity in unknown circumstances. Even as edited, the videos graphically portray their last, horrific moments. Each man was alive throughout a significant portion

---

[18] The video of Mr. Armstrong's death was significantly edited, with missing material from between the initiation of the beheading and the final severing of the head from the body. *See* Ex. 40. Presumably, the effort took longer than even Zarqawi's terrorists wished to depict of their wanton cruelty but the unseen agony of Jack Armstrong also constitutes part of his compensable pain and suffering.

of the beheading and knew his death was upon him, with pain and blood and indescribable suffering.

The Court finds that the evidence is fully satisfactory to prove the pain and suffering experienced by Jack Armstrong and Jack Hensley while they remained conscious before they died. It awards compensatory damages for pain and suffering in the amount of $50,000,000.00 to the estate of each.

### 4. Punitive Damages

As amended, the FSIA now specifically allows an award of punitive damages for personal injury or death resulting from an act of state-sponsored terrorism. 28 U.S.C. § 1605A(c). Several factors are considered in the analysis of whether to award punitive damages and how substantial an award should be. Those factors include the character of the defendant's acts; the nature and extent of harm to the Plaintiffs that the Defendant caused or intended to cause; the need for deterrence; and the wealth of the Defendant. Restatement (Second) Torts § 908(1)-(2) (1977). The purpose of punitive damages is two-fold: to punish those who engage in outrageous conduct and to deter others from similar conduct in the future. *See Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 9 (D.D.C. 2000). "This cost functions both as a direct deterrent, and also as a disabling mechanism: if several large punitive damage awards issue against a foreign state sponsor of terrorism, the state's financial capacity to provide funding will be curtailed." *Flato*w, 999 F. Supp. at 33.

Al-Qaeda in Iraq wanted the world at large to know that Jack Armstrong and Jack Hensley died in conscious pain and terror. Syria was a willing and substantial supporter of Zarqawi and his terrorist organization and knew, full well, that they were capable of this kind of barbarism after the brutal and public acts of terrorism against Nicholas Berg. Through the Internet, Zarqawi

and his fellow terrorists transformed heinous acts into infamous and indelible propaganda that served the Syrian political ends.  The world at large must shout these actions down in infamy.

One is tempted to say that such a death as Mr. Armstrong's and Mr. Hensley's is unimaginable.  But it is not.  Zarqawi and his terrorist organization, aided in material ways by Syria, carried out this torture and murder and plastered it on the Internet for all the world to see.  This was real, not imaginary.  Three real-life men, counting Mr. Bigley, died in unspeakable ways, with great intention and forethought by their captors so that Zarqawi and his followers might brag about just how disconnected they were from human norms.  The evidence shows that Syria supported, protected, harbored, and subsidized a terrorist group whose *modus operandi* was the targeting, brutalization, and murder of American and Iraqi civilians.  Premeditated violence against civilian targets is not a legitimate action by any government.  Civilized society cannot tolerate states whose partnership with terrorist surrogates, like Zarqawi's terrorist network, is formed for the purpose of achieving political victory through heinous acts of barbarism.

In deciding the amount of punitive damages necessary, the Court undertakes the difficult task of quantifying in financial terms each act of such repugnance, premeditation, and cruelty as to earn the opprobrium of all civilized persons.  Jack Armstrong and Jack Hensley were frightened, humiliated, and terrorized.  They were then decapitated by a technique not fit for the slaughter of animals because of its clumsiness and abject viciousness.  *See* Williams T-2-63-64.  Nowhere is the premeditation and callousness of these acts more evident than in the recording, publication, and distribution of video footage of the torture and murders.  The videos of these atrocities transformed innocent men into mere props in a propaganda campaign.  The videos glorified cruelty and fanned the flames of hatred, in a fundamental offense to human dignity.  Syria's liability

-35-

for its continued support to Zarqawi and al-Qaeda in Iraq must be recognized and deterred.

In hopes that substantial awards will deter further Syrian sponsorship of terrorists, the Court will award to the estate of Jack Armstrong punitive damages in the amount of $150,000,000.00, and to the estate of Jack Hensley punitive damages in the amount of $150,000,000.00.[19]

## IV.  CONCLUSION

Money judgments cannot compensate Jack Armstrong or Jack Hensley for their torture and deaths or compensate their family members for their losses.  The law, however, cannot let depraved lawlessness go unremarked and without consequence.  Syria provided crucial support to Zarqawi and al-Qaeda in Iraq, without which they could not have entered Iraq or engaged in a long string of terrorist activities under Syrian protection.  Default judgment will be entered in favor of Plaintiffs in the following amounts:

Economic Damages to the Estate of Jack Armstrong -- $1,051,377.00

Pain and Suffering  to the Estate of Jack Armstrong – $50,000,000.00

Punitive Damages to the Estate of Jack Armstrong   –  $150,000,000.00

Solatium to Francis Gates – $3,000,000.00

---

[19] This finding comports with the requirements of due process.  *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996) (when reviewing punitive damage awards for compliance with due process, courts should consider the degree of reprehensibility of defendant's conduct, the disparity between the compensatory damages and the punitive damages, and awards granted in similar cases).  Here, Syria's conduct was most reprehensible.  While punitive damages are awarded in an amount far in excess of compensatory damages for economic loss, pain and suffering, and solatium, the size of the award here is commensurate with that awarded in other FSIA cases filed by the families of those tortured and killed by terrorists.  *See, e.g.*, *Weinstein*, 184 F. Supp. 2d at 25 (family members and estate awarded $150,000,000 in punitive damages); *Elahi*, 124 F. Supp. 2d at 114 (family members and estate awarded $300,000,000 in punitive damages).

Solatium to Jan Smith – $1,500,000.00

Economic Damages to the Estate of Jack Hensley – $1,358,210.00

Pain and Suffering  to the Estate of Jack Hensley – $50,000,000.00

Punitive Damages to the Estate of Jack Hensley – $150,000,000.00

Solatium to Pati Hensley – $3,000,000.00

Solatium to Sara Hensley – $3,000,000.00

A memorializing order accompanies this Memorandum Opinion.


Date: September 26, 2008            _____/s/_____
                                                              ROSEMARY M. COLLYER
                                                              United States District Judge