## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FRANCIS GATES et al

                CASE NUMBER:  1:06CV01500

Plaintiffs,

v.

SYRIAN ARAB REPUBLIC, SYRIAN
MILITARY INTELLIGENCE, PRESIDENT
BASHAR AL-ASAD and GENERAL 'ASIF
SHAWKAT

Defendants.


## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO VACATE UNDER RULE 60(b)

COME NOW the Plaintiffs and submit this memorandum of law in opposition to Defendants', (hereinafter "Syria"), motion for relief under Fed. R. Civ. P. 60(b)(4) and (b)(6), without offering any arguments in support of their Motion under 60(b)(6). By its motion, Syria makes several arguments, all of which appear directed at contesting the jurisdiction of the judgment entered in this case. Syria's arguments cannot be reconciled with the reliable and uncontroverted facts of this case. Further, as a matter of law, Syria's arguments must be rejected for the following reasons: (1) there is evidence of a signed receipt of the summons and complaint; (2) Article II of the United Nations Charter provides no basis for Syria to obtain relief from the judgment; (3) the issues in this case are cognizable by this Court and do not implicate the political question doctrine; and (4) the judgment of this Court is not unconstitutional on grounds of separation of powers. Each of these arguments will be addressed in detail below.

## STATEMENT OF FACTS

**Service of Process under 28 U.S.C.A. § 1608(a)(3)**

Plaintiffs brought this action on August 25, 2006 pursuant to the provisions of the

Foreign Sovereign Immunities Act, ("FSIA"), codified at 28 U.S.C. § 1602, *et seq*. To

affect service upon Syria, Plaintiffs initiated service through the Clerk of the Court under

28 U.S.C. § 1608(a). Plaintiffs delivered the complaint, summons and administrative

documents with translations into Arabic to the Clerk of Court, together with a blank DHL

express airbill, as required by the FSIA. The electronic docket shows that the Clerk of

the Court mailed "one copy of the summons and complaint, together with a translation of

each into the official language of the foreign state on 10/26/06, by DHL, to the agency or

instrumentality of the foreign state, pursuant to 28 U.S.C. [§] 1608(a)(3)." (Docket

Entry #3). Service upon Syria was thereafter perfected under 28 U.S.C. § 1608(a)(3) on

October 30, 2006. Specifically, the required documents were delivered to an employee

and agent of Syria via DHL, an international courier service. This delivery was

evidenced by a signature[1] dated October 30, 2006. (Docket Entry #17). Though served,

none of the Defendants answered and the Clerk of the Court consequently entered

defaults against them. (Docket Entry #7-8).

**Trial on the Merits Results in Judgment**

On January 7, 2008, the Honorable Rosemary M. Collyer began a three-day, non-

jury trial. The families of the two murdered Americans presented evidence in the form of

live testimony, videotaped testimony, affidavit, and original documentary and

videographic evidence. Given the gruesome nature of the beheadings, and the fact that

---

[1] A signature that Syria confirms is the signature of its employee who regularly receives shipments for DHL, including FSIA service of process papers in other cases in this Court. (Mot. to Vacate at p.8).

the terrorists recorded and disseminated the acts on video for propaganda purposes, the trial was an emotional and traumatic event.

On September 26, 2008, the Court entered an order imposing liability and damages against Defendant Syrian Arab Republic (Syria" and/or "Appellant") under the FSIA, 28 U.S.C. § 1605A, that sought compensatory and punitive damages for acts of state-sponsored terrorism that supported and facilitated the kidnapping, torture, and murder of two Americans: Olin Eugene Armstrong (hereinafter "Jack Armstrong") and Jack L. Hensley ("Jack Hensley").  (Memorandum Opinion, at p.16, filed Sept. 26, 2008, Docket Entry #42, Final Order Docket Entry #43).  The gruesome deaths of these men were carried out by terrorists operating in Iraq with material aid and support from Syria.

Syria provided material support and resources to the al-Tawhid wal-Jihad (also known as Al Qaeda in Iraq), and Abu Mus'ab al-Zarqawi ("Zarqawi").  Syria intended such support for Zarqawi and his organization to promote terrorism in Iraq, including torture and extrajudicial killings of innocent civilians.  In the detailed Memorandum Opinion, the District Court found: (1) Syria facilitated the recruitment and training of Zarqawi's followers and facilitated their transportation into Iraq, (Finding of Fact ¶¶18-30, Docket Entry #42); (2) Syria harbored and provided sanctuary to terrorists and their operational and logistical supply network, (Finding of Fact ¶¶31-38, Docket Entry #42); (3) Syria financed Zarqawi and his terrorist network in Iraq, (Finding of Fact ¶¶39-41, Docket Entry #42); and (4) President Assad and General Shawkat were aware of the activities of Zarqawi and al-Qaeda, (Finding of Fact ¶¶42-52, Docket Entry #42).

The Court further noted the breathtaking brutality of the beheadings that were aided and abetted by Syria's long-standing support of Zarqawi:

Zarqawi and his terrorist organization, aided in material ways by Syria, carried out this torture and murder and plastered it on the Internet for all the world to see.  This was real, not imaginary.  Syria was a willing and substantial supporter of Zarqawi and his terrorist organization and knew, full well, that they were capable of this kind of barbarism after the brutal and public acts of terrorism against Nicholas Berg.  Through the Internet, Zarqawi and his fellow terrorists transformed heinous acts into infamous and indelible propaganda that served the Syrian political ends. . . . The evidence shows that Syria supported, protected, harbored, and subsidized a terrorist group whose *modus operandi* was the targeting, brutalization, and murder of American and Iraqi civilians. . . . Civilized society cannot tolerate states whose partnership with terrorist surrogates, like Zarqawi's terrorist network, is formed for the purpose of achieving political victory through heinous acts of barbarism.

(Docket Entry #42 at p.34-35).

Despite Syria's many prior experiences in state-sponsorship of terrorism litigation under the FSIA, *see e.g., Wyatt v. Syrian Arab Republic*, 304 F. Supp. 2d 43 (D.D.C. 2004), it affirmatively chose to ignore service of the complaint.  "By its failure to appear and defend itself, Syria put itself at risk that the Plaintiffs' uncontroverted evidence would be satisfactory to prove its points."  (Docket Entry #42).  By action of the District Court on September 26, 2008, the case was closed and a final judgment was entered in favor of the Plaintiffs.  In its Order, the District Court explicitly stated "[t]his case is closed. This is a final appealable order."  (Docket Entry #43).

**Belatedly, Syria Contests Judgment**

On October 24, 2008, Syria entered an appearance and noticed an appeal of the District Court's September 26, 2008 decision.  (Docket Entry #48).  Syria later sought a remand of the case back to this Court while Plaintiffs sought to begin enforcement proceedings.  (Docket Entry #51-62).  The Court denied Plaintiffs' motions to begin enforcement pending resolution of the appeal and entered a stay of enforcement pending

the appeal without the posting of a bond so the Court could address Syria's arguments

regarding the sufficiency of service of process.  (Docket Entry #62).

On February 23, 2009 an order was entered by the United States Court of Appeals

for the District of Columbia Circuit holding Syria's appeal in abeyance "pending the

district court's decision whether it intends to vacate the default judgment or otherwise

grant relief to Appellants."  (Docket Entry #64).  Plaintiffs thereafter moved for a status

conference, over Syria's objection, to allow the parties to recommend a subsequent

course of action for the Court's approval.  The Court ordered Syria to file a motion that

contained any and all arguments for relief under Fed. R. Civ. P. 60(b) or otherwise.

(Minute Order March 6, 2009).  The Court also set a briefing schedule.  (Minute Order

March 6, 2009).

## SUMMARY OF ARGUMENT

Plaintiffs have produced proof that the Syrian government employee who

regularly signs for Foreign Sovereign Immunities Act service of process in the Syrian

Ministry of Foreign Affairs also signed the DHL delivery log sheet in this case.  This

proves Syria's receipt of the summons and complaint in this case on October 30, 2006.

In the face of such evidence, Syria's response never rises above irrational speculation that

the signature was created through an act of fraud by DHL.   Plaintiffs served Syria under

28 U.S.C. § 1608(a)(3), which required evidence of a signed receipt.  However, the law

neither specifies the precise nature of the "signed receipt," nor even a particular type of

mail service.  As required, Plaintiffs obtained a "signed receipt": a DHL delivery log

sheet bearing the signature of an employee of Syria's Ministry of Foreign Affairs.  To

obtain relief under Fed. R. Civ. P. 60(b), the movant bears the burden of proof, which is not satisfied by unsubstantiated innuendo and wild accusations.

Syria does not explain how the Court's subject matter jurisdiction would violate the United Nations Charter. Nor can Syria show that the designation of Syria as a state sponsor of terrorism is a discriminatory action simply because there are other Members of the United Nations that have not also been designated as state sponsors of terrorism. This argument fails because any other Member that chooses to support groups of terrorists that kill and injure Americans, as does Syria, can be designated in the same manner. Syria's argument that the case is not justiciable under the political question doctrine overlooks the weight of precedent in this Court in favor of hearing the case.

## ARGUMENT

Syria has not met the burden of proof required under Fed. R. Civ. P. 60(b)(4) to overturn the Court's finding that service was perfected in 2006. The burden of proof in a motion under Fed. R. Civ. P. 60(b)(4) rests with Syria, the challenging party. *Valdez v. Feltman (In re Worldwide Web Sys.)*, 328 F.3d 1291, 1299 (11th Cir. 2003); *Burda Media, Inc. v. Viertel*, 417 F.3d 292, 299 (2d Cir. 2005). "A signed return of service constitutes prima facie evidence of valid service 'which can be overcome only by strong and convincing evidence.' " *O'Brien v. R.J. O'Brien Assocs., Inc.,* 998 F.2d 1394, 1398 (7th Cir. 1993) (quoting *Hicklin v. Edwards,* 226 F.2d 410, 414 (8th Cir. 1955)); *People of State of New York ex rel. Spitzer v. Operation Rescue Nat.*, 69 F. Supp. 2d 408, 416 (W.D.N.Y. 1999). Although the existing documentation found in the record was already sufficient to defeat Syria's unsupported assertions, Plaintiffs gathered additional evidence to prove service was valid and that the evidence provided by Plaintiffs in

support thereof is reliable.  Plaintiffs' efforts resulted in DHL's production of several

emails sent from the DHL "trace specialist" in the United States to the DHL office in

Damascus, Syria in early November 2006.  These business records confirm DHL

obtained a hard copy of the service record after Plaintiffs requested it and then forwarded

that record to counsel for Plaintiffs.  In fact, the emails conclusively shatter Syria's

allegations of fraud by DHL, which are completely unsupported by any evidence.

The standard under Fed. R. Civ. P. 60(b)(6) is even higher.  *Kramer v. Gates*, 481

F.3d 788, 792 (D.C. Cir. 2007).[2]  Syria fails to provide any factual or legal support for its

request for relief under Fed. R. Civ. P. 60(b)(6).  Further, because the entirety of Syria's

arguments are directed at attacks upon this Court's jurisdiction, Rule 60(b)(6) does not

provide an independent ground for relief from the final judgment in this case:

> Under the established principle that Rule 60(b)(6) is not available where
> another subsection of Rule 60(b) provides the proper analytical framework
> for consideration, plaintiffs cannot obtain relief under Rule 60(b)(6)
> merely because they have failed to satisfy the strictures of Rule 60(b)(5).
> See 12 JAMES WM. MOORE ET AL., MOORE'S FEDERAL
> PRACTICE P 60.48[2] (3d ed. 2002) (" The provision applies only when
> there are reasons for relief other than those set out in the more specific
> clauses of Rule 60(b). To read the provision any other way would
> eliminate the need for the specific provisions and would eliminate the
> limitations that are imposed on those specific provisions.")

*Pigford v. Veneman*, 307 F. Supp. 2d 43, 48 (D.D.C. 2004).  Accordingly, relief is not

available under Fed. R. Civ. P. 60(b)(6) for Syria.  "The Supreme Court has noted that

courts should grant Rule 60(b)(6) motions only in 'extraordinary circumstances' . . .

plaintiffs must clear a very high bar to obtain relief under Rule 60(b)(6)."  *Id.* (citing

*Ackermann v. United States*, 340 U.S. 193, 199 (1950); *Gonzalez v. Crosby*, 545 U.S.

---

[2] Even assuming, arguendo, that relief was available under Fed. R. Civ. P. 60(b)(6), the Court would be
authorized to revisit the issue of the setting of conditions under "just terms" for such relief, including the
setting of an appropriate bond.  *E.g.*, *Knox v. Palestinian Liberation Organization*, 248 F.R.D. 420, 432
(S.D.N.Y. 2008) (a wrongful death case under 18 U.S.C. § 2333, the Anti-Terrorism Act).

524, 535 (2005)).  Where a litigant has decided to ignore the legal proceedings, as here, Rule 60(b) can not be employed to undo the damage caused by a risky litigation strategy. *Krieger v. United States DOJ*, 98-1703 (CKK), 2004 U.S. Dist. LEXIS 27396 at \*7 (D.D.C. Apr. 2, 2004) ("Rule 60(b) cannot, therefore, be employed simply to rescue a litigant from strategic choices that later turn out to be improvident.").  For whatever reason, Syria made a deliberate choice to risk a default in this lawsuit.  Under such circumstances, Fed. R. Civ. P. 60(b) cannot, and should not, rescue Syria from that decision.

I.    THE EVIDENCE PROVES DHL DELIVERED THE SUMMONS AND COMPLAINT AND SYRIA SIGNED FOR THEM

Fed. R. Civ. Pro. 60(b) requires more than Syria's conclusory denial that it did not receive service of process in this case.  None of Syria's arguments or its wild speculation provide a legitimate basis to vacate a final judgment under Fed. R. Civ. Pro. 60(b).  E.g., *O'Brien v. R.J. O'Brien Assocs., Inc.,* 998 F.2d 1394, 1398 (7th Cir. 1993).  In stark contrast, Plaintiffs are able to document every step taken under 28 U.S.C. § 1608(a)(3) to serve Syria.  First, Plaintiffs initiated service through the Clerk of the District Court by delivering the complaint, summons and administrative documents with translations into Arabic to the Clerk of Court, together with a blank DHL express airbill. (Docket Entry #3), (Affidavit of Counsel for Plaintiffs, Exhibit 1).  Next, the Clerk of the Court placed the summons and Complaint in the hands of DHL. (Docket Entry #3).  Finally, DHL delivered the service package to the Syrian Ministry of Foreign Affairs where an employee of Syria's Ministry of Foreign Affairs, whom Syria admits routinely signs for such deliveries, signed the DHL log sheet for an airway bill number matching the package dispatched by the Clerk of the Court.  Pls. Mem. Regarding Service, filed Dec.

28, 2007, (Docket Entry #17); (Mot. to Vacate at p. 8) ("The signature of the recipient at the Syrian Foreign Ministry as mentioned above is well known to DHL and to the U.S. Embassy.") (Exhibit 1).  Finally, Plaintiffs have also obtained DHL internal emails, Exhibit 2[3], that document DHL's internal steps taken to comply with Plaintiffs' request for the proof of delivery.  On November 13, 2006, DHL delivered the proof of delivery to Plaintiffs.  (Exhibit 3).

The exact method of service of process used in this case is consistent with that which has been approved by another court in this Circuit, a fact Syria omits from its brief. In *Abur v. Republic of Sudan***,** 437 F. Supp. 2d 166, 173 (D.D.C. 2006), the Honorable John D. Bates upheld service of process under 28 U.S.C. § 1608(a)(3).  In doing so, that court relied upon evidence of "signed receipt" that is indistinguishable from the evidence in this case.  Specifically, the *Abur* court cited the submission of a DHL airbill with tracking numbers that correlated to the proof of delivery.  The *Abur* court emphasized the importance of the same proof of delivery submitted in this case -- a DHL delivery log documenting the delivery signed for by the recipient's mail room.  "Of equal or greater evidentiary significance, however, *are the DHL delivery logs*, which reflect a recipient's signature (apparently in Arabic script) for the delivery to the Sudan ministry and some type of stamp or seal for the delivery to the Iran ministry."  *Id*. at 173.  (emphasis added). The *Abur* court then found that to require plaintiffs to serve the defendants in that case in any additional manner would thwart "the explicit congressional preference for service by mail whenever possible".  *Id*.  *Abur* is significant because it represents a complete

---

[3] Exhibit 2 is the complete set of 8 pages of documents sent to Plaintiffs by DHL that document DHL's response to Plaintiffs counsel's request for proof of delivery after the October 30, 2006 delivery of the summons and complaint and associated papers.

rejection of the primary thesis of Syria's motion and approval of the very same delivery method that was used in this case.

Instead of discussing *Abur* or the other applicable precedent from this Circuit, Syria raises arguments that are at odds with the evidence in this case, are contrary to legal precedent or both.  Syria repeatedly insinuates an impropriety by DHL based upon unfounded conjecture.  For instance, Syria postulates that a mere two-week period of time between the date of service, October 30, 2006, and the date DHL transmitted proof of delivery to counsel for Plaintiffs, November 13, 2006, is grounds for suspicion.  (Mot. Vacate at p. 5).  Without bothering to provide any evidence, Syria claims "[o]rdinarily when a shipper tracks a package to delivery and there is no problem in delivery DHL is able to provide details of delivery immediately with a day or two, at most."  (Mot. Vacate at p. 5).  Also, Syria faults Plaintiffs for failing to "apprise the Court of the questions arising from DHL's inability to provide immediate details of delivery, when requested by plaintiffs to do so . . ." and for filing a memorandum on service "as though its proof presented no problems."  (Mot. Vacate at p. 5).  Plaintiffs did not explain the two-week period because it is not extraordinary or suspicious.

Syria's arguments do not give any reasonable person cause to doubt the validity of service.  In sworn affidavits and in Plaintiffs' memorandum on service, Plaintiffs candidly and fully informed the Court of the dates of service and when DHL delivered the proof of delivery to counsel for Plaintiffs.  (Docket Entry #5.2 at p. 2).  The additional evidence secured by Plaintiffs since the March 6, 2009 status conference, (Exhibit 1), proves DHL sent an email to its Damascus office on November 9, 2006 in response to Plaintiffs' queries for proof of delivery.  (Exhibit 4).  The email states:  "Edward

MacAllister (shipper) would like a hard copy POD [proof of delivery] and also a letter from DHL stating the cnee [consignee] has received the pkg.  Please advise."  (Exhibit 4).  DHL sent another email to its Damascus office on the same day requesting a faxed hard copy of the proof of delivery.  (Exhibit 5).  DHL sent the same email again to Damascus on November 10, 2006.  (Exhibit 6).  Both of these emails ask that a hard copy proof of delivery be sent to "Jay", which was the first name of the DHL trace specialist, Jay Bitsuc, who sent the letter that confirmed delivery of the summons and complaint to counsel for Plaintiffs on November 13, 2006.  (Exhibit 3).  The Damascus office replied by email on November 11, 2006 "Rcvd yr rqst, plz hold till Monday for POD".  (Exhibit 7).  Later, the Damascus office sent an email on November 13, 2006 that stated the "HC [hard copy] has been faxed to your att plz check and adv", (Exhibit 8), and the DHL office responded on the same day by email that the "hc pod recd.  Thank you.  CLOSING FILE."  (Exhibit 9).  These emails conclusively corroborate the evidence that has long been in the record in the form of affidavits by Mr. MacAllister and Mr. Perles and supported by documents attached thereto.

Perhaps the most ridiculous argument made by Syria is its sinister interpretation of DHL's closing line "DHL sincerely regrets any inconvenience this may have caused." (Mot. to Vacate at p.6).  It is not unreasonable to suppose that this formulaic line is used in all DHL correspondence of this type when trace specialists are asked to provide letters about a DHL delivery.  The inclusion of the phrase "DHL sincerely regrets any inconvenience this may have caused" in DHL's delivery confirmation letter proves nothing.

Syria's next argument that the DHL log sheet signed by the Syrian government employee is "highly dubious" is another unfounded exercise in speculation.  Syria would have the Court believe DHL falsified a delivery log sheet.  (Mot. to Vacate at p.6-8).  Syria characterizes the DHL log sheet submitted by Plaintiffs with the Syrian government employee's signature as an "unusual document." (Mot. to Vacate at p.8).  In reality, Plaintiffs' delivery log sheet is anything but unusual which is confirmed by comparing it to the DHL delivery log sheet that Syria submitted as evidence of a delivery of a FSIA summons and complaint to the Syria Foreign Ministry in another case.  Exhibit B to Mot. to Vacate, (Docket Entry #66-3).  Syria's Exhibit B, another DHL log sheet, contains the same driver's name, Mohammed, as Plaintiffs' DHL log sheet.  The delivery route identification is the same: DM06.  The courier identification, (4305), is the same.  The service area, DAM/DCO/sy01, is the same.

The important indicia of reliability and validity of the service comes from an admission volunteered by Syria, itself, in its briefing.  Syria concedes that the signature contained on the DHL log sheet is that of a well-known recipient at the Syrian Foreign Ministry, "Esam," who regularly signs for other deliveries to the Syrian Ministry of Foreign Affairs, including FSIA service of process.  (Mot. to Vacate at p.8).  It is no wonder, then, that Syria is reduced to the preposterous claim that the DHL falsified its log sheet.  (Motion to Vacate at p.8).  Mere speculation is not sufficient to vacate a default judgment under the Federal Rules of Civil Procedure.

**II.     THE DHL SERVICE IN THIS CASE REQUIRED SYRIA TO SIGN A DHL
RECEIPT SIGNIFYING DELIVERY OF THE SUMMONS AND
COMPLAINT, THEREBY COMPLYING WITH 28 U.S.C. § 1608(a)(3).**

Syria was served with process pursuant to the provisions of the Foreign Sovereign

Immunities Act ("FSIA"), 28 U.S.C. § 1608(a)(3).  The evidence produced in this case

demonstrates that Plaintiffs used a mail service that required a signed receipt.  Indeed,

every DHL log sheet produced by both Plaintiff s and Syria contains a signature by the

recipient for every delivery listed.  (Exhibit 3); (Exhibit B and C to Mot. Vacate).

Plaintiffs expected that DHL would be able to furnish a signature from Syria if service

was not refused and planned to rely upon that signature to prove service had occurred.

The Foreign Sovereign Immunities Act "provides the sole basis for obtaining

jurisdiction over a foreign state in the courts of this country."  *Argentine Republic v.*

*Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989).  28 U.S.C. § 1608 sets forth

the requirements for sufficient service on a foreign sovereign.  These requirements are

comprised of a hierarchy of service options, meaning that the methods must be attempted

in descending order.  The first possible means set forth in subsection § 1608(a)(1) is

under any special arrangement for service between the "plaintiff and the foreign state or

political subdivision."  No such "special arrangement" existed with regard to any Plaintiff

in this action and any Defendant in this action.  The next means of service pursuant to the

FSIA is through delivery in accordance with any international convention on service of

judicial documents.  28 U.S.C. § 1608(a)(2).  The only potentially applicable

international convention would be the *Hague Convention on the Service Abroad of*

*Judicial and Extrajudicial Documents in Civil or Commercial Matters*.  (citation

omitted).  This Convention was ratified by the United States.  Because it was not ratified by Syria, service was not available by this means either.

The next available means of service was to send "a copy of the summons and complaint with a notice of the suit, together with a translation of each into the official language of the foreign state by any form of mailing requiring a *signed receipt*, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned."  28 U.S.C. § 1608(a)(3) (emphasis added).  Service upon Syria was carried out under 28 U.S.C. § 1608(a)(3) as required by the FSIA.

Syria argues that even if it was served via DHL on October 30, 2006, Plaintiffs can only effectuate service upon Syria using a service that DHL called "return receipt." (Motion to Vacate at p.9).  Syria further claims that the DHL log sheet, signed for by the same Syrian official that accepted service in another FSIA case against Syria[4], is not a "return receipt."  Syria's argument seeks to promote a distinction without a difference.

Had DHL's "return receipt service" been purchased by Plaintiffs, the same thing would have happened as indisputably happened here: an agent of Syria's Foreign Ministry would have signed a piece of paper evidencing Syria's receipt of the service of process.  (Mot. to Vacate at p.9).  Of course, this is exactly what happened in this case, without the use of the DHL return receipt service.  An employee for Syria signed DHL's delivery log sheet evidencing the receipt of the summons and complaint.  Furthermore, the use of the statutory language "signed and returned postal receipt," in a different subsection, 28 U.S.C. § 1608(c)(2), demonstrates that Congress would have drafted

---

[4] Exhibit B to the Motion to Vacate.

subsection (a)(3) differently if it had intended to require the use of a "return-receipt" service.

Syria has not shown that the procedure utilized by Plaintiffs did not require a "signed receipt". The DHL service called "return receive service" would not have provided any additional guarantee of service or otherwise promoted additional compliance with 28 U.S.C. § 1608(a)(3). In *Transaero, Inc. v. La Fuerza Aerea Boliviana*, a case where the D.C. Circuit found service inadequate under 28 U.S.C. § 1608(a), the plaintiffs ignored the hierarchical nature of 28 U.S.C. § 1608(a) and "never attempted the methods of service prescribed in sections 1608(a)(3) and (a)(4) . . . ." 30 F.3d 148, 153 (D.C. Cir. 1994). Instead, those plaintiffs relied upon service of a foreign state under 28 U.S.C. § 1608(b). *Id.* The *Transaero* plaintiffs' service substantially departed from 28 U.S.C. § 1608(a) and therefore failed. In this case, the Plaintiffs utilized a mail service that required a signed receipt, proof of which is provided at Exhibit 3, and the very same Syrian that has processed FSIA service of process in other cases against Syria signed for Plaintiffs' DHL package on October 30, 2006. Syria's argument rests upon strained nomenclature, not substance, and can not pinpoint any deviation from the statute.

The facts are clear. Plaintiffs delivered the complaint, summons and administrative documents with Arabic translations to the Clerk of Court, together with a blank DHL express airbill for delivering the service of process to Syria as required by the FSIA. The Clerk of the Court filled out the DHL airbill, presumably following instructions publicized on the United States District Court for the District of Columbia

website, which recommends DHL as a courier but does not mention the return receipt procedure advocated by Syria, as Syria admits.  (Mot. Vacate at p.10).

To succeed, Syria must convince this Court that "return receipt," which is a type of service offered by mail carriers, is the same thing as "signed receipt," which is the type of evidence required by 28 U.S.C. § 1608(a)(3).  Syria asks this Court to re-write the statute to impose a different requirement than that promulgated by Congress in 28 U.S.C. § 1608(a)(3), which only requires a "signed receipt."  This Court should reject Syria's bid to have this Court re-draft a clear and unambiguous statute.

The difference between the plain words used by Congress in different subsections in the same statute is not trivial or insignificant.  The disparity between what Congress drafted into 28 U.S.C. § 1608(a)(3), and what Syria thinks is required by those words, is underscored by the statutory language used in 28 U.S.C. § 1608(c)(2).  Congress actually used the words "signed and returned postal receipt" in 28 U.S.C. § 1608(c)(2).  Had Congress intended to require a "return receipt service" through the mail in 28 U.S.C. § 1608(a)(3), Congress could have used exactly those words.  It did not.

Syria's argument that "signed receipt" actually means "return receipt mail service" would require the Court to impermissibly rewrite the subsection.  28 U.S.C. § 1608(c)(2) requires a "signed and returned postal receipt," and "other proof of service applicable to the method of service employed," as follows:

> (c) Service shall be deemed to have been made—
> . . . .
> (2) in any other case under this section, as of the date of receipt indicated in the certification, *signed and returned postal receipt*, or *other proof of service applicable to the method of service employed.*

(emphasis added).[5]  By carefully choosing different language in the construction of the different subsections of 28 U.S.C. § 1608, Congress differentiated between what kinds of evidence of service would be required in each subsection.  The phrases "signed receipt" found in 28 U.S.C. § 1608(a)(3), and a "signed and returned postal receipt," found in 28 U.S.C. § 1608(c)(2) do not mean the same thing.  The different phrases manifestly require a different type of documentation and action on the part of the recipient. The words "signed receipt" found in 28 U.S.C. § 1608(a)(3), require only some signed documentation to confirm and authenticate that the receiver acknowledged taking possession of the documents.  28 U.S.C. § 1608(a)(3) requires nothing more, and nothing less, than the service executed in this case, which is consistent with the DHL delivery evidenced by a signed log sheet as approved in *Abur v. Republic of Sudan*, 437 F. Supp. 2d. at 173.

While DHL, among other governmental and commercial providers, might have a "return receipt procedure," 28 U.S.C. § 1608(a)(3) by its explicit terms does not require a return receipt service, but simply a "signed receipt", which Plaintiffs have provided to the Court.  28 U.S.C. § 1608(a)(3) permits *any* form of "mail" to be used to transmit service of process.  In this case, the delivery log sheet provided by DHL provides reliable, uncontroverted evidence of a "signed receipt" by an employee of the Syrian Foreign Ministry.

---

[5]  The "signed and returned postal receipt," language found in 28 U.S.C. § 1608(c)(2), requires that the sender employ a specific courier or postal facility providing for a "postal receipt," and that the recipient "signed *and return[ed]* that postal receipt", which therefore translates into a different and elevated level of active participation by the recipient, and specifically that a plaintiff (or court) actually receive the "signed and returned postal receipt."  The key focal point is that the service required in Section 1608(c)(2) is a type of "postal" services, which is not required under 28 U.S.C. § 1608(a)(3).

Syria seeks to rewrite 28 U.S.C. § 1608(a)(3) by excising the words "signed receipt" and replacing that verbiage with "return receipt postal service" and claiming that the failure to employ a service by such a name—irrespective of the functional equivalency of a signed receipt -- destroys service under 28 U.S.C. § 1608(a)(3). Congress declined however to impose the requirement of "return receipt postal service" as a specific and exclusive jurisdictional building block of 28 U.S.C. § 1608(a)(3).  As a matter of statutory interpretation, the words of 28 U.S.C. § 1608(a)(3) are clear on their face.  "Our objective in a case such as this is to ascertain the congressional intent and give effect to the legislative will." *Philbrook v. Glodgett*, 421 U.S. 707, 713 (1975).  If Congress had intended that claimants under 28 U.S.C. § 1608(a)(3) must employ a "return receipt postal service," than Congress would have drafted 28 U.S.C. § 1608(a)(3) the same way it did 28 U.S.C. § 1608(c)(2).

The *Phoenix Consulting* court held that service strictly adheres to the terms of 28 U.S.C. § 1608(a)(3) if service is most likely to generate, *but not guaranty*, notice of the proceeding by mandating active participation of both the dispatcher and the recipient. 35 F. Supp. 2d 14, 19 (D.D.C.  1999), *rev'd on other grounds*, 216 F.3d 36 (D.C. Cir. 2000). That court rejected any claim that a claimant must ensure or guarantee service of process upon a person authorized to accept service of process.  *Id.* at 18.  The *Abur* court agreed with the *Phoenix Consulting* court that the word "receipt" evidences "active participation," and constitutes a vivid authentication by the recipient that in fact they have received the document.  *Abur*, 437 F. Supp. 2d at 173.  The word "signed receipt" could mean *any type* of notation that authenticates and confirms that the recipient acknowledged receipt of the document itself.  The proof of delivery in this case, which is

a receipt of delivery signed by a Syrian government employee, is sufficient under the clear and unambiguous terms of 28 U.S.C. § 1608(a)(3), and the reasoning of *Phoenix Consulting* and *Abur* courts.

**III.    ARTICLE II OF THE UNITED NATIONS CHARTER IS IRRELEVANT TO THE RESOLTUION OF THIS CASE**

**A.    28 U.S.C. § 1605(a)(7) DOES NOT VIOLATE THE SOVEREIGN EQUALITY AND THE JURIDICAL EQUALITY OF THE SYRIAN ARAB REPUBLIC**

Syria argues that 28 U.S.C. § 1605(a)(7) as applied violates Article 2 of the U.N. Charter, which would be a violation of a treaty signed by the United States, by subjecting Syria to the subject matter jurisdiction of this Court while exempting all other U.N. Members from suits for the violations cognizable under 28 U.S.C. § 1605(a)(7).  (Motion to Vacate at p.11-24).  The Court of Appeals for the District of Columbia Circuit rejected the very same argument raised by counsel for Syria in another case:  *Wyatt v. Syrian Arab Republic*, 06-7094, 2008 U.S. App. LEXIS 2272 at *2-4 (D.C. Cir. January 25, 2008) (unpublished decision).

Syria rests its argument on a shaky foundation by assuming that "the attempted exercise of judicial power by one sovereign over . . . another sovereign . . . violates the principles of sovereign equality and juridical equality protected by the U.N. Charter." (Mot. to Vacate at p.12).  Syria cites no precedent in support of this proposition and indeed the D.C. Circuit expressed doubt that Article 2 would even prevent "states from subjecting other states to judicial process for certain acts."  *Id.* at *2.  To maintain that the U.N. Charter guarantees the absolute immunity of one nation from the judicial process of another is a radical stance.  Syria states that "[l]ong before the drafting of the U.N. Charter, its first principle – the sovereign equality of all nations – was an axiom of

international law." (Motion to Vacate at p.12). Equally true, but overlooked by Syria, is that the need for exceptions to that sovereign immunity has also existed for almost as long as there has been sovereign immunity.

Before modern times, federal common law generally provided foreign states with absolute immunity from suit. *See, e.g., The Schooner Exchange* v. *M'Faddon*, 11 U.S. (7 Cranch) 116 (1812). With the rise of state trading companies in the twentieth century, exceptions were made under a theory of "restrictive immunity," which was formally adopted as United States policy by the Department of State in the so-called Tate Letter of May 1952.[6] *See Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486-87 (1983). Under this theory, immunity was confined to suits involving the foreign sovereign's public acts, and did not extend to cases arising out of a foreign state's strictly commercial acts. *Id*. at 487.

Administration of the restrictive-immunity theory proved problematic. Courts deferred to State Department recommendations on immunity questions, which forced this executive agency to assume a judicial function that often conflicted with its primary mission of conducting American foreign policy. Foreign nations frequently pressured the State Department to recommend immunity, and political considerations sometimes led to recommendations of immunity in cases where immunity would not have been available under the restrictive theory. *Id*. The State Department, moreover, did not participate in every case, which left the courts to make their own decisions in that class of cases. As a

---

[6] Letter from Jack B. Tate, Acting Legal Advisor, Department of State to Acting Attorney General Philip B. Perlman (May 19, 1952), *reprinted in* 26 Department of State Bulletin 984-85 (1952) *and in Alfred Dunhill of London, Inc*. v. *Cuba*, 425 U.S. 682, 711 (1976) (Appendix 2 to opinion of White, J.)

result, "the governing standards were neither clear nor uniformly applied." *Id*. at 488 (citations omitted).

In 1976, Congress responded to these problems by enacting the Foreign Sovereign Immunities Act.  28 U.S.C. §§ 1330, 1602-1611.  Importantly, the FSIA assigned the interpretation of those statutory exceptions to the courts.  The FSIA therefore was simply a codification and clarification of longstanding principles: the recognition that there must be exceptions to sovereign immunity and that the courts must apply these exceptions.

The modern conception of sovereign immunity clashes sharply with Syria's position.  Syria wishes to return the law to the state in which it existed in the nineteenth century.  Such an absolutist and inflexible rule would nullify the intent of Congress expressed in the FSIA, which codified a theory of "restrictive immunity".  The exposure of Syria to civil liability for certain specified acts as described in 28 U.S.C. § 1605(a)(7) or 28 U.S.C. § 1605A does not violate Article 2 of the U.N. Charter.

Syria also claims that it is a victim of unfair discrimination as a result of its susceptibility to suit under 28 U.S.C. § 1605(a)(7).  Syria complains that the decision to strip Syria of its immunity through its designation as a state sponsor of terrorism is a "discriminatory act," in violation of the U.N. Charter.  (Mot. to Vacate at p.18).  As Syria's counsel well knows, the D.C. Circuit has rejected this argument as well:

> But even if Article 2(1) does demand strict equality across states, the provisions are not in conflict because § 1605(a)(7) does not treat Syria (and the other terrorism sponsor states) unequally. Any country can come within § 1605(a)(7)'s exception so long as the Secretary of State designates it a terrorism sponsor.

*Wyatt v. Syrian Arab Republic*, 06-7094, 2008 U.S. App. LEXIS 2272 at *4 (D.C. Cir. January 25, 2008) (unpublished decision).  Any foreign sovereign may be designated a

"state-sponsor of terrorism" provided its actions furnish sufficient cause to the Secretary

of State, as have Syria's.  The Secretary of State is responsible for the designation under

two different statutes:  the Export Administration Act of 1979 ("EAA"), 50 U.S.C. Appx.

§ 2405(j), and the Foreign Assistance Act of 1961 ("FAA"), 22 U.S.C. § 2371.

A country can be designated a state sponsor of terrorism under the EAA if the

Secretary of State finds "[t]he government of such country has repeatedly provided

support for acts of international terrorism" including allowing "the recurring use of any

part of the territory of the country as a sanctuary for terrorists or terrorist organizations."

50 U.S.C. Appx. § 2405(j)(1)(A), (j)(5)(A).  50. U.S.C. Appx. § 2405(j) provides further

guidelines for the designation:

> (5) (A) As used in paragraph (1), the term "repeatedly provided support
> for acts of international terrorism" shall include the recurring use of any
> part of the territory of the country as a sanctuary for terrorists or terrorist
> organizations.
>     (B) In this paragraph--
>         (i) the term "territory of a country" means the land, waters, and
> airspace of the country; and
>         (ii) the term "sanctuary" means an area in the territory of a country--
>           (I) that is used by a terrorist or terrorist organization--
>             (aa) to carry out terrorist activities, including training, financing,
> and recruitment; or
>             (bb) as a transit point; and
>           (II) the government of which expressly consents to, or with
> knowledge, allows, tolerates, or disregards such use of its territory.

The designation of a state sponsor of terrorism is hardly an "arbitrary" decision, as Syria

believes.  (Mot. Vacate at p.21).  The evidence produced in this case established that

Syria has engaged in precisely such conduct over multiple decades.  In contrast, other

Members of the United Nations that have not been engaged in such conduct have not

been so designated a state sponsor of terrorism.  This is not discrimination.

Syria also claims that every exception to sovereign immunity contained in the FSIA treats all nations equally, except for 28 U.S.C. § 1605(a)(7).  (Mot. to Vacate at p.23).   The statutory language drafted by Congress for each exception to sovereign immunity, however, includes certain requirements that strip a foreign sovereign of its immunity for those acts, which is no different than 28 U.S.C. § 1605(a)(7) or 28 U.S.C. § 1605A.

Syria charges that 28 U.S.C. § 1605(a)(7) is "discriminatory limitation of Article III jurisdiction" without explanation or support.  If by this Syria means to contend that there is a separation of powers issue in the statute, as Syria implies elsewhere, that question has been answered in the negative by the D.C. Circuit in *Owens v. Republic of the Sudan*.  531 F.3d 884, 888 (D.C. Cir. 2008).  Congress' delegation of fact finding decisions to the Executive in 28 U.S.C. § 1605(a)(7) or 28 U.S.C. § 1605A relied upon the Presidency's foreign relations powers and was bound by intelligible principles, which confirm the constitutionality of the statutes.  *Id.* at 888-91.

It is true that only a "chosen few" foreign sovereigns have been designated under the EAA or the FAA but this is simply because not that many foreign sovereign choose to support groups of terrorists who kill or injure United States citizens.

## B.  NEITHER 28 U.S.C. § 1605(a)(7) NOR 28 U.S.C. § 1605A VIOLATE ANY EXISTING INTERNATIONAL AGREEMENTS

Syria argues that while Congress made the FSIA subject to existing international agreements at 28 U.S.C. § 1604, Congress did not express an intent to alter the U.N. Charter when it drafted 28 U.S.C. § 1605(a)(7) or 28 U.S.C. § 1605A.  As stated above in Section III.A., neither 28 U.S.C. § 1605(a)(7) or 28 U.S.C. § 1605A are implicated by

Article 2 of the U.N. Charter.  *Wyatt v. Syrian Arab Republic*, 06-7094, 2008 U.S. App.

LEXIS 2272 at *2-4 (D.C. Cir. January 25, 2008) (unpublished decision).  Nor do 28

U.S.C. § 1605(a)(7) or 28 U.S.C. § 1605A unfairly discriminate against Syria, even if the

requirements of Article 2 are implicated, as described above.  *Id.*

### C.  THE COURT IS NOT A FORUM FOR SYRIA'S GENERALIZED OBJECTIONS TO ITS DESIGNATION AS A STATE SPONSOR OF TERRORISM

Syria's motion states several vague objections to 28 U.S.C. § 1605(a)(7) or 28

U.S.C. § 1605A without presenting an actual argument that Plaintiffs can respond to.

(Mot. Vacate at p.27-29).  Syria's grievances are not cognizable in this forum.  Syria

falsely states that "the identical criminal conduct here, if committed by any of the more

than 190 Members of the U.N. . . . can not be addressed by U.S. courts."  (Mot. Vacate at

p.28).  That is untrue.  If any nation knowingly and intentionally supported a terrorist

network to promote torture, hostage taking, and extrajudicial killings of American

citizens, then that nation would be designated as a state-sponsor of terrorism and its acts

would be cognizable in U.S. courts.

Syria also scorns Plaintiffs' case as not worthy of adjudication:  "plaintiffs, are a

minuscule number among thousands of victims."  (Mot. Vacate at p.28).  Other tragedies

and cruelties do not diminish the horrible deaths suffered by Olin Eugene "Jack"

Armstrong and Jack L. Hensley.

### D.  THE DESIGNATION OF A STATE SPONSOR OF TERRORISM BY THE SECRETARY OF STATE IS GUIDED BY INTELLIGIBLE PRINCIPLES

Syria mistakenly argues that there are "no criteria or procedural requirements for the Secretary's . . . designation of a state as a 'sponsor' of terrorism." (Mot. Vacate at p.29). The D.C. Circuit recently found that the delegation of power from Congress to the Executive branch to make the designation under 28 U.S.C. § 1605(a)(7) is bound by intelligible principles:

> The EAA permits the Secretary of State to label a country a state sponsor of terrorism if the "government of such country has repeatedly provided support for acts of international terrorism." 50 U.S.C. App. § 2405(j)(1)(A). . . *The statutory context surrounding § 1605(a)(7) coupled with the Executive Branch's inherent constitutional authority in the area of foreign affairs provide more than enough guidance to the Secretary of State to make a finding of fact* upon which the operation of § 1605(a)(7) partially depends.

*Owens v. Republic of the Sudan*, 531 F.3d 884, 893 (D.C. Cir. 2008) (emphasis added).

Syria's argument that 28 U.S.C. § 1605(a)(7) impermissibly does not define "terrorism", (Mot. Vacate at p. 29), was rejected by D.C. Circuit in *Owens*. *Id.* The D.C. Circuit rejected the argument that 28 U.S.C. § 1605(a)(7) was not specific enough because it did not define certain key terms:

> Sudan argues that this delegation is not specific enough--*that it does not define "repeatedly," "support," or "acts of international terrorism," or require Congress's approval.* In light of the Supreme Court's precedent, it is clear that *no further definition of these terms is required; they are sufficiently intelligible as they are. See Whitman,* 531 U.S. at 475 ("[W]e did not require the statute to decree how 'imminent' was too imminent, or how 'necessary' was necessary enough, or even . . . how 'hazardous' was too hazardous."). In any event, a *related statute requiring the Secretary of State to prepare a detailed assessment of state sponsors of terrorism defines, inter alia, the terms "terrorism" and "international terrorism."* 22 U.S.C. § 2656f(d)(1), (2).

*Id.* (emphasis added). Syria's arguments do not even attempt distinguish or address the *Owens* decision and cannot survive its application of the precedent represented by the *Owens* decision.

**E.  SYRIA'S DEFAULT WAS A FAILED TACTICAL PLOY THAT
CANNOT BE EXCUSED BY GENERAL CALLS FOR RESPECT FOR
SOVEREIGN IMMUNITY**

Syria's motion is replete with repetitive and vague broadsides against the

statutory framework underlying Plaintiffs' claims as well as pleas for the respect of every

country's sovereign immunity, which is an ironic plea from the country that supported

Abu Zarqawi while he committed infamous acts of violence and unusually barbaric

crimes for many months.

The arguments that Syria chooses to make in its motion are further proof that

Syria seeks to avoid the merits of this case.  The evidence is conclusive that Syria

received the Court dispatched service of process.  Syria's pleading makes clear that Syria

wishes nothing more than to waste the Court's resources while it mounts an ideological

and political defense that is irrelevant to the cognizable issues in this case.

**IV.  THE ISSUES IN THIS CASE ARE COGNIZABLE BY THIS COURT AND
DO NOT FALL WITHIN THE AMBIT OF THE POLITICAL QUESTION
DOCTRINE**

Syria would like the Court to believe that it is adjudicating the fate of nations,

when, in fact, the Court is applying traditional tort principles to a case congressionally

mandated to the jurisdictional cognizance of an Article III court.  Syria argues that under

the political question doctrine the issues raised in this lawsuit are non-justiciable and are

not properly the subject of a judicial inquiry.  (Mot. Vacate at p. 33).  The facts and the

law are against Syria in this case.  Therefore, it argues that the court can not hear the

case.  This Court should follow the path established by other courts and reject Syria's

argument.

The mere presence of political issues does not make a case inappropriate for judicial scrutiny.  "This is a tort suit brought under a legislative scheme that Congress enacted for the express purpose of providing a legal remedy for injuries or death occasioned by acts of international terrorism." *Ungar v. Palestinian Liberation Organization*, 402 F.3d 274, 280 (1st Cir. 2005); *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 49 (2nd Cir. 1991) (observing that in a suit arising from a terrorist murder, "[t]he fact that the issues before us arise in a politically charged context does not convert what is essentially an ordinary tort suit into a non-justiciable political question.").  Nor does the presence of issues that might touch upon foreign relations convert a tort case into a non-justiciable case.  "[T]he Supreme Court has made clear that not 'every case or controversy which touches foreign relations lies beyond judicial cognizance.'" *Beaty v. Republic of Iraq*, 480 F. Supp. 2d 60, 71 (D.D.C. 2007) (quoting *Baker*, 369 U.S. 186, 211 (1962); *Japan Whaling Ass'n v. American Cetacean Society*, 478 U.S. 221, 229-230 (1986).  An analysis of the factors set forth by the Supreme Court in the seminal case of *Baker v. Carr* make clear that the political question doctrine is not applicable to this case.

Supreme Court precedent mandates consideration of the following factors when a court analyzes the applicability of the political question doctrine:

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker,* at 217.  In *Beaty v. Republic of Iraq*, 480 F. Supp. 2d 60 (D.D.C. 2007), Judge

Bates applied the *Baker v. Carr* factors to a suit against Iraq by children of Americans

imprisoned and tortured by the former Iraqi government under Saddam Hussein.  The

analysis, and outcome, of *Beaty v. Republic of Iraq* should inform this Court's

consideration of the flawed arguments made by Syria.

The results of the application of the first factor underscore the inapplicability of

the political question doctrine in this case.  As noted in *Klinghoffer*, 937 F.2d at 49, the

first *Baker* factor has been regarded as the most important of the six factors by the author

of *Baker* himself, Justice Brennan.  *Goldwater v. Carter*, 444 U.S. 996, 1006 (1979)

(Brennan, J. dissenting); *see also Beaty*, at 75.  Here, the case is a tort suit over which the

Court asserts subject matter jurisdiction as specifically authorized by Congress.  28

U.S.C. § 1605A.  "Applying standards set forth in a duly enacted statute that represents

the considered judgment of the political branches is a quintessential task undertaken by

the federal courts."  *Beaty*, at 76.  Explicit in the statutes at issue is a textually

demonstrable delegation of authority to the judiciary:

> The Congress has given the courts of the United States the jurisdiction to
> decide the legal issues and factual questions raised by the plaintiffs'
> allegations, which sound in tort; accordingly the courts have the duty to
> proceed to the extent the actions are justiciable.

*Simon v. Republic of Iraq*, 529 F.3d 1187, 1197 (D.C. Cir. 2008), *rev'd on other grounds*,

07-1090 and 08-539, 2009 U.S. LEXIS 4158 (U.S. June 8, 2009).  "The department to

whom this issue has been 'constitutionally committed' is none other than our own--the

Judiciary."  *Klinghoffer*, 937 F.2d at 49; *Presbyterian Church of Sudan v. Talisman

Energy, Inc.*, 244 F. Supp. 2d 289, 347 (S.D.N.Y. 2003) (the presence of a jurisdictional

federal statute denotes a constitutional commitment to the judiciary branch).  Nor does

this case require this Court to "evaluate 'any executive or congressional policy decision or value judgment' in order to adjudicate plaintiffs' claims." *Beaty*, at 75 (quoting *Vine v. Republic of Iraq*, 459 F. Supp. 2d 10, 20 (D.D.C. 2006), *rev'd on other grounds*, 07-1090 and 08-539, 2009 U.S. LEXIS 4158 (U.S. June 8, 2009).  28 U.S.C. § 1605A explicitly created jurisdiction for this exact specie of case.  It is not a "judicial intrusion" into the conduct of foreign affairs for a federal court to review a case under a grant of Article III jurisdiction by Congress.

Secondly, there is not a lack of "judicially discoverable and manageable standards for resolving" this tort case, because the common law "provides clear and well-settled rules on which the district court can easily rely." *Klinghoffer*, at 49.  Plaintiffs' tort claims "will be resolved by applying the firmly established requirements of a federal statute (the FSIA) and the principles that courts in this district have developed for resolving claims under the FSIA's state-sponsored terrorism exception." *Beaty*, at 79.

Thirdly, the attribution of civil liability for the beheadings of Olin Eugene "Jack" Armstrong and Jack L. Hensley does not require an "initial policy determination of a kind clearly for nonjudicial discretion".  Indeed, "in adjudicating this suit, the Court will be honoring precisely the 'policy determination' that 'nonjudicial' (i.e., political) officials made when they enacted 28 U.S.C. § 1605(a)(7)." *Beaty*, at 78.

Factors four through six also counsel against application of the political question doctrine.  "*Baker* factors four through six would only be applicable if 'judicial resolution of a question would contradict prior decisions taken by a political branch in those limited contexts where such contradiction would seriously interfere with important governmental interests.'" *Presbyterian Church of Sudan*, 244 F. Supp. 2d at 347 (quoting *Kadic v.*

*Karadzic*, 70 F.3d 232, 249 (2d Cir. 1995)).  There are no prior announcements by any other political branch of the United States government that would conflict with the adjudication of this case.

Syria's argument regarding the fourth, fifth and sixth factors presumes that the requirements for designating it a state sponsor of terrorism would be undercut had this Court found that Syria's support for Al Qaeda did not cause the murders at issue.  That simply is not true.  Had this Court found the proof insufficient, a finding of "no liability" would not have meant Syria was not supporting terrorism in other cases.  This Court may well have decided that Syria's support did not cause the terrible murders at issue without "impugning the Secretary of State's finding that the foreign sovereign was a state sponsor of terrorism." (Mot. to Vacate at p.38).  That Syria can identify nothing in the Memorandum Opinion that contradicts, or criticizes, decisions by another branch of the American government exposes Syria's Motion as hollow rhetoric.

"[I]t is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Kadic,* 70 F.3d at 250 (quoting *Japan Whaling Ass'n v.,* 478 U.S. at 229-30).   This mistaken political question doctrine argument forms the centerpiece of Syria's attempt to cause the Court undue anxiety about exercising its congressionally authorized jurisdiction.

The political question doctrine argument has been rejected repeatedly in cases involving the overseas murder of Americans by terrorist organizations in the Middle East and other political "hotspots".  *Simon*, 529 F.3d at 1197; *Beaty*, at 70-85; *Klieman v. Palestinian Auth.*, 424 F. Supp. 2d 153, 161 (D.D.C. 2006); *Gilmore v. Palestinian Interim Self-Government Auth.*, 422 F. Supp. 2d 96, 99 (D.D.C. 2006); *Vine v. Republic*

*of Iraq*, 459 F. Supp. 2d 10, 19-21 (D.D.C. 2006); *Biton v. Palestinian Interim Self-Government Auth.*, 310 F. Supp. 2d 172, 184 (D.D.C. 2004); *Ungar v. Palestinian Authority*, 228 F. Supp. 2d 40, 44-47 (D.R.I. 2002), *Knox*, at 448; *Klinghoffer*, at 50. Syria has not called this Court's attention to the fact that the weight of legal authority falls against it nor can Syria cite any precedent in its favor.  Certainly, Syria has given this Court no reason to depart from the reasoning of other judicial decisions where Syria's arguments have been rejected.

**V.      THE JUDGMENT OF THIS COURT IS NOT UNCONSTITUTIONALLY SUBJECT TO THE POWER OF CONGRESS OR THE PRESIDENT**

In several places, Syria seems to imply that there is a separation of powers concern found in the statutory framework that Plaintiffs' case was brought under.  (Mot. Vacate at p.29-30, 42-43).  But the D.C. Circuit conclusively settled that question in favor of Plaintiffs in *Owens v. Republic of the Sudan*.  531 F.3d 884, 888 (D.C. Cir. 2008).  As the D.C. Circuit explained in *Owens*:

> The Constitution assigns to Congress the power to define the jurisdiction of the lower federal courts. This power derives from Congress's power in Article I "[t]o constitute  tribunals inferior to the Supreme Court," U.S. CONST. art. I, § 8, and in Article III to "ordain and establish" inferior courts, U.S. CONST. art. III, § 1. *See Kline v. Burke Constr. Co.,* 260 U.S. 226, 233-34, 43 S. Ct. 79, 67 L. Ed. 226 (1922) (holding that lower federal courts derive their "jurisdiction wholly from the authority of Congress . . . provided it be not extended beyond the boundaries fixed by the Constitution"); *Fair Assessment in Real Estate Ass'n v. McNary,* 454 U.S. 100, 125, 102 S. Ct. 177, 70 L. Ed. 2d 271 (1981) (Brennan, J., concurring in the judgment); *Belhas,* 515 F.3d at 1282-83. Congress may exercise its power to define the lower courts' jurisdiction through its legislative authority. U.S. CONST. art. I, § 8 (The Congress shall have power . . . [t]o make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the government of the United States . . . .").

*Id.* Congress' delegation of fact finding decisions to the Executive in 28 U.S.C. §
1605(a)(7) and 28 U.S.C. § 1605A relied upon the Presidency's foreign relations powers
and was bound by intelligible principles, which confirm the constitutionality of the
statutes. *Id.* at 888-91.

Syria claims an unlawful impairment to the finality of judgments rendered under
28 U.S.C. § 1605(a)(7) or 28 U.S.C. § 1605A. Yet Syria cites not a single case that
supports this proposition. (Mot. Vacate at p.44-45). Syria cites *Hayburn's Case*, 2 Dall
(2 U.S.) 409 (1792), for the principle that "Federal constitutional courts act only on cases
and controversies and do not give advisory opinions." *McGrath v. Kristensen*, 340 U.S.
162, 167 (1950) (citing 2 U.S. 409, 410 (1792)). Indeed, *Hayburn's Case* held that where
"[n]o application has yet been made to the court, or to ourselves individually" . . . "we
have had some doubts to the propriety of giving an opinion in a case which was not yet
come regularly and judicially before us." 2 U.S. 409, 410 (1792). This concern is absent
in this case, which is properly before the Court after being filed by Plaintiffs under
Article III jurisdiction, 28 U.S.C. § 1605(a)(7) and later 28 U.S.C. § 1605A.

Syria also cites *McGrath v. Kristensen* for the proposition that there should be
some concern regarding the finality of the judgments rendered under 28 U.S.C. §
1605(a)(7) or 28 U.S.C. § 1605A. Syria's reliance is misplaced. In *McGrath*, the
Supreme Court actually rejected a challenge to its jurisdiction to rule upon the case
before it. 340 U.S. 162, 167 (1950). While the Supreme Court ruled that the Voting
Rights Act did not apply to the case before it in *Connor v. Johnson*, the Court made a
ruling on other grounds: "A decree of the United States District Court is not within reach
of Section 5 of the Voting Rights Act. However, other reasons lead us to grant the motion

to the extent indicated below."  402 U.S. 690, 691 (1971).  This case does not seem to support any of Syria's implications about separation of powers concerns or about the finality of the judgment in this case.

## CONCLUSION

Syria has failed to carry its legal burden of showing that the final judgment in this case is void for lack of jurisdiction.  Syria has neither articulated any grounds that would justify relief under Fed. R. Civ. P. 60(b)(4) nor asserted any grounds in support for relief under Fed. R. Civ. P. 60(b)(6).  For the foregoing reasons, Plaintiffs respectfully request that the Court DENY Syria's Motion to Vacate in its entirety.

DATED: June 12, 2009                    Plaintiffs, by their attorneys

**/s/ Steven R. Perles**
Steven R. Perles (No. 326975)
Edward MacAllister (No. 494558)
THE PERLES LAW FIRM, PC
1146 19th Street, NW, 5th Floor
Washington, DC 20036
Telephone: 202-955-9055
Telefax:     202-955-3806

Roy Barnes (GA Bar #039000)
John Salter (GA Bar #623325)
The Barnes Law Group
P.O. Box 489
Marietta, Georgia 30061
Telephone:     770-419-8505
Telefax:         770-590-8958

Attorney for Plaintiffs